# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

KAMINA PINDER and          :
SCOTT SIGMAN,           :
                     : CIVIL ACTION FILE NO.
    Plaintiffs,       : 1:12-cv-03300-WSD-JSA
                     :
v.                     :
                     :
JOHN MARSHALL LAW SCHOOL, LLC :
and JOHN MARSHALL LAW SCHOOL,  :
                     :
    Defendants.      :

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs Kamina Pinder ("Pinder") and Scott Sigman ("Sigman") bring this action against John Marshall Law School, LLC and John Marshall Law School under the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"), the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), and for breach of contract.

## I.    STATEMENT OF FACTS[1]

Until July 31, 2011, Plaintiffs were highly qualified professors at John Marshall Law School ("JMLS"), and were loved by their students and respected by

---

[1]    Plaintiffs hereby incorporate by reference their Statement of Material Facts as to Which There Exist Genuine Issues to be Tried (Doc. 66-1) as if set forth in its entirety herein.

their peers.  (Deposition of Robert D'Agostino ("D'Agostino Dep.") 47:20-23, 52:5-7, 52:8-11, 56:25-57:5, 79:8-80:13; Deposition of Helen de Haven ("de Haven Dep.") 23:13-20, 43:2-44:6, 44:23-45:11, 46:10-47:23; Deposition of Michael Markovitz ("Markovitz Dep.") 40:11-17; Pl. Exs. 160, 161; Deposition of Andrea Doneff ("Doneff Dep.") 67:1-70:15; Deposition of Kevin Ross ("Ross Dep.") 177:13-178:2.)  Both had records of exemplary performance, service, and scholarship.  (*Id.*)  On June 14, 2010 JMLS renewed both professors' one-year term contracts for the 2010-2011 academic year, to run from August 1, 2010 through July 31, 2011.  (Pl. Exs. 85, 140; D'Agostino Dep. 47:20-23; 52:5-7; de Haven Dep. 23:13-20, 43:2-44:6, 44:23-45:11; Markovitz Dep. 40:11-17.)  Pinder was one year away from eligibility to become a tenured JMLS professor, and was by all accounts going to obtain tenure.  (D'Agostino Dep. 57:10-14; de Haven Dep. 99:12-21; Ross Dep. 177:13-178:2.)

In the summer of 2010, Pinder, an African American woman, approached JMLS Dean Richardson Lynn ("Lynn"), Director of Academic Support Kimberly D'Haene ("D'Haene"), Dean of Students Sheryl Harrison ("Harrison"), Director of Legal Skills Plaintiff Scott Sigman, and the former Associate Dean Kathleen Burch ("Burch") and told them of her idea for a summer preparation program for incoming law students.  (Pinder Dep. 125:23-126:5, 190:17-191:3, 192:7-9,

2

252:15-253:18, 270:20-271:14; Pl. Ex. 166.)   She also approached Dr. Michael Markovitz ("Dr. Markovitz"), the owner of JMLS, with her idea, and Dr. Markovitz replied, "why not make the program your own?"  (Pinder Dep. 240:1-17, 258:20-259:3, 260:3-13, 271:15-19; D'Agostino Dep. 49:23-50:20; Doneff Dep. 107:4-16; Markovitz Dep. 36:6-21.)   Having received Dr. Markovitz's blessing and permission, Pinder and Sigman began organizing a one-week summer preparation program called Law School Advantage ("LSA").  (Pinder Dep. 273:5-14; Pinder Decl. ¶ 6; Sigman Decl. ¶ 8.)

Pinder was an outspoken professor who on multiple occasions complained about racial discrimination against her during the course of her employment at JMLS.  (Pl. Exs. 3, 25, 98; Pinder Dep. 121:6-22, 146:7-148:18, 149:17-150:12; D'Agostino Dep. 47:20-25, 48:14-17; Deposition of Andrea Doneff ("Doneff Dep.") 111:24-113:11; Markovitz Dep. 55:21-57:8, 61:3-62:8; Ross Dep. 41:13-42:4, 67:14-71:11; de Haven Dep. 20:1-21:3; Harris Dep. 46:13-49:3, 52:13-16, 52:17-53:23, 68:7-69:7, 73:13-20, 138:5-139:8.)   Pinder often spoke of race discrimination at the law school, including in pay disparities and as it related to the disproportionate number of white and/or white male tenured professors at JMLS. (*Id.*)  Pinder pointed out that as of Spring 2011, no African American had ever been granted tenure at JMLS.  (D'Agostino Dep. 46:14-18; de Haven Dep. 35:14-

36:17; Doneff Dep. 80:18-81:11; Pl. Ex. 180; Markovitz Dep. 89:13-91:23; Ross Dep. 94:17-24; Pinder Decl. ¶3.)

Sigman, who is white, was also an outspoken professor who on multiple occasions complained about apparent gender and/or race based discriminatory treatment of students and himself. (Van Detta Dep. 106:21-107:18; Harris Dep. 113:20-114:14, 115:3-9.) On March 1, 2011 Sigman met with Dean Lynn and complained specifically about gender and racial bias against himself and JMLS students, including disparate treatment of white male students by a black professor at the law school, which he explained was consistent with that professor's treatment of Sigman. (Sigman Dep. 159:8-160:14, 161:1-4, 161:18-22; Lynn Dep. I 72:18-74:5, 211:21-212:8; de Haven Dep. 72:10-16.)

On March 3, 2011 Lynn met with Pinder and Sigman separately and suddenly terminated their employment. (Pl. Exs. 91, 151, 164; Pinder Dep. 243:2-9; Sigman Dep. 232:9-15; de Haven Dep. 137:1-8.) The reason given for their terminations was the LSA business they were starting together. (Pl. Exs. 91, 151.) Pinder and Sigman violated no Faculty Handbook provisions when they started LSA, and had permission from the owner of JMLS, Dr. Markovitz, to start the business. (Pl. Ex. 1; Harris Dep. 87:1-88:22, 91:3-92:1; Ross Dep. 87:21-88:12; Markovitz Dep. 36:6-21.) However, in late 2012, Kathleen Burch, a white

professor at JMLS who did not engage in protected activity, started a for-profit bar exam tutoring business that is *virtually identical* to Pinder and Sigman's business, without prior permission, and has not been terminated.  (Burch Dep. 13:18-24, 36:16-22; Pinder Dep. 194:20-23.)   Indeed, Lynn acknowledged the disparate treatment that Pinder and Sigman suffered at his hands on February 18, 2013, when he wrote to Professor Burch:

> **Kathe, when you spoke to me about the bar prep business, I was focused on doing anything that you wanted to do, but it has been pointed out to me that I may have acted inconsistently compared to Sigman and Pinder.  Now that has been raised, I'm not sure how to distinguish the two situations.**

(Lynn Dep. 240:19-241:12; Pl. Ex. 191 (emphasis added); Burch Dep. 75:3-10.)

