UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KAMINA PINDER and          :
SCOTT SIGMAN,              :
                          :  CIVIL ACTION FILE NO.
    Plaintiffs,           :  1:12-cv-03300-WSD-JSA
                          :
v.                        :
                          :
JOHN MARSHALL LAW SCHOOL, LLC :
and JOHN MARSHALL LAW SCHOOL,  :
                          :
    Defendants.           :

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXIST GENUINE ISSUES TO BE TRIED

Pursuant to Fed. R. Civ. P., Rule 56 and Local Rule 56, Plaintiffs Kamina Pinder ("Pinder") and Scott Sigman ("Sigman") submit this Statement of Material Facts as to Which There are Genuine Issues to be Tried.

**Plaintiff Kamina Pinder's Employment with John Marshall Law School**

1.     Kamina Pinder, an African American female, was first hired by John Marshall Law School ("JMLS") as an associate professor of legal skills on August 1, 2006, under a one year contract to run through July 31, 2007.  (Deposition of Kamina Pinder ("Pinder Dep.") 117:3-16, Ex. 2, 192:7-9.)

2.     Pinder was an excellent, highly qualified and highly contributing

1

professor and was loved by her fellow faculty and students alike.  (Deposition of Robert D'Agostino ("D'Agostino Dep.") 47:20-23, 52:5-7; Deposition of Helen de Haven ("de Haven Dep.") 23:13-20, 43:2-44:6, 44:23-45:11; Deposition of Michael Markovitz "(Markovitz Dep.") 40:11-17.)

3.    In the fall of 2006, based on her experience and credentials in teaching, Professor Pinder was encouraged by members of the faculty to apply for a tenure track position teaching doctrinal courses.  (Pinder Dep. 128:21-132:1; de Haven Dep. 23:13-20.)

4.    Subsequently, Pinder applied for a tenure track position.  (Pinder Dep. 128:21-132:1; de Haven Dep. 20:14-21:3, 23:6-20.)

5.    At that time, the Dean of JMLS, Richardson Lynn ("Dean Lynn") indicated that he made the decision regarding whether Pinder would move to the tenure track based on a "consensus."  (Pl. Ex. 6[1]; Deposition of Richardson Lynn, June 11, 2013 ("Lynn Dep. I") 82:14-83:21.)

6.    Many faculty members expressed their support for Professor Pinder's application to move to the tenure track; however, in early 2007 Dean Lynn

---

[1]    Plaintiffs utilized continuous deposition exhibit numbers, entitled Plaintiffs' Exhibits 1 through 249, during the depositions.  Many of these exhibits were introduced in multiple depositions.  For ease of reference in this Response, Plaintiffs refer to the exhibits as "Pl. Ex. __", rather than referring to every deposition in which the exhibits were used.

informed Professor Pinder that she did not have enough faculty support to switch tracks.  (de Haven Dep. 22:4-10, 23:6-20; Pl. Exs. 6, 24.)

7.     Suspicious about the real reason that Dean Lynn decided not to move her to the tenure track position, Professor Pinder questioned Dean Lynn and subsequently formally complained to him that she believed she had been discriminated against based on her race when she was not moved to the tenure track.  (Pl. Ex. 25; Deposition of Michelle Harris ("Harris Dep.") 67:3-18; Pinder Dep. 146:7-16, 149:17-150:12.)

8.     Pinder also complained that race was a factor in the Dean's decision not to move her to the tenure track to other professors, including Helen de Haven, and some agreed that Pinder's complaints sounded plausible and not farfetched. (de Haven Dep. 20:1-21:3.)

9.     Professor Pinder also drafted a report to the American Bar Association pointing out what she believed to be patterns of race-based discrimination at JMLS, and forwarded the draft report to the Owner of JMLS, Dr. Michael Markovitz ("Dr. Markovitz") copying Dean Lynn and JMLS Board of Directors member Kevin Ross.  (Pl. Exs. 25, 39; Pinder Dep.147:16-148:18; Lynn Dep. 104:19-23.)

10.     In that report, Pinder made specific reference to her concern that

decisions had been made with respect to African American faculty or potential faculty that were questionable at best and informed Dean Lynn that she contacted the ABA to report what she perceived to be biased treatment at JMLS.  (Pl. Ex. 25.)

11.     Dean Lynn took this complaint as a complaint of discrimination. (Lynn Dep. I, 87:23-89:19; Pl. Ex. 25.)

12.     Professor Pinder's complaint of discrimination was never investigated by JMLS, despite the procedures in place whereby complaints of discrimination are to be reported to Adams Keegan, JMLS's payroll and HR company.  (Harris Dep. 46:13-49:3, 52:13-16, 52:17-53:23, 68:7-69:7, 73:13-20, 138:5-139:8.)

13.     Pinder accepted a position as an associate professor of legal skills for the 2007-2008 academic year.  (Pinder Dep. 121:6-22, Ex. 3.)

14.     As a result of Professor Pinder's complaint, JMLS's Board of Directors conducted a review of the process whereby professors can apply to be moved to the doctrinal track and Dean Lynn's "consensus" process in place at the time was replaced by a formal vote by the faculty.  (de Haven Dep. 22:24-23:23; Deposition of Kevin A. Ross ("Ross Dep.") 88:13-92:3, Pl. Exs. 39, 46.)

15.     During the 2007-2008 academic year, Professor Pinder reapplied for a doctrinal position on the doctrinal staff and received a substantial majority of

positive votes.  (Pinder Dep. 145:23-146:6, 169:5-170:1; Lynn Dep I, 95:11-15.)

16.    Professor Pinder accepted a position on the doctrinal (tenured) track for the 2008-2009 academic year, but nevertheless was assigned to teach a skills class in addition to her doctrinal contracts class.  (Pinder Dep. 121:23-122:11, Ex. 4, 170:6-24.)

17.    No other doctrinal hire was assigned to teach a skills course along with a doctrinal course.  (Pinder Dep. 170:6-24.)

18.    Until fall 2011, after Pinder's termination, there were no African American tenured faculty members and there has never been an African American female tenured faculty member.   (de Haven Dep. 35:14-36:17; Deposition of Andrea Doneff  ("Doneff Dep.") 80:18-81:11; Markovitz Dep. 89:13-91:23; Ross Dep. 94:17-24.)