Pinder was also given two additional reasons for her termination.  (Pl. Ex. 91.)  Despite giving Pinder and Sigman "for cause" reasons for their termination, Lynn characterized their terminations as "nonrenewals" rather than "dismissal for cause" -- admittedly  in order to prevent Pinder and Sigman from being able to appeal their terminations pursuant to the provisions in the Faculty Handbook.  (Pl. Ex. 164; Markovitz Dep. 49:7-20.)  Lynn confirmed this in a March 2, 2011 email correspondence to Dr. Markovitz:

> **[R]ather than fire Kamina and Scott for cause, I have decided to notify them that their contract will not be renewed, as I am doing with Profs. Marbes and Butts.  The faculty handbook has a lot of process for firing for cause, including an appeal to the Retention,**

> **Promotion & Tenure Committee, before an appeal to you…non-renewal will [be] easier and reduces, but does not eliminate, the threat of litigation.  It will cost one more month of pay, since they're entitled to six months notice of non-renewal…**

(Pl. Ex. 164; Markovitz Dep. 49:7-20 (emphasis added).)

Pinder and Sigman did, in fact, attempt to appeal the decisions, but the Retention, Promotion, and Tenure Committee ("RPTC") and the Board of Directors rubber stamped the Dean's actions with little to no explanation or information.  (Pl. Exs. 1, 99, 107,164; Ex. "A" (JMLS6080-81); Markovitz Dep. 76:4-77:22; Ross Dep. 126:6-128:16, 151:23-155:15, 171:2-173:11.)  Indeed, Lynn sought to and did directly influence the decision of both bodies by emailing the RPTC limited information and hiding evidence, including Plaintiffs' Exhibit 164, from the Board of Directors.  (Pl. Exs. 153, 164; Ross Dep. 171:2-173:11.)  Had he allowed them to appeal his decision, Lynn's real reason for their terminations -- Pinder's race and Sigman's protected activity -- may have come to light.

In addition to discriminatorily terminating Pinder because of her race and terminating Sigman in retaliation for engaging in protected activity, Lynn breached Plaintiffs' one-year employment contracts by misapplying the terms of the Faculty Handbook in order to circumvent Plaintiffs' due process rights, failed to follow the proper procedures for dismissal for cause, and failed to follow appropriate procedure regarding non-reappointment.

6

## II.   PLAINTIFFS' RACE, RETALIATION, AND BREACH OF CONTRACT CLAIMS SURVIVE SUMMARY JUDGMENT

Summary judgment is appropriate only when no genuine issue of material fact exists.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). At the summary judgment stage, this Court "may not weigh conflicting evidence or make credibility determinations of [its] own.  If the record presents disputed issues of fact, the court may not decide them; rather, [it] must deny the motion and proceed to trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. June 11, 2012) (*citing FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011)).

In this case, issues of material fact overwhelm any argument for summary judgment.  Of course, the Court is bound to accept the truth of Plaintiffs' testimony and view the evidence and draw all inferences in a manner most favorable to them as the non-movants.  *Adickes v. Kress*, 398 U.S. 144, 157 (1970); *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143 (2000) (court "must disregard all evidence favorable to the [defendant] that the jury [is] not *required* to believe.") (emphasis added); *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).  Here, Plaintiffs' testimony and the inferences to be drawn from the stark differences in treatment between them and white professors, or professors who did not engage in protected activity, demand denial of Defendants' motion and a trial on the merits.

### A. Pinder Was Discriminated Against and Terminated Because of Her Race in Violation of Title VII and § 1981

Courts employ the same analytical framework in evaluating claims brought under § 1981 as they do in evaluating claims brought under Title VII. *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998). Absent direct evidence of discrimination, a plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 504 (1993); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). In a case alleging discriminatory discharge or termination, the plaintiff may accomplish this by showing that: (1) she is a member of a protected class; (2) she was qualified for the position from which she was terminated; (3) she was terminated; and (4) a similarly situated employee who was not a member of her protected class engaged in comparable conduct and was not discharged. *Williams v. Motorola, Inc.,* 303 F.3d 1284, 1294 (11th Cir. 2002); *Coutu v. Martin County Bd. of County Comm'rs,* 47 F.3d 1068, 1073 (11th Cir. 1995). "Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination." *Holifield v. Reno,* 115 F.3d 1555, 1562 (11th Cir. 1997); *Boex v. OFS Fitel, LLC*, 339 F.Supp.2d 1352, 1360 (N.D. Ga. 2004).

Defendants challenge only the fourth element of Pinder's *prima facie* case and contend that Pinder cannot show that a similarly situated employee was

involved in or accused of the same or similar conduct and was disciplined in different ways.[2]  Doc 57-2, "Def. Br." at p. 8.  Defendants completely ignore Kathleen Burch, a JMLS professor who engaged in (and is currently engaged in) a business venture *almost identical* to Plaintiffs' LSA business.  (Burch Dep. 13:18-24.)  Burch's Bar Prep business is a bar exam tutoring course (LSA was a pre-law school tutoring course) allegedly for students who fail the Georgia State Bar on the first attempt.  (Burch Dep. 13:18-24, 100:25-101:5; Pl. Exs. 192, 204.)  In fact, as late as February 2013, during discovery in the instant action, Dean Lynn could not distinguish the two businesses -- he wrote to Burch:

> **Kathe, when you spoke to me about the bar prep business, I was focused on doing about anything that you wanted to do, but it has been pointed out to me that I may have acted inconsistently compared to Sigman and Pinder.  Now that has been raised, I'm not sure how to distinguish the two situations.**

(Pl. Ex. 191 (emphasis added).)  As such, Pinder has identified a white professor who engaged in almost identical conduct and was not terminated by Dean Lynn.  (Burch Dep. 36:16-22.)  Pinder therefore has established the fourth element of her *prima facie* case of race discrimination.[3]