19.    Throughout her tenure at JMLS, Pinder complained regularly about racial bias at JMLS, including the lack of tenured professors, the dominance of white males on the faculty generally and their advantages in faculty committees, and pay disparities between black and white professors.  (Pl. Exs. 3, 25, 98, 212; Pinder Dep. 121:6-22, 146:7-148:18, 149:17-150:12, 208:6-9; D'Agostino Dep. 47:21-48:17;  Dep. 111:24-113:11; Markovitz Dep. 55:21-57:8, 61:3-62:8; Ross Dep. 41:13-42:4, 67:14-71:11; de Haven Dep. 20:1-21:3; Harris Dep. 52:17-53:23,

68:7-69:7, 73:13-20.)

20.     Other professors perceived the same race and gender disparities at JMLS as it relates to tenure, discrepancies in who holds the power amongst the faculty, class and administrative assignments, and hiring practices.  (de Haven Dep. 24:3-28:21;  Dep. 86:10-87:14.)

21.     At JMLS, "advantage and privilege is distributed according to race and sex."  (de Haven Dep. 117:18-20.)

22.     In 2006 and 2007, the faculty formed a committee to discuss the "white male advantage" and how to develop a more equal culture at JMLS.  (de Haven Dep. 32:3-34:20.)

23.     Professor Pinder was offered another position on the doctrinal track for the 2009-2010 academic year, during which time she utilized her position on the strategic planning committee to suggest several ideas for JMLS, including introducing a summer preparation program for incoming law students.  (Pinder Dep. 125:23-126:5, 253:4-18, 270:20-271:14.)

24.     In the summer of 2010, Professor Pinder approached Dean Lynn, Director of Academic Support Kimberly D'Haene, Dean of Students Sheryl Harrison, Director of Legal Skills Plaintiff Scott Sigman, and the former Associate Dean Kathleen Burch and suggested a summer preparation program for incoming

law students.  (Pinder Dep. 125:23-126:5, 190:17-191:3, 252:15-253:18, 270:20-271:14; Pl. Ex. 166.)

26. 25.   Professor Pinder initially proposed that JMLS create such a program, and Dean Lynn told Pinder that "it was a good concept."  (Lynn Dep. 222:25-223:16; de Haven Dep. 72:17-73:3; Ross Dep. 54:12-56:3; Pinder Dep. 252:15-253:18.)

26.   Professor Pinder also approached Dr. Markovitz with her idea, and Dr. Markovitz gave her permission to start it herself, saying "why not make the program your own?"  (Pinder Dep. 240:1-17, 258:20-259:3, 260:3-13, 271:15-19; D'Agostino Dep. 49:23-50:20;  Doneff Dep. 107:4-16; Markovitz Dep. 36:6-21.)

27.   Shortly after receiving Dr. Markovitz's permission and blessing, Professor Pinder and Professor Sigman decided to start their own summer preparation program for incoming law students.   (Pinder Dep. 258:20-259:3, 271:15-19, Pinder Decl. ¶ 6; Sigman Decl. ¶ 8.)

28.   JMLS did not offer any such program through the school, and JMLS students had been asking for a summer prep program for years.  (de Haven Dep. 73:4-74:8; Doneff Dep. 108:1-14; Pinder Decl. ¶ 13, Sigman Decl. ¶ 15.)

29.   Also during the 2009-2010 academic year, Pinder proposed a change to the Faculty Handbook that would make it a policy at JMLS for the full-time

faculty to get priority over faculty at other schools for summer and intercession teaching assignments.  (Pinder Dep. 214:15-216:15; Pl. Exs. 82, 84.)

30.     The faculty voted to adopt Pinder's proposed change, but before it went before the Board of Directors, Dr. Markovitz inexplicably asked for an explanation as to why it was good for the institution.  (Pinder Dep. 214:15-216:15; Pl. Exs. 82, 84.)

31.     Pinder concluded that Dr. Markovitz did not want the change and did not send an explanation on June 4, 2010, and Dr. Markovitz never took issue with her lack of explanation.   (Pinder Dep. 214:15-216:15; Markovitz Dep. 58:23-59:12; Pl. Exs. 82, 84.)

32.     On June 14, 2010, after her decision to not provide an explanation for her proposed Handbook amendment, Pinder was extended an offer to teach on the doctrinal track for the 2010-2011 academic year.  (Pl. Ex. 85; Pinder Dep. 214:15-216:15.)

33.     Pinder's June 14, 2010 letter renewing her contract with JMLS for the 2010-2011 academic year incorporated the terms of the Faculty Handbook, including the AAUP's 1940 Statement on Academic Freedom and Tenure and 1970 Interpretive Comments to the same.  (Pl. Exs. 85, 175; Lynn Dep. I, 191:1-194:13.)

8

34.     Professor Pinder was one year away from eligibility to become a tenured JMLS professor, and was by all accounts going to obtain tenure. (D'Agostino Dep. 57:10-14; de Haven Dep. 99:12-21; Ross Dep. 134:1-24, 177:13-178:2.)

**Plaintiff Scott Sigman's Employment with John Marshall Law School**

35.     Scott Sigman, a white male, was first hired to join the JMLS faculty as an associate professor of legal skills in a one-year appointment spanning the 2007-2008 academic year.  (Sigman Dep. 72:22-73:7, Ex. 27.)

36.     Sigman was an excellent, highly qualified and highly contributing professor and was loved by his fellow faculty and students alike.  (D'Agostino Dep. 52:8-11, 56:25-57:5, 79:8-80:13; Pl. Exs. 160, 161; de Haven Dep. 46:10-47:23; Doneff Dep. 67:1-70:15; Markovitz Dep. 40:11-17; Ross Dep. 177:13-178:2.)

37.     Sigman served as the Director of the Legal Skills faculty beginning in January 2008, and excelled in that difficult and time consuming position in addition to his teaching responsibilities.  (Sigman Dep. 74:17-76:24, Exs. 28, 29; Doneff Dep. 67:1-70:15, 76:24-77:17, 97:18-98:18.)

38.     From the outset of his employment at JMLS, Sigman was an outspoken member of the faculty, and complained about his observations of race-

based discriminatory conduct.  (Van Detta Dep. 106:21-107:18.)

39.    For instance, Sigman complained that Associate Professor Michele Butts told a minority student that minorities did not do well in Professor Sigman's class.  (Harris Dep. 113:20-114:14, 115:3-9; Sigman Dep. 119:3-17.)