Defendants appear to argue that Sigman is Pinder's comparator who was

---

[2]  Except, of course, Sigman.  Plaintiffs address this issue below at p.10-11.)
[3]  Defendants set forth the same pretextual reasons for both of Plaintiffs' terminations.  Therefore, Plaintiffs jointly address the pretextual nature of their terminations below at Section C, p. 19-27.

terminated for engaging in the same conduct. However, this argument would lead to the illogical conclusion that employers could discriminatorily and/or retaliatorily terminate multiple employees, giving the same blatantly pretextual reason, and defeat any claims of discrimination. If this were the law, then a defendant could make up a transparently bogus reason for terminating two individuals, or more, for different discriminatory reasons (for example race and sex) but because the comparators are in different protected groups, be immune from any discrimination claim. Moreover, because Pinder identified a white comparator who was treated more favorably than she -- Professor Burch -- Sigman is not an appropriate comparator in this instance. *See, e.g. Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642 (6th Cir. 2012) ("given the four similarly situated male employees who were not terminated based on similar conduct, MGM cannot defeat the inference of a discriminatory motive with one comparator who was treated similarly"); *see also Loesch v. City of Philadelphia*, No. 05-cv-0578, 2008 WL 2367310, *5 (E.D. Pa. June 4, 2008). As such, Pinder, has adequately set forth evidence which establishes the fourth element of her *prima facie* case.[4]

## B. Scott Sigman Was Terminated Because of His Complaints of Discrimination

Sigman has set forth evidence on which a reasonable jury could base a

---

[4] Of course, the same argument applies to the pretextual reason given to Sigman.

decision finding that he was retaliated against because of his complaints of discrimination.   To establish a *prima facie* case of retaliation "a plaintiff must show that (1) [he] engaged in statutorily protected expression; (2)[he] suffered an adverse employment action; and (3) the adverse action was causally related to the protected expression." *Tucker v. Talladega City Sch.*, 171 F. App'x 289, 296 (11th Cir. 2006).   Defendants may respond to Sigman's *prima facie* case by providing a legitimate, non-discriminatory reason for the adverse action.  *Id.*  Sigman may then overcome this proof by demonstrating pretext, *i.e.*, that the Defendants' "reasons were not what actually motivated its conduct."  *Id.*

In arguing that Sigman fails to state a claim of retaliation, Defendants ignore undisputed testimony and extensive evidence proffered regarding retaliation in response to Sigman's complaints of race and gender discrimination at JMLS. Sigman has established every element of his *prima facie* case of retaliation.

"In the employment context, the same substantive analysis applies to § 1981 and Title VII claims of retaliation."  *Williams v. Waste Management, Inc*., 411 Fed. Appx. 226, 229 (11th Cir. 2011) (*citing Turner v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1060 (11th Cir. 1994)).   A plaintiff "may bring a § 1981 claim…for retaliation due to his opposition to race discrimination." *Tucker v. Talladega City Schools*, 171 Fed. Appx. 289, 294 (11th Cir. 2006) (*citing Pinkard v. Pullman-*

*Standard*, 678 F.2d 1211, 1229 (5th Cir. Unit B 1982)).  Section 1981's cause of action for retaliation includes retaliation for a plaintiff's opposition to race discrimination, whether or not he personally is the victim of that race discrimination. *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1007 (11th Cir. 1997).

> 1.   Sigman engaged in protected activity under both Title VII and Section 1981.

On March 1, 2011, Sigman complained to Lynn about racial and gender discrimination against both himself and students.  (Sigman Dep. 159:21-160:14, 161:1-4; 161:18-22.)  Specifically, Sigman complained about "gender and racial bias against [him] and students and us[ed] supporting information [about grading biases] that [he] believed supported [his] complaint.  (Sigman Dep. 159:8-14; Lynn Dep. I, 72:18-74:5, 211:21-212:8.)  Sigman told Dean Lynn that Butts's "disparate treatment of white male students was consistent with the disparate treatment of" him.  (Sigman Dep. 159:23-160:1; Lynn Dep. I, 72:18-74:5, 211:21-212:8.)

Sigman further told Lynn on March 1 that "the pattern of altering grades for minority females was consistent with [his] treatment by Ms. Butts that [he] had attempted to get remedied through numerous channels, and that [he] wanted it to stop both on [his] behalf and the students."  (Sigman Dep. 160:9-14.)  Sigman also complained to Lynn that Butts was putting him in a hostile work environment and

complained repeatedly, both in writing and verbally, that Butts was favoring African Americans and women in her grading and other policies and that her biased behavior against white male students was consistent with her biased behavior against Sigman, a white male.  (Sigman Dep. 159:21-160:14, 161:1-4, 161:18-22.) [5]  Sigman has thus set forth enough evidence to establish that he did, in fact, complain about discrimination against himself as well as against students and that he has a reasonable belief that the conduct that he complained of was illegal.  *Orquiola v. National City Mortg. Co.*, 510 F. Supp. 2d 1134, 1156-57 (11th Cir. 2007) (plaintiff "need not prove  the underlying claim of discrimination which led to" his protest) (citing *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997).

a.    Sigman engaged in protected activity under § 1981.

While Title VII and § 1981 follow the same analytical framework, Section 1981 is broader in that it covers complaints unrelated to "employment."  *See Gratz v. Bollinger*, 539 U.S. 244, 276 (2003) (Section 1981 was meant to "proscribe discrimination in making or enforcement of contracts against, or in favor of, any race.").  It is well settled that retaliation claims under § 1981 include claims by an

---

[5]    Dean Lynn did conclude that Professor Sigman's complaints regarding Professor Butts giving race and gender biased grade bumps appeared to be true. (Lynn Dep. I 211:21-212:8.)

individual, whether black or white, who suffers retaliation because he has tried to help a different individual suffering racial discrimination.  *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008) (holding that § 1981 "encompasses a complaint of retaliation against a person who has complained about a violation of another person's contract-related 'right'").  The Georgia Court of Appeals "has held that private universities in Georgia formed contracts with their students via the student handbook issued during the student's enrollment." *Barnes v. Zaccari*, 757 F. Supp. 2d 1313, 1335 (N.D. Ga. 2010); (affirmed in part, reversed in part and remanded on other grounds); *see also Morehouse College, Inc. v. McGaha*, 277 Ga. App. 529 (2005) (recognizing the breach of contract was Morehouse's failure to abide by the hearing procedures in its student handbook); *Kuritzky v. Emory University*, 294 Ga. App. 370 (2008); *Gratz*, 539 U.S. 276.