40.    Sigman reported this to Assistant Dean for Administration Michelle Harris, telling her that Professor Butts told a student that minorities did not do well in Sigman's class and that he thought Butts' allegation was racially motivated, which Harris took to be a complaint of discrimination.  (Sigman Dep. 127:8-22; Harris Dep. 113:20-114:14, 115:3-9.)

41.    On June 14, 2010, JMLS renewed Sigman's contract for the 2010-2011 academic year, with a term from August 1, 2010 through July 31, 2011, and his letter of renewal incorporated the Faculty Handbook by reference.  (Pl. Ex. 140.)

42.    In November 2010, an evening student complained to Professor Sigman that Professor Butts discriminated on the basis of gender.  (Sigman Dep. 194:1-23, Ex. 34; 196:10-197:14.)

43.    Subsequently, at least one other student complained to Professor Sigman that Professor Butts discriminated on the basis of gender.  (Sigman Dep. 199:19-204:12.)

44.     On February 8, 2011, the Retention, Promotion, and Tenure Committee recommended that Professor Sigman's contract be renewed for the 2011-2012 academic year.  (Pl. Ex. 144; D'Agostino Dep. 59:15-61:10; 68:19-69:1.)

45.     In February 2011, after Professor Sigman received multiple complaints from students that Professor Butts was favoring minorities and women in the way that she applied grade bumps to her students' grades, he complained to the RPTC and Dean Lynn about Butts' discriminatory practices.  (Sigman Dep. 214:3-224:3.)

46.     Sigman also complained to Harris that Professor Butts was grading minority students more favorably than non-minority students; Harris turned his complaint over to Academic Dean Michael Mears, who launched an investigation into whether Sigman's complaints were accurate.  (Harris Dep. 117:9-118:4.)

47.     On February 25, 2011, email exchanges between Professor Lee Adams, then Dean Mears, and Lance McMillan contained an analysis of the grade bumps given by Professor Butts, which supported an inference of discrimination. (Sigman Dep. 172:25-173:12; Exs. "D", "E".)

48.     At or close to this time, Professor Adams told Sigman that there was a prima facie case of a Title IX violation against the school.  (Sigman Dep. 172:25-

11

173:12.)

49.     On February 28, 2011, Professor Sigman had a phone conversation with the Chair of the Retention, Promotion, and Tenure Committee, Professor Jeff Van Detta, in which Professor Sigman stated that he believed that he and JMLS students were being discriminated against.  (Sigman Dep. 125:14-126:1; Sigman Decl. ¶ 5.)

50.     Other professors were aware of Sigman's complaints of race and gender discrimination and it was not a secret that students complained about Professor Butts.  (D'Agostino Dep. 84:2-15, 85:25-86:19; Doneff Dep. 88:24-90:8, 92:10-93:24, 95:4-18.)

51.     On March 1, 2011, Professor Sigman met with Dean Lynn and complained directly to Dean Lynn about racial and gender discrimination against both himself and students.  (Sigman Dep. 159:21-160:14, 161:1-4, 161:18-22.)

52.     Specifically, Professor Sigman complained "about gender and racial bias against [him] and students and us[ed] supporting information [about grading biases] that [he] believed supported [his] complaint."  (Sigman Dep. 159:8-14; Lynn Dep. I, 72:7-74:3, 211:21-212:8.)

53.     Professor Sigman told Dean Lynn that the "disparate treatment of white male students was consistent with the disparate treatment of" him, for

instance, when Professor Butts told students of color to avoid taking his classes. (Sigman Dep. 159:23-160:1; Lynn Dep. I, 72:18-74:5, 211:21-212:8; de Haven Dep. 72:10-16.)

54.     Sigman further told Dean Lynn on March 1 that "the pattern of altering grades for minority females was consistent with [his] treatment by Ms. Butts that [he] had attempted to get remedied through numerous channels, and that [he] wanted it to stop both on [his] behalf and the students." (Sigman Dep. 160:9-14.)

55.     Sigman also complained to Dean Lynn that Professor Butts was putting him in a hostile work environment and complained repeatedly, both in writing and verbally, that Professor Butts was favoring African Americans and women in her grading and other policies and that her biased behavior against white male students was consistent with her biased behavior against Professor Sigman, a white male, including previously writing to Sigman, "I'm not your bitch, Scott." (Sigman Dep. 159:21-160:14, 161:1-4, 161:18-22, 169:20-170:7; Exs. "D", "E".)

56.     Sigman's complaints of discrimination also were not turned over to Adams Keegan for investigation, in violation of the usual procedure when discrimination is reported at JMLS. (Harris Dep. 46:13-48:25, 52:13-16, 53:20-23, 113:3-12, .)

13

57.     Dean Lynn concluded that Professor Sigman's complaints regarding Professor Butts giving race and gender biased grade bumps at JMLS appeared to be true.  (Lynn Dep. I, 211:21-212:8.)

58.     The RPTC also concluded that Professor Butts was favoring women students of color over white men in the way she graded her classes.  (de Haven Dep. 68:2-18.)

**Plaintiffs Began Organizing The Summer Preparation Program, Law School Advantage**

59.     During the spring and summer of 2010, Pinder and Sigman began organizing Law School Advantage ("LSA"), the summer preparation program for incoming law students that Dr. Markovitz told Pinder to "make her own," with plans to launch in July 2011.  (Pinder Dep. 218:16-220:7, 272:8-273:4.)

60.     LSA was going to be a one week long course during the summer before JMLS students began official classes, designed to help the entering law students learn the basic skills they needed to learn to start law school, including how to read a case and how to write a case brief.  (Pinder Dep. 259:21-260:2, 270:20-271:5; Sigman Dep. 123:7-21, 126:2-13, 240:11-18;  Dep. 107:17-108:14.)

61.     Plaintiffs' preparation included creating a website that recited their credentials, including their positions at JMLS, and a description of the LSA course. (Pinder Dep. 218:16-220:7, 273:2-22; Sigman Dep. 241:12-20.)

62.   Pinder asked Michelle Harris, the Associate Dean of Administration, for the contact information of Amanda French at the Jewish Federation Breman Center, so that LSA could use the Center's conference room to hold classes. (Pinder Dep. 191:10-18.)

63.   Neither Pinder nor Sigman kept the launch of LSA a secret, having received the go-ahead from Dr. Markovitz, and many members of the faculty and senior faculty offered suggestions in support of the business.   (de Haven Dep. 50:25-52:24, Doneff Dep. 104:24-107:16, 109:7-13, Pinder Dep. 260:3-13.)