Sigman complained about race and gender discrimination against JMLS students (in addition to discrimination against himself).  (Sigman Dep. 159:8-160:14,   161:1-4,   161:18-22;   Lynn   Dep.   I,   72:18-74:5,   211:21-212:8.) Accordingly, Sigman's complaints of race and gender discrimination constituted protected activity under § 1981.

      b.     Sigman engaged in protected activity under Title VII.

In addition to complaining about discrimination against students at JMLS,

Sigman complained about discriminatory treatment against himself.  (Sigman Dep. 159:8-160:14,  161:1-4,  161:18-22;  Lynn  Dep.  I,  72:18-74:5,  211:21-212:8.) Defendants' reliance on case law is misplaced.  In *Little v. United Technologies, Carrier Transicold Div.*, 103 F.3d 956 (11th Cir. 1997), the court acknowledged that even if the actions complained about are not in fact an unlawful employment practice, "he nonetheless can make out a *prima facie* case by showing that he reasonably believed that he was opposing a violation of Title VII by his employer." *Id.* at 960.  In the end, the court found that the plaintiff did not reasonably believe the plaintiff was engaging in protected activity because he complained about an isolated  racially  offensive  comment  about  a  coworker,  eight  months  after  the comment occurred, and never to a supervisor or management-level employee of the  company.   *Id.*   As  such,  *Little*  is  completely  factually  dissimilar  and inapplicable to the instant motion.

In their Brief, Defendants completely ignore Sigman's testimony critical to his retaliation claim.  Def. Br. at p. 11-18.  Defendants characterize Sigman's complaints, set forth in part above, as simply "what Mr. Sigman perceived to be grade discrimination against law students."  Def. Br. at p. 12.  This is simply not true.  As noted above, Sigman complained *both* about discrimination against himself and about discrimination against JMLS students.  See *supra* Sections I and

B(1).  As such, Defendants' reliance on *Holt v. Lewis*, 955 F. Supp. 1385, 1387 (N.D. Ala. 1995), is also misplaced.  In *Holt*, the Plaintiff, a professor, merely assisted a female student with a discrimination complaint.  955 F. Supp. at 1386. The court noted that "[w]ithout more, any retaliation by defendants for plaintiff's advocacy of a student's rights is simply not prohibited by Title VII."  *Id*. at 1388. Accordingly, *Holt* is completely factually distinguishable because Sigman actually complained to Dean Lynn regarding discrimination against JMLS students. See *supra* Sections I and B(1).

Defendants try to completely obfuscate the record by asserting that Sigman earlier complained about Ms. Butts and alleged that she put him in a "hostile work environment."  Def. Br. at pp. 13-16.  While this exchange did take place, it is not the sole basis for Sigman's retaliation claim.   Rather, Sigman testified that he clearly complained to Lynn about both discrimination against him *and* discrimination against JMLS students.  See *supra* Sections I and B(1).  Lynn does not dispute that Sigman may have complained that he was being discriminated against.  (Lynn Dep. I, 72:18-74:5.)   As such, Sigman has set forth sufficient evidence that he engaged in protected activity under § 1981 and Title VII.

       c.    Sigman's complaints were the "but for" reason for his termination.

Timing is an issue of paramount importance in this case, and one with

respect to which Defendants have again totally mischaracterized the testimony of Lynn and others.  Sigman can demonstrate that he would not have been terminated but for Lynn's retaliation against him in response to his complaints of discrimination.  *See Univ. of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (holding but-for method of proof applies in Title VII retaliation cases).  On February 14 or 15, Michelle Harris brought the Facebook page of LSA to the attention of Dean Lynn.  (Harris Dep. 81:23-82:11; Lynn Dep. I, 221:13-19.)  Lynn and Michelle Harris spoke about LSA, and at no point during the conversations about LSA did Lynn say he was not going to renew Pinder and Sigman's contracts.  (Harris Dep. 92:16-19, 93:19-94:9.)  Lynn also testified that he spoke with Dr. Markovitz "within a day or two" of learning of LSA, *i.e.* no later than February 17.  (Lynn Dep. I, 222:9-13.)  Lynn now asserts in his Affidavit that he had dinner with Dr. Markovitz on February 23 and that the two discussed terminating Pinder and Sigman.  (Lynn Aff. ¶ 23.)  However, this "fact" is strikingly absent from Lynn's deposition testimony, where he was asked about any conversation regarding termination of Pinder and Sigman and yet failed to mention this alleged February 23 dinner.  (Lynn Dep. I, 222:9-13.)

It was not until March 2, one day after Professor Sigman complained to Lynn about gender and race discrimination at JMLS, that Lynn for the first time

mentioned termination:

> **[R]ather than fire Kamina and Scott for cause, I have decided to notify them that their contract will not be renewed, as I am doing with Profs. Marbes and Butts.  The faculty handbook has a lot of process for firing for cause, including an appeal to the Retention, Promotion & Tenure Committee, before an appeal to you…non-renewal will [be] easier and reduces, but does not eliminate, the threat of litigation.  It will cost one more month of pay, since they're entitled to six months notice of non-renewal…**

(Pl. Ex. 164; Markovitz Dep. 49:7-20 (emphasis added.))   Until his complaint on March 1, there is no evidence whatsoever that Sigman was in danger of termination.  His performance was exemplary, he excelled in his positions, and he was loved by students and his fellow faculty members alike.  (D'Agostino Dep. 52:8-11, 56:25-57:5, 79:8-80:13; Pl. Exs. 160, 161; de Haven Dep. 46:10-47:23; Doneff Dep. 67:1-70:15, 76:24-77:17, 97:18-98:18; Markovitz Dep. 40:11-17; Ross Dep. 177:13-178:2, Sigman Dep. 74:17-76:24, Exs. 28, 29.)   As such, the credible evidence shows that but for Lynn's retaliatory decision in response to Sigman's complaints of discrimination, Sigman would not have been terminated.

>        2.        JMLS terminated Sigman because of his protected activity.