64.   Neither Pinder nor Sigman considered LSA to be a violation of any school policy or a conflict with their job at JMLS, and other faculty members who they told about it shared the same opinion.   (D'Agostino Dep. 62:1-13; de Haven Dep. 76:8-21; Doneff Dep. 108:1-21; 123:3-11; Pinder Dep. 193:5-19, 254:10-255:7, 260:3-13; Pinder Decl. ¶ 4, 8-14; Sigman Decl. ¶ 7-11, 13-16.)

65.   Pinder asked the Dean in 2008 whether privately tutoring current students would be an ethical conflict of interest.   (Pinder Decl. ¶ 4.)

66.    Dean Lynn responded that it might be odd but that such a program would not pose a conflict with her job at the law school.   (Pinder Decl. ¶ 5.)

67.   When she actually started LSA in 2010, Pinder was never concerned that LSA could conflict with her teaching at JMLS or the Faculty Handbook.

(Pinder Dep. 193:5-19, 254:10-255:7; 260:3-13; Pinder Decl. ¶ 4, 8.)

68.     LSA would not conflict with Pinder and Sigman's positions at JMLS because LSA would be taught during the summer when Pinder and Sigman had no teaching obligations to JMLS, would not conflict with the first-year orientation program, would not obligate Pinder or Sigman to work on it for more than ten hours a week, there was no such program at JMLS, and the first-year courses taught by Pinder and Sigman are blind graded and as such, they could not give preference to JMLS students who took the LSA course.  (Pinder Decl. ¶ 8-14; Sigman Decl. ¶ 7-11, 13-16.)

69.     The LSA program would have been beneficial to both JMLS and its incoming students because JMLS students are "not usually coming in as well educated or with the same writing and reading skills" and because generally, "anything that helps students perform better at any point of the process is beneficial to a school."  (de Haven Dep. 74:25-75:25; Ross Dep. 73:3-18, 81:10-82:8.)

70.     The LSA program would have been within the realm of typical work that academics do.  (de Haven Dep. 87:24-88:18.)

71.     Pinder and Sigman were well aware that other professors spent substantial amounts of time engaging in outside businesses, including for-profit

16

business and acting as "of counsel" for a law firm, utilized JMLS facilities to conduct their businesses, and used their credentials at JMLS to promote their business. (Pl. Exs. 1, 10, 11, 14, 192, 193, 204; Burch Dep. 13:18-24, 36:16-22; Lynn Dep. I, 245:6-246:21; D'Agostino Dep. 38:15-20, 39:18-21, 40:19-42:5, 42:17-19, 89:12-20; de Haven Dep. 82:24-83:23, 85:8-11, 86:16-23; Doneff Dep. 11:10-24, 14:20-25, 16:8-17:8, 65:18-66:3, 114:1-115:20; Van Detta Dep. 48:1-25, 54:9-18, 208:23-209:18; Ross Dep. 75:3-76:10; Pinder Dep. 181:17-21.)

72.    Like other business started and engaged in by JMLS professors, LSA was not a "consulting" business. (Pinder Dep. 218:9-219:19; de Haven Dep. 79:2-10, 84:8-11, 87:3-7; Ross Dep. 105:23-25, 106:1-11; Doneff Dep. 122:24-123:21.)

**Plaintiffs Are Told Their Contracts Will Not Be Renewed**

73.    In mid-February 2011, Michelle Harris brought the Facebook page of LSA to the attention of Dean Lynn. (Harris Dep. 81:23-82:11; Lynn Dep. I, 221:13-19.)

74.    Dean Lynn and Michelle Harris spoke about LSA, and at no point during the conversations about LSA did the Dean say he was not going to renew Pinder and Sigman's contracts. (Harris Dep. 92:16-19, 93:19-94:9.)

75.    Dean Lynn testified that he spoke with Dr. Markovitz about the Facebook posting within a day or two. (Lynn Dep. I, 222:9-13.)

17

76.    On March 2, one day after Sigman complained to Dean Lynn about gender and race discrimination at JMLS against both students and himself, Dean Lynn wrote an email to Dr. Markovitz, saying that

> **[R]ather than fire Kamina and Scott for cause, I have decided to notify them that their contract will not be renewed, as I am doing with Profs. Marbes and Butts.  The faculty handbook has a lot of process for firing for cause, including an appeal to the Retention, Promotion & Tenure Committee, before an appeal to you…nonrenewal will [be] easier and reduces, but does not eliminate, the threat of litigation.  It will cost one more month of pay, since they're entitled to six months notice of non-renewal…**

(Pl. Ex. 164 (emphasis added); Markovitz Dep. 49:7-20.)

77.    On March 3, Dean Lynn met with Pinder and Sigman separately and terminated their employment, characterizing the termination as a nonrenewal rather than a dismissal for cause so that he could avoid providing Pinder and Sigman the process they were entitled to under the Faculty Handbook.  (Pl. Exs. 1, 91, 151, 164; Pinder Dep. 243:2-9; Sigman Dep. 232:9-15; de Haven Dep. 137:1-8.)

78.    The reason he gave for why Plaintiffs' contracts were terminated "include [their] establishing and engaging in a business while employed as a full time faculty member, engaging in a business which creates possible conflicts of interest, using the law school name on [their] website without permission, and using law school computer facilities for [their] business."  (Pl. Exs. 91, 151.)

79.    Dean Lynn did not ask Plaintiffs how much time they spent per week

on LSA.  (Lynn Dep. I, 238:15-22.)

80.     Dean Lynn did not warn Plaintiffs in advance that they would be terminated if they started LSA.  (Lynn Dep. I, 167:1-7.)

81.     During her termination meeting, Pinder told Dean Lynn and Michelle Harris that Dr. Markovitz was aware of the business and that Dr. Markovitz told Pinder to make the business her own.  (Pinder Dep. 239:14-240:2; Harris Dep. 99:24-100:5.)

82.     During his termination meeting, Sigman told Dean Lynn and Michelle Harris that he understood from Pinder that Dr. Markovitz was aware of the business and that Dr. Markovitz told Pinder to make the business her own. (Sigman Dep. 122:1-15, 242:10-18; Harris Dep. 97:21-98:24; Pl. Ex. 194.)

83.     Sigman also told Dean Lynn that he would not participate in LSA if it would cost him his job.  (Lynn Dep. I, 171:17-24; (Sigman Decl. ¶ 7.)