Sigman complained to Lynn on March 1, 2011.  (Sigman Dep. 159:21-160:14, 161:104, 161:18-22.)  Lynn told Dr. Markovitz on March 2 that he planned to terminate Sigman's employment.  (See supra Pl. Ex. 164; Markovitz Dep. 49:7-20.)  Lynn did not actually testify that he decided to terminate before March 2 -- he

testified that he spoke with Markovitz and Michelle Harris about LSA a couple of days after he learned about "the business,"  completely omitting that he had allegedly decided to terminate them or communicated that to Markovitz.  (Lynn Dep. I, 222:9-13; Harris Dep. 92:16-19, 93:19-94:9.)   Contrary to Defendants' characterization of Lynn's testimony, it is *not at all clear* when Lynn decided to terminate Pinder and Sigman.   As such, Sigman has produced evidence that requires a fact finder to weigh the credibility of each party's testimony and summary judgment as to his retaliation claims must be denied.

### C.    Evidence of Pretext As to Both Pinder and Sigman

Pinder and Sigman may establish pretext "indirectly by showing that the employer's proffered explanation is unworthy of credence." *Goldstein v. Manhatten Industries Inc.*, 758 F.2d 1435, 1445 (11th Cir. 1985) (*citing Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256 (1981)); *see also Aka v. Wash. Hosp. Ctr.,* 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) (holding that plaintiffs are not "presumptively required to submit evidence over and above [evidence of pretext] in order to avoid summary judgment…[t]he jury can conclude that an employer who fabricates a false explanation has something to hide; that 'something' may well be discriminatory intent."); *Colbert v. Tapella*, 649 F.3d 756, 759 (D.C. Cir. 2011).   Here, both Pinder and Sigman have

demonstrated pretext.   Plaintiffs demonstrate below that Defendants' inconsistencies, incoherencies, and contradictions could lead a reasonable jury to determine that the reasons for their terminations were pretextual.   *See Vessels v. Atlanta Indep. Sch. Sys.,* 408 F.3d 763, 772 (11th Cir. 2005). "If a person is shown to be a liar in an outrageous manner or is shown to have lied about a number of issues, the inference that the person is *non-credible,* and should not be believed as to other issues, is a reasonable one." *Chapman*, 229 F.3d at 1051.  Plaintiffs can also show that each of Defendants' alleged reasons for their terminations are unworthy of credence.

Defendants give the following reason for Pinder and Sigman's termination: "engaging in an outside business that created possible conflicts of interest and used the Law School's name and facilities to create the business, all without seeking and obtaining permission from the Dean."  Def. Br. at p. 9.  Defendants give additional, albeit flimsy reasons for Pinder's termination, namely, that she failed to hold a make-up class and failed to explain a proposal she made for an amendment to the Faculty Handbook.  Def. Br. at p. 6.  There is sufficient evidence for a jury to disbelieve every single one of Defendants' explanations.   Pinder and Sigman address Defendants' pretextual reasons in turn.

1.     Other professors engaged in outside businesses, used the Law School's name and facilities in connection with the businesses, and did not seek permission from Lynn -- but were not terminated.

Defendants argue that LSA could have created a conflict of interest and that Pinder knew this to be the case when she began LSA.  Nothing could be further from the truth.  In 2008, Pinder asked Dean Lynn whether privately tutoring current students would be an ethical conflict of interest.  (Pinder Decl. ¶ 4.)  Dean Lynn responded that it might be odd but that such a program would not pose a conflict with her job at the law school.  (Pinder Decl. ¶ 5.)  When she actually started LSA in 2010, she was never concerned that LSA could conflict with her teaching at JMLS or the Faculty Handbook.  (Pinder Dep. 193:5-19, 254:10-255:7; 260:3-13; Pinder Decl. ¶ 4, 8.)[6]

LSA would not have conflicted with Pinder and Sigman's positions at JMLS.  (Pinder Decl. ¶ 4-5, 8-14; Sigman Decl. ¶ 7-11, 13-16.) LSA was to be taught during the summer, when Pinder and Sigman had no teaching obligations to JMLS. (Pinder Decl. ¶ 11; Sigman Decl. ¶ 13.)   LSA would not have obligated

---

[6]     Pinder did testify that she thought the March 3 meeting would be negative -- but that was not due to any fear that LSA posed any conflict.  Rather, Pinder testified that she believed the meeting could be negative because Dean Lynn did not want to see her get tenure and "had been wanting to get rid of [her] for a while."  (Pinder Dep. 251:5-20, 254:10-255:7, 257:12-259:3.)

Pinder or Sigman to spend more than ten hours a week on their business. (Pinder Decl. ¶ 9; Sigman Decl. ¶ 10.) LSA would not have conflicted with the first-year orientation program. (Pinder Decl. ¶ 12; Sigman Decl. ¶ 14.) JMLS did not have a similar program in its curriculum. Finally, first-year courses were blind graded and as such, Pinder or Sigman could not give preference to JMLS students who took their course. (Pinder Decl. ¶ 14; Sigman Decl. ¶ 16.)

The LSA program actually would have been beneficial to both JMLS and its incoming students because JMLS students are "not usually coming in as well educated or with the same writing and reading skills" and because "anything that helps students perform better at any point of the process is beneficial to a school." (de Haven Dep. 74:25-75:25; Ross Dep. 73:3-18, 81:10-82:8.)

Defendants' argument boggles the mind given the fact that Lynn allowed Kathleen Burch to start a bar exam tutoring business, which clearly created a conflict with the school's contract with the Kaplan bar review program.[7] (Burch

---

[7] For example, Burch's bar prep business poses a direct conflict with the law school's contract for bar exam prep with Kaplan because students who are forced to pay for Kaplan in their JMLS tuition may instead feel pressure to take the Burch Bar Review course. (Harris Dep. 131:2-16, 145:6-23; Lynn Dep. I, 231:5-235:5, 236:4-238:6, Burch Dep. 16:25-17:13, 18:24-19:11.) Additionally, Burch testified that her course is for students who fail the bar exam on the first try (although she does not advertise as much). Accordingly, Burch could benefit from doing a poor job in teaching students -- leading to their failing the bar exam and being offered her prep course – creating an obvious and egregious conflict with her JMLS duties.