84.     The Faculty Handbook does not mandate that faculty members ask permission to engage in outside for-profit businesses; rather, the Handbook mandates that "[p]rior permission *to consult* must be received from the dean."  (Pl. Ex. 1 (emphasis added)); Harris Dep. 87:1-88:22, 91:3-92:1; Ross Dep. 87:21-88:12.)

85.     There is no specific provision of the Handbook that prohibits

professors from using law school facilities to engage in consulting or outside business.  (Van Detta Dep. 62:15-64:1; Pl. Ex. 1.)

86.     Around the time of Pinder and Sigman's terminations, Dr. Markovitz did not recall whether he told Pinder to make the business her own.  (Ross. Dep. 183:1-15, 185:24-185:12.)

87.     Dean Lynn included additional reasons for Pinder's termination -- "failure to cooperate by submitting an explanation to the Board of Directors for the proposed Faculty Handbook change that [she] supported, and failure to follow law school policies on make-up classes."  (Pl. Ex. 91.)

88.     Pinder did not miss a make-up class, and in fact, students complained that Pinder held a mandatory make up class.  (Pinder Dep. 212:10-21; Pl. Ex. 89; Harris Dep. 149:21-150:1.)

89.     No professor other than Pinder has been nonrenewed for failing to conduct a single make-up class, and missing a make-up class would absolutely not be a reason for termination.  (D'Agostino Dep. 90:1-6; de Haven Dep. 92:6-12.)

90.     Pinder's contract had been renewed on June 14, 2010, after her February 2010 proposed amendment to the Faculty Handbook.  (Pl. Ex. 85; Lynn Dep. I, 191:1-194:13.)

91.     Other professors were in shock at Pinder and Sigman's terminations;

20

for instance, Helen de Haven "had a very difficult time getting past summarily discharging someone for doing something to which the school objected without first telling them…It's a problem.  We don't want it done."  (de Haven Dep. 58:24-59:14.)

92.    There was a lot of speculation amongst the faculty members about "whether this could possibly be the reason."  (de Haven Dep. 59:19-23.)

93.    The faculty "questioned whether [the business] could actually be the reason, the real reason" for Pinder and Sigman's terminations and questioned whether Pinder and Sigman were denied due process under the Handbook.  (de Haven Dep. 60:2-6; Doneff Dep. 41:10-43:13.)

94.    Other faculty members do not think that the reason given for Pinder and Sigman's terminations were convincing or persuasive and "raises concerns" of pretext.  (de Haven Dep. 120:2-6, 121:2-16; Doneff Dep. 130:13-132:23.)

95.    No faculty members supported the terminations of Pinder and Sigman. (de Haven Dep. 64:8-11.)

96.    When Dean Lynn was interviewing for the Dean position, he characterized himself as someone who "would always try to work out with a faculty member if there was a problem," and that he was "not the kind of person who's going to take rapid action against faculty without giving them the chance to

explain and negotiate and work it out," but he has not "lived up to his promise," "certainly in terms of what's happened" to Pinder and Sigman.  (de Haven Dep 97:18-99:6.)

97.    Faculty members were fearful of reprisal if they spoke up about Pinder and Sigman's terminations -- so much so that one drafted an anonymous letter to the Board of Directors voicing their concerns and the faculty agreed with the contents of the letter.  (de Haven Dep. 103:15-104:19, 106:2-14; Pl. Exs. 174, 179; Doneff Dep. 87:15-88:9, 104:10-16; Ross Dep. 133:3-17, 139:17-140:17.)

98.    There was a "pretty clear message being sent that the administration did not want to hear from" faculty members.  (de Haven Dep. 105:7-11.)

**Pinder and Sigman Attempt to Appeal Their Terminations**

99.    On March 7, 2011, Professors Pinder and Sigman attempted to request an appeal of their terminations to the RPTC under Section 703 of the Faculty Handbook.  (Pl. Exs. 1, 99; Ex.  "A" (JMLS6080-81).)

100.   Professor Van Detta, the Chair of the RPTC forwarded Pinder and Sigman's appeal requests to Dean Lynn and asked for Dean Lynn's "guidance on how RPTC should proceed."  (Pl. Ex. 153.)

101.   Dean Lynn responded by telling Van Detta that Pinder and Sigman were not terminated for cause and that the Faculty Handbook did not allow a

22

hearing for nonrenewals.  (Pl. Ex. 153.)

102.   The RPTC simply accepted Dean Lynn's characterization of Pinder and Sigman's terminations as nonrenewals, and "did not discuss the question of cause or no cause."  (Van Detta Dep. 125:17-23.)

103.   Van Detta has never seen Pinder and Sigman's termination letters and the RPTC did not review the letters in determining whether to provide Pinder and Sigman with a review of their terminations.  (Van Detta Dep. 129:1-131:6.)

104.   On March 14, Professor Jeff Van Detta responded to both Pinder and Sigman that the RPTC does not have jurisdiction over the matter.  (Pl. Exs. 99, 157.)

105.   Section 703 of the Faculty Handbook does not limit the jurisdiction of the RPTC's hearing process to terminations only for matters of teaching or scholarship.  (Pl. Ex. 1; Burch Dep. 114:9-115:3, 134:2-10.)

106.   At that time, the only information the RPTC had was Dean Lynn's assertion that he nonrenewed Pinder and Sigman and gave them six month notice, and that he did not "think the Handbook allows for a hearing for nonrenewals." (Pl. Ex. 153.)

107. On or around March 7, 2011, Professor Pinder contacted the American Association of University Professors ("AAUP") and the Society of

American Law Teachers ("SALT") for assistance with appealing their terminations.  (Pl. Ex. 96.)

108.   Also on March 7, Pinder emailed Dr. Markovitz complaining that she had been subjected to discrimination and retaliation, which Dr. Markovitz forwarded to Dean Lynn, who subsequently forwarded it to Michelle Harris, the Associate Dean of Administration with oversight over HR.  (Harris Dep. 73:21-75:22; Pl. Ex. 95.)

109.   Again, Pinder's complaints of discrimination and retaliation were not turned over to Adams Keegan for investigation, in violation of the usual procedure when discrimination is reported at JMLS.  (Harris Dep. 73:21-75:22.)

110.   Gregory Scholtz, the Associate Secretary and Directory Department of Academic Freedom, Tenure, and Governance at the AAUP responded to Pinder's complaint regarding Pinder and Sigman's terminations:   "Under our standards, the decision not to reappoint should have been originated with review by an appropriate faculty body…you should have received 12 month's notice…and you should have been afforded the opportunity to file an appeal with a duly constituted faculty body."  (Pl. Ex. 105.)