Dep. 16:25-17:13, 18:24-19:11; Harris Dep. 131:2-16, 145:6-23.)  Notably, Burch only profits from her bar review course if students taught by her at JMLS fail the Bar Exam.  (Lynn Dep. I, 231:5-235:5, 236:4-238:6.)  Moreover, Burch's Bar Review course is virtually identical to LSA, a fact that Lynn acknowledged as late as February 18, 2013:

> **Kathe, when you spoke to me about the bar prep business, I was focused on doing anything that you wanted to do, but it has been pointed out to me that I may have acted inconsistently compared to Sigman and Pinder.  Now that has been raised, I'm not sure how to distinguish the two situations.**

(Pl. Ex. 191.)  Clearly, Lynn's self-serving claim in his deposition that he sees no conflict with Burch's bar prep business is not credible, and should not be believed. *Chapman*, 229 F.3d at 1051.  Too, his prior statement to Pinder that he saw no conflict should she start a program such as LSA belies his contention at Pinder and Sigman's terminations that the program created a conflict. (Pinder Decl. ¶ 4-5.) Thus, any alleged "conflict" is clearly pretext for Plaintiffs' terminations. *Goldstein*, 758 F.3d at 1445.  Lynn's testimony is not credible for yet another reason -- he testified that professors needed to get permission from him to start "consulting," but yet he represented to the Board of Directors that it would never have been appropriate for him to authorize a professor to start an outside business.

---

(Lynn Dep. I, 231:5-235:5, 234:17-23, 236:4-238:6.)

(Pl. Ex. 165.)  Like Plaintiffs, Burch also uses the John Marshall Law School name on advertisements for her business, but has not been terminated.  (Pl. Ex. 192.)  As such, Lynn's shifting reasons for Plaintiffs' terminations are not worthy of credence.  *Cleveland v. Home Shopping Network, Inc.,* 369 F.3d 1189, 1194 (11th Cir. 2004) (holding that evidence of pretext can include where an employer gives "shifting" reasons for an employment decision.)

Other professors also engage in outside businesses without first seeking and getting permission from the Dean, and use the Law School's name and facilities in their business pursuits.  This is undoubtedly added evidence of pretext.  (Lynn Dep. I 245:6-246:21.)  Helen De Haven did not seek permission to engage in advocacy work.  (de Haven Dep. 85:8-11.)  Andrea Doneff engages in mediation through a company, and uses JMLS's name on the company's website without having requested permission from the Dean.  (Doneff Dep. 11:10-24, 14:20-25, 114:1-115:20.)  D'Agostino and Doneff use JMLS facilities to engage in their outside businesses.  (de Haven Dep. 86:16-23; Doneff Dep. 16:8-17:18, 65:18-66:3.)  John Rapping runs a public defender training program and uses JMLS's name on his business website.  (Pl. Ex. 11; Ross Dep. 75:3-76:10.)  Rebecca Cummings is of counsel at a law firm in Atlanta in violation of the Handbook's express prohibition of serving as of counsel at a law firm, and has not been

terminated for serving as of counsel at a law firm.  (de Haven Dep. 83:20-23; Pl. Exs. 1, 10; Ross Dep. 82:24-84:6; Pinder Dep. 181:17-21.)  Jeff Van Detta teaches classes at another law school, and lists JMLS on the school's website.  (Pl. Ex. 14; Van Detta Dep. 48:1-25, 54:9-18, 208:23-209:18.)   As such, Plaintiffs have set forth myriad evidence that other professors, who were white and/or did not engage in protected activity, were not terminated and accordingly, the reasons for Plaintiffs' terminations are pretext.  Professors Kathleen Burch, Helen de Haven, Robert D'Agostino, Andrea Doneff, John Rapping, Rebecca Cumming and Jeffrey Van Detta are all white and did not engage in protected activity.   (Pinder Decl. ¶ 20; Sigman Decl. ¶ 17.)

2.     The additional reasons for Pinder's termination are pretextual.

Defendants allege that Pinder was also terminated for failing to hold a make-up class and failing to explain why she proposed an amendment to the Faculty Handbook.  Pinder did not miss a make-up class, and in fact, students actually complained that Pinder held a mandatory make up class.  (Pinder Dep. 212:10-21; Pl. Ex. 89; Harris Dep. 149:21-150:1.)  Moreover, no professor other than Pinder has been nonrenewed for failing to conduct a single make-up class, and missing a make-up class would absolutely not be a reason for termination.  (D'Agostino Dep. 90:1-6; de Haven Dep. 92:6-12.)

Defendants' additional allegation that Pinder was terminated because she did not explain her proposal to the Faculty Handbook is patently pretextual. During the 2009-2010 academic year, Pinder proposed a change to the Handbook. (Pinder Dep. 214:15-216:15; Pl. Exs. 82, 84.) The faculty voted to adopt Pinder's proposed change, but before it went before the Board of Directors, Dr. Markovitz inexplicably asked for an explanation as to why it was good for the institution. (Pinder Dep. 214:15-216:15; Pl. Exs. 82, 84.) Pinder concluded that Dr. Markovitz did not want the change and so did not send an explanation. (Pinder Dep. 214:15-216:15; Markovitz Dep. 58:23-59:12; Pl. Exs. 82, 84.) Dr. Markovitz never took issue with her lack of explanation. (Pinder Dep. 214:15-216:15; Markovitz Dep. 58:23-59:12; Pl. Exs. 82, 84.)

Moreover, Pinder's contract was renewed on June 14, 2010 -- after her proposed amendment to the Faculty Handbook and shortly after she failed to send the explanation to Dr. Markovitz. (Pl. Ex. 85; Pinder Dep. 214:15-216:15.) Additionally, Pinder informed Dean Lynn that she was not going to provide explanations and Lynn, by reply, indicated that was not a problem. (Pl. Ex. 84.) It was not until eight months later and the renewal of Pinder's contract that Lynn suddenly raised the issue for the first time in her letter of termination. (Pl. Ex. 85.) Pinder has demonstrated that the failure to have a make-up class simply did not happen, and that her not having given an explanation for the proposed amendment

26

to the Faculty Handbook was a non-issue. Pretext has been demonstrated.[8]

### D.     Breach of Contract

In Georgia, contract interpretation involves a three step analysis. *Chaudhuri v. Fannin Reg'l Hosp.*, 730 S.E.2d 425, 427 (Ga. App 2012).  "First, the trial court must decide whether the language is clear and unambiguous." *Id*.  If the language is clear, the contract alone is looked to for its meaning and is enforced accordingly. *Id*.  However, if the contract is ambiguous, the court must apply the rules of contract construction to resolve the ambiguity. *Id*.  If the ambiguity remains, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury. *Id*; s*ee also Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 774 (11th Cir. 2011); citing *Peachtree Cas. Ins. Co. v. Kim*, 236 Ga.