111.  Raquel Aldana, Co-President of the Society of American Law Teachers, wrote to the JMLS Board of Directors in response to Pinder's complaint

24

regarding her and Sigman's terminations: "we are also concerned that the failure to renew the contracts of these…professors may be part of a pattern of disparate treatment on the basis of race, gender, and/or sexual orientation. In particular, we note that had these unilateral decanal decisions not taken place, Professor Kamina Pinder would have been considered for tenure next year and most likely…would have become the law school's first tenured African American woman faculty member and the first African American faculty member…" (Pl. Ex. 176.)

112.   After investigating Pinder's allegations, the AAUP contacted Dean Lynn and Dr. Markovitz, indicating that "Professors Pinder and Sigman, however, reject your characterizing [their terminations] as no more than nonreappointment. Given the gravity of the charges against them, we believe that their rejection of that characterization is correct and that you have, in fact, moved to dismiss them for cause." (Pl. Exs. 175, 199.)

**JMLS Board of Directors Reviews the Decision**

113.   On March 23, 2011, the Board of Directors of JMLS met and discussed Plaintiffs' nonrenewals, with armed guards posted at the stairwell access to where the meeting took place. (Pl. Ex. 207; de Haven Dep. 105:13-106:1; Ross Dep. 166:3-9.)

114.   Before the meeting Pinder and Sigman submitted a letter to the Board

of Directors challenging the Dean's actions and his contention that their termination was a "nonrenewal" rather than a termination for cause for the Board's consideration at the meeting.  (Pl. Ex. 107; Markovitz Dep. 76:4-77:22; Ross Dep. 126:6-128:16.)

115.   Dean Lynn sent the Board of Directors the text of the Faculty Handbook regarding only nonrenewals, but not terminations for cause, for review.  (Ross Dep. 151:23-155:15; Pl. Ex. 219.)

116.   Board of Directors member Kevin Ross felt that in order to review the appropriateness of Pinder and Sigman's terminations, including determining whether they were terminated for cause and entitled to process, the Board should also have been provided the provisions in the Handbook relating to terminations for cause.  (Ross Dep. 151:23-155:15.)

117.   Dean Lynn did not send the Board of Directors his email to Dr. Markovitz informing Dr. Markovitz that he planned to characterize Pinder and Sigman's terminations as nonrenewals rather than terminations for cause in order to avoid providing Pinder and Sigman process under the Handbook.  (Pl. Ex. 164; Ross Dep. 171:2-173:11.)

118.   After reviewing the Faculty Handbook provisions, Ross felt that Pinder and Sigman's terminations were "termination[s] for cause because this issue

26

about the business was being cited as the reason…particularly in the context of discussions being had where the dean was acknowledging that they were excellent classroom teachers and otherwise seemed to be on the track for promotion." (Ross Dep. 134:1-136:15.)

119.   Ross was also concerned as to whether there was fair process applied in the terminations. (Ross Dep. 134:1-136:15.)

120.   Board member Kevin Ross protested the Dean's characterization of Pinder and Sigman's terminations as nonrenewals. (Markovitz Dep. 80:4-14.)

121.   Ross "expressed deep concern about the nonrenewals, the appearance of deficiencies, and [lack of] fair process that impact on the faculty." (Ross Dep. 134:1-24.)

122.   Ross "found that [they were] termination[s] for cause." (Ross Dep. 135:4-10.)

123.   During the Board of Directors meeting, Dean Lynn did not express concern about whether LSA posed a potential conflict, but rather Lynn only discussed his concern about Pinder and Sigman using school resources for their business. (Ross Dep. 120:10-121:19.)

**Kathleen Burch's Bar Exam Tutoring Business**

124.   JMLS Professor Kathleen Burch, a white woman, started and began

operating a for-profit bar exam tutoring business in late 2012.  (Burch Dep. 13:18-24, 36:16-22; Pinder Dep. 194:20-23.)

125.   There is no distinction between LSA and Burch's bar exam tutoring other than "the obvious distinction, one is on the front end of law school and one is on the back end of law school."  (de Haven Dep. 77:11-18.)

126.   Burch does not only solicit business from students who have taken the bar one time and failed, but also advertises that Burch Bar Prep can help students "Pass the bar exam the first time."  (Burch Dep. 100:25-101:5; Pl. Exs. 192, 204.)

127.   Burch obtained the contact information of students who failed the Georgia Bar Examination from Dean Lynn's secretary, Barbara Chelikowsky, and used JMLS resources containing private and confidential information about its former students to send correspondence to prospective clients.  (Burch Dep. 71:4-21, Pl. Exs. 192, 204.)

128.   Burch uses the John Marshall Law School name on advertisements for her business.  (Pl. Ex. 192.)

129.   Professor Burch began soliciting graduates of JMLS to be customers of her tutoring business by Facebook as early as December 11, 2012, and by email solicitations as early as January 20, 2013.  (Pl. Exs. 192, 204; Burch Dep. 15:10-20, 73:9-18; Ex. "C" JMLS 9494-9495.)

130.   Burch did not discuss her business with Dean Lynn until "a few days before February 18, 2013."  (Lynn Dep. I, 245:6-246:21.)

131.   Professor Burch did not get permission to start and operate the business in advance.  (Lynn Dep. I, 245:6-246:21.)

132.   Burch's business is not considered to be "consulting."   (de Haven Dep. 79:2-10; Ross Dep. 106:6-11.)

133.   On February 18, 2013, Dean Lynn wrote to Professor Burch:

> **Kathe, when you spoke to me about the bar prep business, I was focused on doing anything that you wanted to do, but it has been pointed out to me that I may have acted inconsistently compared to Sigman and Pinder.  Now that has been raised, I'm not sure how to distinguish the two situations.**

(Lynn Dep. I, 240:19-241:12; Pl. Ex. 191 (emphasis added); Burch Dep. 75:3-10.)

134.   In that email, Dean Lynn suggested they discuss the conflict, but Dean Lynn and Professor Burch "never really had the conversation."   (Pl. Ex. 191; Burch Dep. 75:20-76:18, 79:11-15.)

135.   Professor Burch has no idea if work that she may do as a bar prep professional would be to the benefit of JMLS.  (Burch Dep. 87:12-16.)