---

[8]     Even if Plaintiffs did not disprove each of Defendants' pretextual reasons, the Eleventh Circuit's explanation in *Chapman v. AI Transport* is instructive:

> We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.

229 F. 3d 1012, 1049 (11th Cir. 2000) (Birch, J concurring) (*quoting Fuentes v. Perskie,* 32 F. 3d 759, 764-65 (3d Cir. 1994)).

App. 689, 690 (1999); O.C.G.A. § 13–2–2(5).

Ambiguities in the language of contracts are construed against the drafter. *Alea*, 638 F.3d at 774; quoting *Certain Underwriters at Lloyd's of London v. Rucker Constr., Inc.*, 285 Ga.App. 844, 848 (2007).   Accordingly, any ambiguities in the Faculty Handbook as applied to Plaintiffs must be resolved by a jury.

     1.     Defendants improperly applied the terms of the Faculty Handbook to circumvent Plaintiffs' due process rights.

The Faculty Handbook has nine separate sections that address the general policies, terms, and procedures that apply to the employment relationship between Defendants and their faculty members. (Pl. Ex. 1.)  Article IV of the Handbook is entitled "Appointment and Separation Policies and Procedures."  (Pl. Ex. 1 at 15.) Article IV of the Handbook designates six separate avenues through which the employment relationship may come to an end. (Pl. Ex. 1 at 15-20.)  The relevant avenues for separation here include: Non-Reappointment of Probationary Appointments, Termination, and Dismissal for Cause. *Id.*

The Handbook distinguishes these sections by defining what activities fall under each category of separation. (*Id.* at § 405(a)-(f).) As a result of the different activities that prompt the different forms of separation, different due process relief is available to the faculty members depending on their category of separation. *Id.*

"Non-reappointment is different from termination and dismissal for cause."

(Pl. Ex. 1 at § 405(c)(1).)   The Handbook provides reasons for classifying a separation as a non-reappointment. They include:

> incongruity between teaching expertise of the faculty member and the educational goals of the law school; unfavorable peer evaluation of the faculty member's teaching or scholarship which make promotion or the award of tenure unlikely; or unfavorable evaluation of the faculty member's other responsibilities.

*Id*. These reasons make clear that non-reappointments are used when Defendants believe a professor is failing to meet the school's academic standards.  On the other hand, a Dismissal for Cause is used when "Adequate cause…relate[s] to the continuation of a faculty member's professional performance as a teacher or lawyer, or both." (Pl. Ex. 1 at § 405(e)).

Additionally, Article VIII of the Handbook sets out the Rights, Obligations, and Conditions of Service for faculty members.  (See Pl. Ex. 1 at 32.) Within that section, policies describing teaching loads, outside employment, professional leaves and sabbaticals, travel, conflicts of interest, and outside grants are addressed. (See Pl. Ex. 1, § 802.)  Violation of that provision falls squarely under the reasons for Dismissal for Cause which include, "violating Law School rules and policies." (See Pl. Ex. 1, § 405(e)(1)(iv).)

Following the rules of construction, the court should apply the terms of the Handbook to Defendants' proffered reason for Plaintiffs' separation. *Chaudhuri*,

730 S.E.2d at 427.  Lynn informed Plaintiffs that their separation was based on a *possible* conflict of interest with the school as a result of Plaintiffs business. (*See* Doc. 57-2 at pg. 19.)  After applying Defendants' reasons to the various separation categories it becomes clear that Plaintiffs' alleged misconduct falls under the Dismissal for Cause category.  *Chaudhuri*, 730 S.E.2d at 427.

Just as quickly, it becomes clear that Defendants purposely characterized Plaintiffs terminations as non-renewals to avoid "a lot of process" that comes with "firing for cause, including an appeal to the Retention, Promotion & Tenure Committee, before an appeal to [the Board]." (*See* Pl. Ex. 164.)   The stark differences between the reason given for Plaintiffs' separation and the label given by Lynn further demonstrate the purposeful breach of the Handbook to avoid the due process procedures that would have been available to Plaintiffs had their separations been properly classified as Dismissals for Cause under the Handbook. *Id*.  You can call a duck a chicken, but it is still going to quack.  And you can call a Dismissal for Cause a nonrenewal, but doing so does not magically adjust the reality of Plaintiffs' terminations.

When the facts and circumstances surrounding Plaintiffs' terminations are analyzed, it becomes evident that their terminations were actually Dismissals for Cause, and the Defendants' actions were a fraudulent effort to avoid the procedures

that would have followed.  As a result of this strategic mischaracterization, Defendants breached the Handbook's provisions and deprived Plaintiffs the due process rights that should have been made available to them.

> 2.   Defendants breached the Faculty Handbook by failing to follow the proper procedures for Dismissal for Cause

After applying the proper provisions to Plaintiffs termination, it becomes clear that Defendants continued to breach the provisions of the Handbook.  Under the Dismissal for Cause provisions, before terminating a faculty member for cause, dismissal "should be preceded by a written admonition by the appropriate administrative officer describing the alleged problem and warning that the faculty member's appointment status is in jeopardy." (*See* Pl. Ex.  § 405(e).)  Here, no such warning occurred. (Pl. Ex. 91, 151.)  In fact, Defendants terminated Plaintiffs without any warning in an effort to avoid the required review of the decision.

Pursuant to the Handbook, Defendants should have first warned the Plaintiffs, and then should have stipulated to a period of time within which the Plaintiffs could have corrected the alleged problem, presumably by dismantling the fledgling business.  (*See* Pl. Ex. § 405(e)(3); Lynn Dep. I, 171:17-24; Sigman Decl. ¶ 12; Pinder Decl. ¶ 15.)  Here, Plaintiffs were given no time to correct the alleged issue of running LSA.  (Pl. Exs. 91, 151.)  Because the Defendants did not want to deal with "a lot of process for firing [Plaintiffs] for cause," they simply mislabeled

their termination as a nonrenewal.  (Pl. Ex. 164.)  Had Plaintiffs' terminations been properly categorized, Defendants would have had to warn the Plaintiffs and give them a chance to cure their alleged conflict of interest.