136.   JMLS provides, as part of its tuition, access to a discount for the Kaplan Bar Review course, a bar review course provided by an outside vendor. (Lynn Dep. I,  231:5-235:5, 236:4-238:6; Burch Dep. 16:25-17:13, 18:24-19:11;

Harris Dep. 131:2-16.)

137.   Since 2011, JMLS purchases the Kaplan Bar Review course on behalf of its students at a "substantial discount," and bundles it in students' tuition.  (Lynn Dep. I, 231:15-232:23.)

138.   Pursuant to its contract with Kaplan, JMLS gets a discount of $1,000 per student for JMLS students to take the Kaplan course.  (Harris Dep. 145:6-23.)

139.   If a student takes the Kaplan Bar Review course and fails the bar examination, the student can retake the Kaplan course for free if they completed 85 percent of the work and attended 85 percent of the lectures.  (Lynn Dep. I, 233:10-21.)

140.   New students do not have the option of whether the Kaplan Bar Review course fee is included in their JMLS tuition.  (Lynn Dep. I, 234:17-23.)

141.   Burch only gets paid through her Bar Review course if a student failed the bar, including students she teaches at JMLS.  (Lynn Dep. I, 231:5-235:5, 236:4-238:6.)

142.   The prospective customers of Burch Bar Review could be students that Burch taught as a professor at JMLS.  (Lynn Dep. I, 237:9-12.)

143.   The discount and bundle arrangement with Kaplan has been in effect during the period of time that Burch created her bar review business.  (Lynn Dep.

I, 232:16-23.)

**Other JMLS Professors' Businesses and Conduct**

144.   Professor Robert D'Agostino ("D'Agostino") works outside of the law school, including spending "an enormous amount of time" unwinding the caseload of an attorney who passed away.  (D'Agostino Dep. 38:15-20.)

145.   D'Agostino also does consulting work, and he does not ask permission to do that consulting work.  (D'Agostino Dep. 39:18-21.)

146.   D'Agostino also spent an "enormous amount of time" on a large private property case and "carried on a lobbying campaign with the Georgia Legislature" without the Dean's permission.  (D'Agostino Dep. 40:19-42:5, 42:17-19.)

147.   D'Agostino appears in court as an advocate in lawsuits.  (Dep. 23:11-15.)

148.   D'Agostino uses law school facilities, such as computer, email, fax machines, and copy machines with respect to his outside consulting.  (D'Agostino Dep. 89:12-20.)

149.   D'Agostino uses library conference room tables when engaging in his outside work.  (de Haven Dep. 86:16-23.)

150.   Dan Piar engaged in mediation while he was employed with JMLS

and was not terminated for conducting his for profit business.  (de Haven Dep. 82:24-25.)

151.   Helen de Haven engages in union advocacy work in arbitration cases, and was has not been terminated for conducting her outside business.  (de Haven Dep. 82:25-83:1.)

152.   De Haven did not seek permission to engage in her advocacy work. (de Haven Dep. 85:8-11.)

153.   De Haven does not consider her work to be consulting.  (de Haven Dep. 84:8-11.)

154.   Andrea Doneff engages in mediation both independently and through Mediation Works, Inc. and has not been terminated for conducting her outside business. (Doneff Dep. 11:10-24, 14:20-25; de Haven Dep. 83:4-6.)

155.   Doneff uses the John Marshall Law School name on the Mediation Works Inc. website without permission.  (Pl. Ex. 193; Doneff Dep. 114:1-115:20.)

156.   Doneff speaks at seminars using a biography that states that she is employed by John Marshall Law School as an associate professor.  (Doneff Dep. 15:14-24.)

157.   Doneff uses JMLS facilities to engage in her outside mediation business.  (Doneff Dep. 16:8-17:18, 65:18-66:3.)

158.   Doneff considers her mediation business to be a business.   (Doneff Dep. 122:24-123:1.)

159.   Engaging in mediation work is not considered consulting.   (de Haven Dep. 87:3-7; Ross Dep. 106:1-5.)

160.   Jeffrey Van Detta teaches classes at Concord Law School and lists JMLS on that school's website, but has not been terminated for conducting his outside business.   (Pl. Ex. 14; Van Detta Dep. 48:1-25, 54:9-18, 208:23-209:18; de Haven Dep. 83:6-10; Doneff Dep. 18:10-12; Markovitz Dep. 54:14-55:2; Ross Dep. 76:11-78:3.)

161.   Teaching classes at a law school is not considered "consulting" for the school.   (Ross Dep. 105:23-25.)

162.   John Rapping created and runs Gideon's Promise, a public defender training program, and has not been terminated for conducting his outside business. (de Haven Dep. 83:12-19;  Doneff Dep. 18:7-9, 122:22-23; Markovitz Dep. 98:22-99:1; Pl. Ex. 11.)

163.   Rapping uses John Marshall Law School's name on his website advertising his business.   (Pl. Ex. 11; Ross Dep. 75:3-76:10.)

164.   Dean Lynn told Michelle Harris that he felt that the only difference between Rapping's outside work and Pinder and Sigman's business was that

"Rapping had asked permission prior to accepting a position at the law school to remains the director of the nonprofit organization that he created."  (Harris Dep. 143:7-144:1.)

165.   Rebecca Cummings is of counsel at a law firm in Atlanta in violation of the Handbook's express prohibition of serving as of counsel at a law firm, and has not been terminated for serving as of counsel at a law firm.  (de Haven Dep. 83:20-23; Pl. Exs. 1, 10; Ross Dep. 82:24-84:6; Pinder Dep. 181:17-21.)

166.   Stan Bernstein, a former professor at JMLS, sexually harassed female students and had an ongoing issue of making numerous inappropriate comments toward women in his classroom during the entirety of his employment at JMLS, in violation of JMLS policy.  (de Haven Dep. 93:6-94:21; Markovitz Dep. 95:2-22, 96:18-98:4; Pl. Ex. 245.)

167.   Bernstein was not terminated or nonrenewed for sexually harassing students and making inappropriate comments in the class room despite repeated warnings to stop the inappropriate conduct.  (de Haven Dep. 94:22-95:7; Harris Dep. 80:6-81:12.)

168.  No faculty member at JMLS has been terminated for having a business or performing work outside of the law school before Pinder and Sigman's terminations.  (Harris 142:22-143:2.)