The procedures related to Dismissal for Cause are set forth in Article VII of the Handbook. (See Pl. Ex. 1 at 29.)  Specifically, Lynn is required (but failed) to refer Plaintiffs' matter to an Informal Committee of Inquiry to examine the allegations.  (*Id*. at § 702.)  Defendants failed to elect three members of the Retention, Promotion, and Tenure Committee to act as the Informal Committee of Inquiry.  The Informal Committee of Inquiry Failed to examine Plaintiffs' matters and no report on its findings was ever generated. Additionally, a faculty member who has been given written notice of dismissal for cause by Lynn has the right to a hearing before the Retention, Promotion, and Tenure Committee.  (*Id*. at § 703.) This also never occurred, and Plaintiffs were left with no option to appeal their terminations, and no option to present evidence because of the Defendants' fraudulent label.  (*See* Pl. Ex. 164).

      3.    Defendants breached the Faculty Handbook by failing to give Plaintiffs appropriate notice of their terminations

Even if this Court finds that Defendants properly labeled Plaintiffs' separation as Non-reappointments (*i.e.* nonrenewals), Defendants still breached the Handbook by failing to properly follow procedure set forth for Non-

Reappointment notices. (*See* Pl. Ex. 1 at § 405(c)(3)(iii).)   The AAUP 1940 Statement of Principles on Academic Freedom and Tenure ("1940 Statement") are incorporated by reference into the Faculty Handbook, which in turn is incorporated into Pinder's and Sigman's contracts.  (Pl. Exs. 85, 140.)  The 1940 Statement as interpreted by the AAUP's 1970 Interpretive Comments (also incorporated into Plaintiffs' contracts with JMLS) *requires* that probationary professors with more than two years of employment at a law school are entitled to one year of notice before their contracts are nonrenewed.  (Pl. Ex. 85, 140, 175, Bates Nos. P000728, P000731.)   The Faculty Handbook requires *at least* six months' notice of nonrenewal, and thus is not in conflict with the AAUP's one year notice requirement because "the language is clear and unambiguous."  *Chaudhuri*, 730 S.E.2d at 427.  Pinder and Sigman were each well beyond their second years at JMLS, their last contracts of employment with JMLS expired on July 31, 2011, and Pinder and Sigman were required to vacate their offices, turn in their keys and parking passes, and not return to JMLS after that date.[9]  (Pl. Exs. 91, 151; Pinder Decl. ¶ 16, 18; Sigman Decl. ¶ 18, 19; Markovitz Dep. 82:12-83:12.)  Also, before his termination, Sigman was offered the opportunity to teach the 2011 summer session at JMLS, which ended before July 31.  (Sigman Decl. ¶ 21.)   However, at his termination meeting, Dean Lynn instructed Sigman that he was no longer

---

[9]      Pinder has returned to the law school campus on a couple of occasions for social visits with her ex-colleagues.

eligible to do so.  (*Id*.)  This fact also sharply undercuts Defendants' contention that Plaintiffs were "employed" beyond July 31.  Therefore, Defendants breached the terms of Plaintiffs' contracts by failing to provide them with one year's notice of their termination.

Even if the AAUP notice provisions were not incorporated into Plaintiffs' employment contracts, the Faculty Handbook requires notice of non-reappointment to be given *at least* six months prior to the termination date of the faculty member if the faculty member is in the third year or beyond of a probationary appointment. *Id*.  Plaintiffs were beyond their third year of employment with John Marshall, and were thus required to receive notice of their non-renewal in writing "at least six months prior to the *termination date* of the faculty member."  *Id*.  March 3, of course, is not six months prior to their July 31 contract termination date.

Contrary to Defendants' assertion, the continuation of payment through September 2, 2011 is not a continuation of employment.  Plaintiffs' contracts for the 2010-11 academic year ran from August 1, 2010 to July 31, 2011.  After July 31, 2011 neither party had employment obligations to one another.  (Pinder Decl. ¶ 16; Sigman Decl. ¶ 19.)  Moreover, after July 31, 2011, Plaintiffs did not perform any work which could be interpreted as conferring a benefit upon the Defendants. (*Id*.)  Plaintiffs had already found jobs,[10] and they were already working for

---

[10] Although at reduced pay.  (Pinder Decl. ¶ 17; Sigman Decl. ¶ 21, 22.)

different institutions.  (Pinder Decl. ¶ 16, 18; Sigman Decl. ¶ 19, 20.)   Classes at the school had already started for the next academic year, and Plaintiffs performed zero faculty duties for John Marshall between July 31 and September, even though students were present and school was in session beginning in August 2011. (Pinder Decl. ¶ 16, 18; Sigman Decl. ¶ 18, 19.)

Thus, even if this Court finds the Defendants' characterization of Plaintiffs' separation appropriate, Defendants still violated the notice of non-appointment provisions by failing to give appropriate notice to Plaintiffs prior to their termination date.  The mere fact that the school continued to pay plaintiffs for 6 months after they gave notice was purely a recognition that they had to transform Plaintiffs terminations into a non-reappointment in an effort to avoid any due process procedures.  (See Pl. Ex. 164.)

## III.   CONCLUSION

Pinder has established her *prima facie* claim of race discrimination. Sigman has established his *prima facie* claims of retaliation. Plaintiffs have overwhelmingly demonstrated that Defendants' reasons for their termination are pretextual. Additionally, both Plaintiffs have shown every element of their breach of contract claims. For these reasons Plaintiffs respectfully request that the Court deny Defendants' motion for summary judgment.

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel certifies that the foregoing has been prepared in Times New Roman (14 point) font, as approved by the Court in LR 5.1B.

Respectfully submitted,

BUCKLEY & KLEIN, LLP

By:    */s/ Jaime L. Duguay*
Jaime L. Duguay
Georgia Bar No. 829447
jlduguay@buckleyklein.com
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleyklein.com

Promenade II, Suite 900
1230 Peachtree Street NE
Atlanta, GA  30309
Telephone:  (404) 781-1100
Facsimile:   (404) 781-1101

Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2013, I electronically filed **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

      Mary M. Brockington
      Jonathan R. Poole

                    BUCKLEY & KLEIN, LLP

            By:   <u>/s/ Jaime L. Duguay</u>
                    Jaime L. Duguay
                    Georgia Bar No. 829447
                    jlduguay@buckleyklein.com

                    Counsel for Plaintiffs