**Additional Facts Relevant to Pinder and Sigman's Breach of Contract Claims**

169.   The Faculty Handbook is incorporated by reference into each professor's yearly contract, which in turn incorporates the AAUP's 1940 Statement of Principles on Academic Freedom and Tenure and its 1970 Interpretive Comments.  (de Haven Dep. 54:9-14; Doneff Dep. 43:20-44:24; Ross Dep. 151:4-22; Pl. Exs. 1, 75, 85, 140.)

170.   The due process set forth in the Faculty Handbook is a part of the professors' contract with JMLS.  (Pl. Exs. 85, 140; Doneff Dep. 44:25-45:10.)

171.   With the exception of the school's post-tenure review process, the Faculty Handbook is subject to the AAUP guidelines.  (D'Agostino Dep. 27:11-29:5.)

172.   Non-renewal is a "peer evaluation that occurs in which the Promotion, Retention, and Tenure Committee recommends whether or not the faculty member should be continued," and "should be considered by the faculty and arise from that faculty committee."  (Pl. Ex. 1; de Haven Dep. 54:22-55:17; Doneff Dep. 51:5-16.)

173.   According to the Faculty Handbook, reasons for nonrenewal include "incongruity between the teaching expertise of the faculty member and the educational goals of the Law School; unfavorable peer evaluation of the faculty member's teaching or scholarship which makes promotion or the award of tenure

unlikely; or unfavorable evaluation of the faculty member's other responsibilities."
(Pl. Ex. 1.)

174.   None of the considerations set forth in the Faculty Handbook for
nonrenewal of professors was given for Pinder and Sigman's alleged
"nonrenewal."  (Doneff Dep. 143:1-21; Pl. Ex. 91, 151.)

175.   There was no incongruity between the teaching experience of Pinder
of Sigman and the educational goals of the Law school, no unfavorable peer
evaluation of Pinder and Sigman's teaching or scholarship which makes promotion
or the award of tenure unlikely, and no unfavorable evaluation of Pinder or
Sigman's other responsibilities.  (Doneff Dep. 143:22-144:19.)

176.   "[F]or academics, the understanding is unless you're fired for cause or
whatever, that you'll have the RPT review so that you will have some notice that
it's coming and there's timing requirements and all that."  (Doneff Dep. 129:20-
24.)

177.   Dismissal for cause is "dismissal for misconduct or some other reason
that justifies termination, and that is something that …can originate with the
administration" rather than the RPTC  (de Haven Dep. 55:18-21; Van Detta Dep.
40:22-41:5.)

178.   According to the Faculty Handbook, reasons for dismissal for cause

include "failure to adhere to a class or examination schedules…[and] violating Law School rules and policies." (Pl. Ex. 1.)

179. No professor has been "nonrenewed" at JMLS without having nonrenewal or potential nonrenewal recommended by the RPTC except for Pinder and Sigman. (de Haven Dep. 56:20-24.)

180. Faculty members agree that according to the Handbook, Pinder and Sigman were dismissed for cause. (de Haven Dep. 124:10-23.)

181. The 1940 Statement of Principles on Academic Freedom and Tenure provides, in pertinent part, that:

> Notice should be given at least one year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period.

(Pl. Ex. 175[2], Bates No. P000728.)

182. The AAUP'S 1970 Interpretive Comments to the 1940 Statement further explains that the one year notice period applies after a professor has held a probationary appointment of two or more years. (Pl. Ex. 175, Bates No. P000731.)

183. The Faculty Handbook provides that "notice of nonreappointment

---

[2] Plaintiffs' Exhibit 175 is a letter from the American Association of University Professors to Dean Richardson Lynn dated March 22, 2011, regarding Plaintiffs' terminations. The author of Exhibit 175 attached sections of multiple documents, each with page numbers at the bottom, but the page numbers are not in order. Therefore, for the Court's ease of reference, Plaintiffs refer the Court to the Bates numbers stamped on the bottom right corner of Exhibit 175.

shall be given *at least* six months prior to the termination date of the faculty member if the faculty member is in the third year or beyond," and thus is not in conflict with the AAUP's guidelines.  (Pl. Ex. 1 (emphasis added).)

184.   Generally professors are given at least six months' notice of nonrenewal because if a professor is nonrenewed without proper notice, it is very difficult for them to find another academic job.  (Doneff Dep. 139:19-140:2; Ross Dep. 182:13-25; Van Detta Dep. 180:2-181:11.)

185.   Pinder and Sigman's last contracts of employment at JMLS expired on July 31, 2011, and Pinder and Sigman vacated their offices, turned in their keys and parking passes, and did not return to JMLS after that date.  (Pl. Exs. 91, 151; Pinder Decl. ¶ 16-18; Sigman Decl. ¶ 18-19; Markovitz Dep. 82:12-83:12.)

186.   March 3, 2011 is less than six months before Pinder and Sigman's contract expiration date of July 31, 2011.   (Van Detta Dep. 179:17-180:1; Markovitz Dep. 83:13-84:1.)

187.   Pinder and Sigman were not given six months' notice of their nonrenewal in violation of the AAUP 1940 Statement, the 1970 Interpretive Comments, and the Faculty Handbook's notice provisions.  (Pl. Ex. 1; Van Detta Dep. 179:17-180:1; Ross Dep. 176:1-177:4, 180:15:181:6.)

188.   Before his termination, Sigman was also offered the opportunity to

teach the summer 2011 session at JMLS. (Sigman Decl. ¶ 21.)

189.   At Sigman's termination meeting, Lynn informed Sigman that he would no longer be allowed to the summer 2011 session despite the fact that the session ran until before July 31. (Sigman Decl. ¶ 21.)

Respectfully submitted this 13th day of September, 2013.

BUCKLEY & KLEIN, LLP

*/s/ Jaime L. Duguay*
Jaime L. Duguay
Georgia Bar No. 829447
jlduguay@buckleyklein.com
Edward D. Buckley
Georgia Bar No. 092750
edbuckley@buckleyklein.com

Promenade II, Suite 900
1230 Peachtree Street NE
Atlanta, GA  30309
Telephone:  (404) 781-1100
Facsimile:   (404) 781-1101

Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2013, I electronically filed **PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE EXIST GENUINE ISSUES TO BE TRIED** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

    Mary M. Brockington
    Jonathan R. Poole

               BUCKLEY & KLEIN, LLP

        By:   <u>/s/ Jaime L. Duguay</u>
               Jaime L. Duguay
               Georgia Bar No. 829447
               jlduguay@buckleyklein.com

               Counsel for Plaintiffs