UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KAMINA PINDER and           :
SCOTT SIGMAN,               :
                            : CIVIL ACTION FILE NO.
    Plaintiffs,             : 1:12-cv-03300-WSD-JSA
                            :
v.                          :
                            :
JOHN MARSHALL LAW SCHOOL, LLC :
and JOHN MARSHALL LAW SCHOOL,  :
                            :
    Defendants.             :

**PLAINTIFFS' RESPONSE TO DEFENDANTS JOHN MARSHALL LAW
SCHOOL, LLC AND JOHN MARSHALL LAW SCHOOL'S STATEMENT
OF UNDISPUTED FACTS AS TO WHICH THERE IS NO
GENUINE ISSUE TO BE TRIED**

Pursuant to Fed. R. Civ. P., Rule 56 and Local Rule ND Ga 56.1., Plaintiffs

respond to Defendants' Statement of Undisputed Material Facts as to Which There

is No Genuine Issue to be Tried.

1.      John Marshall Law School, LLC, and not John Marshall Law School,

employed Plaintiffs. Affidavit of R. Lynn ("Lynn Aff."), ¶4 attached as Ex. A.

John Marshall Law School is an improper party.

RESPONSE:        Denied; Plaintiffs are not aware whether Defendants'

Statement of Facts ("DSF") 1 is a fact, but know only that ADP Totalsource I Inc

and Adams Keegan-GA, LLC issued their paychecks at different times during their employment with Defendants.  (Declaration of Scott Sigman ("Sigman Decl.") ¶ 2; Declaration of Kamina Pinder ("Pinder Decl.") ¶ 2.)

2.     Kamina Pinder began her employment at John Marshall on August 1, 2006.  Deposition of K. Pinder [Doc. 52]("Pinder Dep."), Exs. 2 and 17

RESPONSE:     Admitted, but denied that Exhibit 17 to the deposition of Kamina Pinder evidences as much.

3.     Scott Sigman began his employment the following year, on July 1, 2007. Deposition of S. Sigman [Doc. 51]("Sigman Dep."), Exs. 27 and 48.

RESPONSE:     Admitted, but denied that Exhibit 48 to the deposition of Scott Sigman evidences as much.

4.     Both held probationary tenure-track appointments that were subject to renewal on an annual basis. *Id*.; Pinder Dep., Exs. 2 and 17

RESPONSE:     Denied that Scott Sigman was hired into a tenure-track position, but admitted that he opted to move to tenure track. (Deposition of Scott Sigman ("Sigman Dep.") 72:22-73:7, Ex. 27, 82:6-17, Ex. 29.)   Denied that Kamina Pinder was hired into a tenure-track position, but admitted that Ms. Pinder applied for a tenure track position, and was moved to the tenure track in the 2008-

2009 academic year.  (Deposition of Kamina Pinder ("Pinder Dep.") 116:23-25, 117:3-16, Ex. 2, 122:4-11.)

5.     Although they were full-time faculty members at John Marshall during the 2010-2011 academic year, Ms. Pinder and Mr. Sigman established and began operating their own for-profit company, Law School Advantage, LLC, to teach law school prep classes for accepted first year law students. June 11, 2013 Deposition of R. Lynn [Doc. 54]("Lynn Dep. I") [221:7-222:24], Ex. 50 (2/6/11 facebook posting announcing the business).

RESPONSE:     Denied that Kamina Pinder and Scott Sigman began operating Law School Advantage ("LSA").  (Sigman Dep. 240:11-18; Pinder Dep. 220:17-19.)  Further, denied to the extent that DSF 5 suggests that the Law School Advantage was or could in any way be a conflict with their jobs as full-time faculty members at John Marshall Law School ("JMLS").  (Sigman Dep. 238:25-239:5; Pinder Dep. 259:21-260:2, 266:12-267:4; Pinder Decl. ¶ 8-14; Sigman Decl. ¶ 7-11, 13-16.)  Otherwise, admitted.

6.     Beginning in 2010, they had created and launched a company website using the Law School's computers, opened a post office box, obtained a business telephone number, advertised for students on the website and on facebook, and prepared and filed a Certificate of Organization, Articles of Organization and an

Annual Registration for the company. Pinder Dep. [218:24-220:7, 222:8-22, 232:17-235:17], Exs. 10-15; Sigman Dep. [239:15-25, 242:2-9, 246:21-25, 247:15-17], Ex. 50.

RESPONSE:      Admitted, however Pinder and Sigman only used the Law School computers after observing other Professors use the Law School's computers for their own separate business enterprises.  (Sigman Decl. ¶ 11; Pinder Decl. ¶ 10.)

7.      They had hired an attorney who prepared an Operating Agreement for the company. Pinder Dep. [222:15-223:4], Ex. 10.

RESPONSE:      Admitted that another professor at JMLS, Jace Gatewood, prepared the Operating Agreement for Law School Advantage and charged Plaintiffs $400 to draft the Agreement.  (Pinder Dep. 222:13-224:1, Ex. 10.)  Further, DSF 7 is not material.

8.      In addition to using their John Marshall credentials and the Law School's name, Ms. Pinder and Mr. Sigman also used testimonials from their John Marshall students to promote the business, and had announced plans "to expand throughout the Southeastern region" and "grow the business nationally." Pages from the Law School Advantage, LLC website attached as Ex. B; *see also* Sigman

Dep., Ex. 50 ("It's going to be great and we're going to grow the business nationally!").

RESPONSE:    Admitted that Plaintiffs used the JMLS name and student testimonials on their website and that LSA's website indicated that Plaintiffs intended to grow the business nationally. (Sigman Decl. ¶ 9.) Denied that Plaintiffs ever intended to travel the country teaching courses or to teach more than one or two one-week summer courses. (*Id.)* LSA would never have conflicted with Plaintiffs' JMLS duties. (*Id*.)

9.    In mid-February, 2011, Richardson Lynn, Dean of the Law School, learned that Plaintiffs had created and were operating this for-profit company. Although they had been working on the company's business throughout the entire 2010-11 academic year, they had never discussed their business or conflicts it might create with Dean Lynn or sought permission to engage in the business. Pinder Dep. [127:10-22, 271:23-274:5]; Sigman Dep. [242:5-9]; Lynn Aff., ¶¶7-12.

RESPONSE:    Plaintiffs object to SMF 9 because it contains multiple allegations of fact in violation of Local Rule 56.1(B)(1).  Denied that Kamina Pinder's deposition at 127:10-22 supports the assertions in DMSF 9.  Denied to the extent that DSF 9 suggests that Plaintiffs' business would create conflicts with

Dean Lynn or JMLS.  (Sigman Dep. 238:25-239:5; Pinder Dep. 259:21-260:2, 266:12-267:4; Sigman Decl. ¶ 7-11, 13-16; Pinder Decl. ¶ 8-14.)  Admitted that Plaintiffs did not discuss any potential conflict with Lynn, though they did discuss it with other faculty and members of the administration because neither ever thought that the business could possibly conflict with their teaching positions. (Sigman Dep. 238:25-239:5; Pinder Dep. 259:21-260:2, 266:12-267:4.)  Admitted that Plaintiffs did not discuss the business with Lynn until he terminated their employment in March 2011.  Admitted that Lynn testified that he learned about Law School Advantage in mid-February 2011.

10.    After reviewing the company's marketing materials and business documents, the Dean concluded that it conflicted with the interests of the Law School and Plaintiffs' obligations and responsibilities to the Law School as full-time faculty members. Lynn Dep. I [223:24-224: 12]; Pinder Dep., Ex. 17; Sigman Dep., Ex. 48; Lynn Aff., ¶¶7-12.

RESPONSE:      Denied.  Lynn testified that he spoke with Ms. Pinder previously about such a program and "told her it was a good concept."  (Deposition of Richardson Lynn, June 11, 2013, ("Lynn Dep. I") 222:25-223:16.)  Moreover, Lynn did not conclude that an almost identical for-profit company started by Kathleen Burch, a white full time faculty member who did not complain of

discrimination at JMLS, conflicted with the interests of the law school.  (Lynn Dep. I, 224:23-225:5, 238:7-14, 239:2-18.)  Moreover, as of February 18, 2013, Lynn admitted that he was "not sure how to distinguish the two" businesses after it was "pointed out to [him] that [he] may have acted inconsistently [by supporting Burch's business] compared to Sigman and Pinder."  (Lynn Dep. I, 240:19-241:12; Pl. Ex. 191[1].)  Finally, Lynn never asked Plaintiffs whether the LSA business would conflict with their obligations and responsibilities to JMLS as full-time faculty members.  (Lynn Dep. I, 238:15-19.)

11.    He was concerned that the business created an impression with incoming law students that, if they paid for and took classes from Plaintiffs' before starting school at John Marshall, they would have an advantage over their John Marshall students, and thereby improve their prospects of success at the Law School. *Id.*

RESPONSE:      Denied.  Lynn testified that he spoke with Ms. Pinder previously about such a program and "told her it was a good concept."  (Lynn Dep. I, 222:25-223:16.)  Moreover, Lynn did not conclude that an almost identical for-

---

[1] Plaintiffs utilized continuous deposition exhibit numbers, entitled Plaintiffs' Exhibits 1 through 249, during the depositions.  Many of these exhibits were introduced in multiple depositions.  For ease of reference in this Response, Plaintiffs refer to the exhibits as "Pl. Ex. __", rather than referring to each and every deposition in which the exhibits were used.

profit company started by Kathleen Burch, a white full time faculty member who did not complain of discrimination at JMLS, conflicted with the interests of the law school.   (Lynn Dep. I, 224:23-225:5, 238:7-14, 239:2-18.)   Moreover, as of February 18, 2013, Lynn admitted that he was "not sure how to distinguish the two" businesses after it was "pointed out to [him] that [he] may have acted inconsistently compared to Sigman and Pinder." (Lynn Dep. I, 240:19-241:12, Ex. 191.)   Finally, Lynn never asked Plaintiffs whether the LSA business would conflict with their obligations and responsibilities to JMLS as full-time faculty members.  (Lynn Dep. I, 238:15-19.)

12.    The Faculty Handbook ("Handbook") required all faculty members to consult with the Dean about any activity that could create a conflict of interest and seek his permission. Pinder Dep., Ex. 9, §802(b), Ex. 6 (language prohibiting an ongoing relationship with a business), [127:10-22, 271:23-274:5]; Sigman Dep., Ex. 31; Sigman Dep. [242:5-9].

RESPONSE:      Denied.   Defendants mischaracterize § 802(b) of the Faculty Handbook, which requires faculty members to consult with the Dean before "consulting." (Pl. Ex. 1.)  Nowhere in § 802(b) of the Handbook are faculty members instructed to consult with the Dean about "any activity that could create a conflict of interest and seek his permission." (Pl. Ex. 1.)  In any event, Plaintiffs

were not engaging in "consulting," but rather starting to operate a for-profit business tutoring incoming law school students.   (Pinder Dep. 270:20-271:2, 271:6-9, 272:3-5; Sigman Dep. 129:22-25.)

13.     Ms. Pinder and Mr. Sigman did not do so. *Id.*

RESPONSE:        Admitted, because the Faculty Handbook did not require Plaintiffs to consult with the Dean regarding their for-profit business.  (Pl. Ex. 1; Pinder Dep. 270:20-271:2, 271:6-9, 272:3-5; Sigman Dep. 218:9-19.)   Further, Pidner sought, and received, permission from the Law School's Owner, Dr. Markovitz, to start the business.  (Pinder Dep. 240:1-17, 258:20-259:3, 260:3-13, 271:15-19; Deposition of Michael Markovitz, Ph.D. ("Markovitz Dep.") 36:6-21.)

14.     Plaintiffs' actions deeply concerned Dean Lynn and he then made the decision to nonrenew Plaintiffs. *Id.*; Lynn Dep. I [221:7-222:24]; Lynn Aff., ¶¶7-13.

RESPONSE:        Denied.   The deposition testimony referenced does not support the assertion set forth in DSF 14.  On March 2, at least two weeks after the Dean testified that he learned about Plaintiffs' business, and one day before Plaintiffs' terminations, Dean Lynn decided that "rather than fire Kamina and Scott for cause, [he would] notify them that their contract will not be renewed."  (Pl. Ex. 164.)

15.    On March 2, 2011, Dean Lynn sent emails to Ms. Pinder and Mr. Sigman asking each of them to meet with him the following day. Pinder Dep. [243:2-244:10].

RESPONSE:    Admitted.

16.    Upon receiving her email, Ms. Pinder knew immediately that the March 3rd meeting was not going to be positive, and felt it could have something to do with her business. Pinder Dep. [245:6-18, 247:14-249:20, 257:12-259:20].

RESPONSE:    Admitted that Pinder did not feel that the meeting would be positive because "the dean wanted to find a way to get rid of" her and because of Lynn's negative "pattern of behavior" with her.  (Pinder Dep. 244:18-21, 246:8-9; Sigman Dep. 233:3-12.)  Admitted that Pinder felt it could have something to do with her business because both she and Sigman received meeting requests from Lynn and the business was the only thing that she and Sigman had in common. (Pinder Dep. 245:6-246:9.)

17.    She prepared for her meeting by drafting a document that set forth the text of the section of the Handbook addressing outside employment and outlined talking points explaining why she did not believe the business created a conflict of interest. *Id*., Ex. 18 ("Dean LSA" document).

RESPONSE:    Admitted, but not material.

18.     She emailed the document to Mr. Sigman. *Id*.

RESPONSE:        Admitted, but not material.

19.     Mr. Sigman knew the business was likely to be the subject of his meeting with the Dean. Sigman Dep. [232:20-233-19]; Pinder Dep. [245:6-18].

RESPONSE:        Denied.  The cited testimony does not support DSF 19. Mr. Sigman testified that he did not agree with Ms. Pinder's concern that Lynn was going to terminate their employment because of the business.   (Sigman Dep. 233:3-19, 246:3-247:6; Pinder Dep. 244:11-245:18.)  Further, Mr. Sigman believed that the meeting would be positive, and that perhaps JMLS's owner Michael Markovitz wanted to offer or sell them space in which they could conduct the business or wanted to purchase the business.  *Id.*  Finally, DSF 19 is not material.

20.     He and Ms. Pinder discussed their strategies for the next day's meetings. Pinder Dep. [245:6-18, 247:14-249:20]; Sigman Dep. [232:20-233:19].

RESPONSE:        Denied.  The cited testimony does not support DSF 20. Further, Plaintiffs testified that they discussed their thoughts on what the meetings could potentially be about.   (Pinder Dep. 244:16-247:9, 248:18-22; Sigman Dep. 233:3-19.)  Further, DSF 20 is not material.

21.     On March 3, 2011, Dean Lynn met with Plaintiffs. Lynn Aff., ¶20.

RESPONSE:     Admitted that on March 3, 2011, Lynn met with Plaintiffs separately and terminated each Plaintiff's employment. (Sigman Decl. ¶ 6; Pinder Decl. ¶ 7; Pl. Exs. 91, 151.)

22.     He told them their annual appointments would not be renewed for the next academic year, 2011-12. *Id.*; Pinder Dep., Ex. 17; Sigman Dep., Ex. 48.

RESPONSE:     Admitted that Dean Lynn stated as much, but denied to the extent that DMSF 22 suggests that the substance of DSF 22 is accurate. Plaintiffs testified that on March 3, their employment was terminated for cause. (Pinder Dep. 261:12-264:24; Sigman Dep. 238:12-239:14.)

23.     Although the Handbook did not require him to inform them of the reasons for their nonrenewal, the Dean gave both Ms. Pinder and Mr. Sigman letters explaining why he had made this decision. *Id.*

RESPONSE:     Admitted the Handbook does not require Dean Lynn to provide reasons for nonrenewal, but denied that Plaintiffs were actually nonrenewed.     (Pinder Dep. 261:12-264:24; Sigman Dep. 238:12-239:14.) Plaintiffs testified that on March 3, their employment was terminated for cause. (Pinder Dep. 261:12-264:24; Sigman Dep. 238:12-239:14.) Dean Lynn explained for cause reasons for Plaintiffs' termination in their termination letters. (Pl. Exs. 1, 91, 151.)

24.    Both nonrenewal letters included the following language:

This is not a termination for cause, but you are entitled to know the reasons why your contract will not be renewed. They include your establishing and engaging in a business while employed as a full-time faculty member, engaging in a business which creates possible conflicts of interest, using the law school name on your business website without permission, and using law school computer facilities for your business.

*Id.*

RESPONSE:    Admitted that the letters Lynn gave Plaintiffs included the language quoted in DSF 24; denied that the Plaintiffs were actually nonrenewed. (Pinder Dep. 261:12-264:24; Sigman Dep. 238:12-239:14.)

25.    Ms. Pinder's nonrenewal letter also included as reasons for her nonrenewal her "failure to cooperate by submitting an explanation to the Board of Directors for the proposed Handbook change that you supported, and failure to follow law school policies on make-up classes." Pinder Dep., Ex. 17; Pinder Dep. [268:17-269:5].

RESPONSE:    Admitted that the letter Dean Lynn gave Ms. Pinder included the language quoted in DSF 25; denied that the Plaintiffs were actually nonrenewed. (Pinder Dep. 261:12-264:24; Sigman Dep. 238:12-239:14.)

26.    John Marshall paid both Ms. Pinder and Mr. Sigman through September 2, 2011, which was six months from the date of their nonrenewal.

Pinder Dep., Ex. 17; Sigman Dep., Ex. 48, [234:20-23]; June 24, 2013 Deposition

of R. Lynn [Doc. 55] ("Lynn Dep. II") [311:3-10].

RESPONSE:        Admitted that Pinder and Sigman were paid as set forth

in this paragraph.  Denied that the Plaintiffs were actually nonrenewed or that these

payments were consistent with nonrenewal under the terms of their contracts.

(Pinder Dep. 261:12-264:24; Sigman Dep. 238:12-239:14.)  Further, DSF 26 is not

material.

27.    Both Ms. Pinder and Mr. Sigman found jobs at other law schools

before their termination date at John Marshall, and have been employed ever since.

Pinder Dep. [88:20-94:3]; Sigman Dep. [102:4-19, 107:7-12].

RESPONSE:        Admitted that both Plaintiffs secured temporary or

visiting positions by July 31, the termination of their employment with JMLS.  (Pl.

Ex. 85; Ex. "B" (JMLS 6599-6600).)   However, Ms. Pinder has only secured

employment as a visiting professor, and neither Plaintiff is currently on a tenure

track like they were at JMLS.  (Sigman Decl. ¶ 22; Pinder Decl. ¶ 17.)  In addition,

neither has been compensated at nearly the same level they were at JMLS and both

have suffered other significant monetary damages since their terminations.

(Sigman Decl. ¶ 21-22; Pinder Decl. ¶ 17.)  Further, DSF 27 is not material.

28.     Ms. Pinder's admitted that Mr. Sigman was treated in exactly the same way as her.

> Q. (By Ms. Brockington) [Scot Sigman] was treated the same as you?
> A. We were both fired.
> Q. Okay. And that's the same treatment, correct?
> A. We were both -- yeah, that treatment was the same.

Pinder Dep. [208:16-22].

RESPONSE:     Plaintiffs object to DSF 28 because it is a legal conclusion and not a statement of fact in violation of Fed. R. Civ. P. 56.1(B)(1)(c). Admitted that both Plaintiffs were terminated for cause.  (Pinder Dep. 261:12-264:24; Sigman Dep. 238:12-239:14.)

29.     Ms. Pinder knew the work her business did could potentially create a conflict of interest. Pinder Dep. [254:13-255:7].

RESPONSE:     Denied that in 2010, when Plaintiffs were actually organizing the business, Pinder believed or thought that the business would create any conflict.  Admitted that in 2008, years before the business was created, Ms. Pinder asked Dean Lynn if privately tutoring students would be "weird" or pose some sort of unwritten conflict.  (Pinder Dep. 254:13-255:7; Pinder Decl. ¶ 4.) Dean Lynn responded that it might be odd but that such a program would not pose a conflict with her job at the law school.  (Pinder Decl. ¶ 5.)  Pinder was never

concerned that LSA could conflict with her teaching at JMLS or the Faculty Handbook.  (Pinder Dep. 193:5-19, 254:10-255:7; 260:3-13; Pinder Decl. ¶ 4, 8-14.)  Further, Ms. Pinder did not testify that she wondered if the business would create a conflict "of interest."  (*Id.*; Pinder 259:23-260:2.)  Finally, DSF 29 is not material.

30.    Ms. Pinder never asked Dean Lynn for permission to operate Law School Advantage, LLC. *Id*. at [271:23-272:5].

RESPONSE:      Admitted, however denied to the extent that DSF 30 suggests that Pinder was required to ask Lynn for permission to operate the for-profit business under the Handbook.  Nowhere in § 802(b) of the Handbook are faculty members instructed to consult with the Dean about "any activity that could create a conflict of interest and seek his permission."  (Pl. Ex. 1.)  In any event, Plaintiffs were not engaging in "consulting," but rather starting to operate a for-profit business tutoring incoming law school students.  (Pinder Dep. 270:20-271:2, 271:6-9, 272:3-5; Sigman Dep. 238:12-239:5, 239:15-17.)  Finally, DSF 30 is not material.

31.    No other faculty members, aside from Mr. Sigman, started and operated a for-profit business without permission from the Dean or a former Dean. Lynn Aff., ¶11.

16

RESPONSE:        Denied.  Kathleen Burch started and operated a for-profit business, barely distinguishable from Plaintiffs' business, in late 2012.  (Burch Dep. 13:18-24; Lynn Dep. I, 247:4-248:13.)   However, she did not discuss her business with Lynn until "a few days before February 18, 2013," and accordingly did not get permission to start and operate the business in advance.  (Lynn Dep. I, 245:6-246:21.)  Indeed, Burch began soliciting graduates of JMLS to be customers of her tutoring business by Facebook as early as December 14, 2012, and by email solicitations as early as January 20, 2013, having obtained their contact information from a list kept by Dean Lynn's secretary.  (Deposition of Richardson Lynn, June 24, 2013 ("Lynn Dep. II"), 269:17-270:17; Ex. 191; Burch Dep. 71:4-21.)  Further, Professor Robert D'Agostino did not seek permission for his work outside of the law school.  (Deposition of Robert D'Agostino ("D'Agostino Dep.") at 42:2-19.)  Professor Helen de Haven also did not seek permission for her for profit advocacy work outside of the law school.  (Deposition of Helen de Haven ("de Haven Dep.") at 84:18-86:1.)

32.    Dean Lynn never understood any of Mr. Sigman's comments to be complaints of discrimination by Ms. Butts against Mr. Sigman. Lynn Dep. II [332:11-15].

RESPONSE:     Denied.  Lynn testified that he did not recall whether Sigman complained to Lynn that he felt that Professor Butts was discriminating against him.  (Lynn Dep. I, 72:18-74:5.)  Further, Lynn did recall Mr. Sigman complaining to him regarding his concern that some black students were being given grade bumps by Butts and that Butts was favoring women and African Americans in grading.  (Lynn Dep. I, 72:18-74:5, 211:21-212:8.)  In fact, Lynn concluded that in one class, Mr. Sigman's complaints of Ms. Butts giving race and gender preferences at JMLS appeared to be true.  (Lynn Dep. I, 211:5-212:8.)  Additionally, when Mr. Sigman complained to Lynn about Butts' discriminatory actions, Lynn responded that he was keeping her around in part because she is a member of a protected class.  (Sigman Decl. ¶ 4.)

33.    The "false" complaint of discrimination complained about by Mr. Sigman arose in an email exchange between Mr. Sigman and Ms. Butts in October 2010. Sigman Dep. [176:5-182:17], Exs. 32 and 33 (relevant emails).

RESPONSE:     Denied.  While Sigman did complain to Lynn that Butts was putting him in a hostile work environment, Sigman also complained repeatedly, both in writing and verbally, that Butts was favoring African Americans and women in her grading and other policies and that her biased behavior against white male students was consistent with her biased behavior

18

against Sigman, a white male.  (Sigman Dep. 159:21-160:14, 161:1-4, 161:18-22.) Sigman further told Lynn on March 1 that "the pattern of altering grades for minority females was consistent with [his] treatment by Ms. Butts that [he] had attempted to get remedied through numerous channels, and that [he] wanted it to stop both on [his] behalf and the students."  (Sigman Dep. 160:9-14.)

34.    John Marshall planned to have a photographer on campus to take business headshots of the faculty. Sigman Dep., Ex. 32.

RESPONSE:        Admitted, but not material.

35.    Ms. Butts sent an email saying she would not be available that day, and Mr. Sigman responded with a five paragraph email conveying his disappointment in response. *Id*.

RESPONSE:        Admitted, but not material.

36.    The next day, Ms. Butts forwarded the email exchange to Dean Lynn and stated, "Scott creates a very hostile work environment for me." *Id*.

RESPONSE:        Admitted, but not material.

37.    The Dean followed up with Ms. Butts, but she said that she was not using hostile work environment in its legal sense, but merely wanted to express her concerns about Mr. Sigman's actions. *Id*.

RESPONSE:        Admitted, but not material.

38.     Dean Lynn relayed that information to Mr. Sigman. *Id*., Ex. 33.

RESPONSE:        Admitted, but not material.

39.     Mr. Sigman was not satisfied with the Dean's response and wanted the Dean to discipline Ms. Butts for making a false complaint about him. Sigman Dep. [188:12-25].

RESPONSE:        Admitted, but not material.

40.     Mr. Sigman admits the "I'm not your bitch, Scott" comment came in response to "recent changes that [he] made in the program." Sigman Dep., Ex. 41.

RESPONSE:        Admitted, but not material.

41.     Mr. Sigman characterized the comment as "unpleasant" and said he "believe[d] others—even others on the RPTC—have had similar confrontations with Prof. Butts where a line of professionalism/ collegiality has been crossed." *Id*.

RESPONSE:        Admitted, but not material.

42.     He never said that he felt discriminated against because of the email. *Id*.

RESPONSE:        Denied.  Sigman testified that he made clear that there "had been a pattern of disparate treatment against [him] and students by Michelle Butts on the basis of race and sex."  (Sigman 224:1-9.)

43.    The decision not to renew the teaching contracts of Ms. Pinder and Mr. Sigman was made in mid-February, well before Mr. Sigman says he met with Dean Lynn on March 1 and voiced his various complaints. Lynn Aff., ¶¶12-14; Lynn Dep. I [221:7-222:24], Ex. 50; Sigman Dep. [162:18-163:3]; [Doc. 1, ¶53].

RESPONSE:    Denied.  In mid-February, Michelle Harris brought the Facebook page of LSA to the attention of Dean Lynn.  (Harris Dep. 81:23-82:11; Lynn Dep. I, 221:13-19.)  With a couple of days, Dean Lynn and Michelle Harris spoke about LSA, and at no point during the conversations about LSA did the Dean say he was not going to renew Pinder and Sigman's contracts.  (Harris Dep. 92:16-19, 93:19-94:9.)   Dean Lynn testified that he spoke with Dr. Markovitz about the Facebook posting within a day or two and did not testify that he spoke with Markovitz about nonrenewing Plaintiffs' contracts.  (Lynn Dep. I, 222:9-13.) Rather, on March 2, at least two weeks after the Dean testified that he learned about Plaintiffs' business, one day after Sigman's March 1 complaints of race and gender discrimination at JMLS, and one day before Plaintiffs' terminations, Dean Lynn decided that "rather than fire Kamina and Scott for cause, [he would] notify them that their contract will not be renewed."  (Pl. Ex. 164.)

44.     Mr. Sigman readily admits that he never obtained permission to operate Law School Advantage, LLC. Sigman Dep. [232:20-233:19, 247:15-17]; Pinder Dep. [245:6-18, 247:14-249:20, 257:12-259:20].

RESPONSE:     Denied.   Pinder, Sigman's business partner, obtained permission to start the business from JMLS's owner, Michael Markovitz.  (Pinder Dep. 178:18-19, 193:17, 267:15-16; 271:18-19; Sigman Decl. ¶ 8.)

45.     Under the terms of the Handbook, the Dean had the authority to make the decision to nonrenew Plaintiffs' teaching appointments. Handbook, §405(c); Markovtiz Dep. [74:25-75-5] (testifying that personnel decisions are the purview of the Dean); Lynn Dep. II [317:15-19].

RESPONSE:     Admitted that Dean Lynn had authority over personnel decisions at JMLS.  Otherwise, denied that under the Handbook provisions, Dean Lynn had the authority to characterize Plaintiffs' terminations as "nonrenewals," "rather than fire [them] for cause" in order to avoid providing Ms. Pinder and Mr. Sigman with the appeal procedures set forth in the Handbook for "for cause" terminations.  (Pl. Ex. 1 at p. 29; Pl. Ex. 164.)

46.     Although he was not required to do so, Dean Lynn met with the Board Chair, Dr. Michael Markovitz, on February 25, 2011, to discuss his decision before implementing it on March 3, 2011. Lynn Dep. I [221:7-222:13]; June 24, 2013

Deposition of M. Markovitz [Doc. 56] ("Markovitz Dep.") [34:24-35:24].

RESPONSE:        Denied.  The cited testimony does not support DSF 46.
Lynn testified that he discussed the Plaintiffs' business Facebook posting, not an
alleged termination decision, with Dr. Markovitz "within just a day or two" after
finding out about Plaintiffs' business on February 14 or 15.  (Lynn Dep. I 221:7-
222:13, 221:16-222:13.)  It was not until March 2, at least two weeks after the
Dean testified that he learned about Plaintiffs' business, and one day before
Plaintiffs' terminations, that Dean Lynn decided that "rather than fire Kamina and
Scott for cause, [he would] notify them that their contract will not be renewed."
(Pl. Ex. 164.)  Thus, Lynn's DSF 46 clearly demonstrates that a disputed material
fact exists as to when Lynn and Dr. Markovitz first discussed Plaintiffs'
terminations.   In any event, *nowhere* in either Lynn's or Dr. Markovitz's
deposition testimony does *either* indicate that this alleged conversation took place
on February 25, 2011.

47.    Plaintiffs were probationary faculty members during the 2010-2011
academic year. Pinder Dep., Ex. 6; Sigman Dep., Ex. 31; [Doc. 1, ¶89]; Handbook,
§402(a).

RESPONSE:        Admitted, however, Ms. Pinder was up for a vote on
whether she would have attained a tenured position the following year, and surely

would have been granted tenure.   (D'Agostino Dep. 57:10-14; de Haven Dep. 99:12-21; Deposition of Kevin A. Ross ("Ross Dep.") 177:13-178:2.)

48.    As probationary faculty members, their appointments were subject to renewal (also called "re-appointment") or nonrenewal (also called "non-reappointment") each academic year under Section 405(c) of the Handbook. *Id.*

RESPONSE:        Admitted that Plaintiffs were subject to the provisions of the Handbook pertaining to probationary faculty members.  (Pl. Ex. 1, pp. 15-17.) However, denied that DSF 48 is a material fact, because Plaintiffs were actually terminated for cause under the provisions of Section 405(e) of the Handbook.  (Pl. Ex. 1, pp. 19-20, "Dismissal for Cause"; Pinder Dep. 261:12-264:24; Sigman Dep. 238:12-239:14.)

49.    Plaintiffs' nonrenewal letters state clearly and unequivocally that the actions taken against them were nonrenewals and not dismissals for cause. Pinder Dep., Ex. 17 ("This is not a termination for cause…"); Sigman Dep., Ex. 48 (same).

RESPONSE:        Admitted that Dean Lynn characterized Plaintiffs' terminations as nonrenewals in order to avoid affording Plaintiffs the "process for firing for cause, including an appeal to the Retention, Promotion & Tenure Committee" and Dr. Markovitz.  (Pl. Ex. 164.)   Otherwise DSF 49 is denied

24

because Plaintiffs were terminated for cause, given cause reasons, and were not provided the notice required under Section 405(c)(3)(iii).  (Pl. Ex. 1, p. 16; Pinder Dep. 261:12-264:24; Sigman Dep. 238:12-239:14.)   Section 405(c)(iii) provides that notice of non-reappointment shall be given "at least six months prior to the termination date of the faculty member if the faculty member is in the third year or beyond of a probationary appointment."  (Pl. Ex. 1.)

50.    The Handbook states that nonrenewal of a probationary faculty member's appointment is different from termination or dismissal for cause. Handbook, § 405(c)(1).

RESPONSE:        Admitted.

51.    When a faculty member is nonrenewed, the Law School is not required to set forth its reasons in the initial notice of non-reappointment. *Id*., § 405(c)(2).

RESPONSE:        Admitted, but not material.

52.    The faculty member is entitled to have the reasons for nonrenewal given in writing upon request to the Dean. *Id*.

RESPONSE:        Admitted, but not material.

53.     Although he was not required to do so in the nonrenewal letters, Dean Lynn included the reasons for nonrenewal in both nonrenewal letters. Pinder Dep., Ex. 17; Sigman Dep., Ex. 48.

RESPONSE:     Denied.   Because Dean Lynn actually terminated Plaintiffs for cause (despite the fact that he characterized Plaintiffs' for cause terminations as non-renewals), he provided Plaintiffs with reasons for their for cause terminations as set forth in Section 405(3)(1)(iii-v). (Pl. Exs. 91, 151, 164.) Specifically, Dean Lynn cited Plaintiffs' alleged violation of "Law School rules and policies," "professional misconduct as a … teacher," and Pinder's "failure to adhere to class or examination schedules," all for cause reasons for dismissal.  (Pl. Ex. 1, p. 19, Section 405(3)(1)(iii-v)).

54.     He did so because he felt letting them know was the right thing to do. Lynn Aff., ¶¶16, 19.

RESPONSE:     Denied.  First, Dean Lynn's Affidavit is in direct conflict with his contemporaneous explanation to Dr. Markovitz that he wished to characterize Plaintiffs' terminations as nonrenewals in order to avoid affording Plaintiffs the "process for firing for cause, including an appeal to the Retention, Promotion & Tenure Committee" and Dr. Markovitz.  (Pl. Ex. 164.)  Second, According to the Faculty Handbook, reasons for nonrenewal include "incongruity

between the teaching expertise of the faculty member and the educational goals of the Law School; unfavorable peer evaluation of the faculty member's teaching or scholarship which makes promotion or the award of tenure unlikely; or unfavorable evaluation of the faculty member's other responsibilities."  (Pl. Ex. 1.) None of the considerations set forth in the Faculty Handbook for nonrenewal of professors was given for Pinder and Sigman's alleged "nonrenewal."  (Deposition of Andrea Doneff ("Doneff Dep.") 143:1-21; Pl. Ex. 91, 151.)   There was no incongruity between the teaching experience of Pinder of Sigman and the educational goals of the Law school, no unfavorable peer evaluation of Pinder and Sigman's teaching or scholarship which makes promotion or the award of tenure unlikely, and no unfavorable evaluation of Pinder or Sigman's other responsibilities.  (Doneff Dep. 143:22-144:19.)  Dismissal for cause is "dismissal for misconduct or some other reason that justifies termination, and that is something that …can originate with the administration" rather than the RPTC (de Haven Dep. 55:18-21; Deposition of Jeffrey A. Van Detta ("Van Detta Dep.") 40:22-41:5.)  Plaintiffs' dismissals originated with the administration and was for alleged "misconduct."  (Pl. Ex. 1, p. 19 (Section 405(3)(1)(iii-v)), 91, 151.)

55.    Plaintiffs sought review of the Dean's nonrenewal decision by the "faculty grievance committee" under Section 703 of the Handbook. [Doc. 1, ¶56]; March 7, 2011 emails attached as Ex. D.

RESPONSE:        Admitted.

56.    Section 703 applies only to dismissals for cause. Handbook, §703.

RESPONSE:        Admitted.

57.    Because both Plaintiffs were nonrenewed and not terminated or dismissed for cause, their request for review by a faculty review committee was denied. *See* March 14, 2011 emails attached as Ex. E.

RESPONSE:        Admitted that Plaintiffs' requests for review were denied. Otherwise, denied that Plaintiffs were nonrenewed; rather, they were dismissed for cause.  (Pl. Ex. 164; *see* Response to SMF 55.)  Further, admitted that because Dean Lynn misrepresented to the RPTC that Plaintiffs were nonrenewed, the faculty review committee was not aware that Plaintiffs were terminated for cause and thus entitled for the procedures outlined in Section 703 of the Handbook.  (Pl. Exs. 1, 153; Burch Dep. 114:9-13, 134:2-10.)  Dean Lynn similarly misrepresented Plaintiffs' terminations to the Board of Directors when he sent the Board of Directors the text of the Faculty Handbook regarding only nonrenewals but not terminations for cause for review.  (Ross Dep. 151:23-155:15; Pl. Exs. 165, 219.)

28

Board of Directors member Kevin Ross felt that in order to review the appropriateness of Pinder and Sigman's terminations, including determining whether they were terminated for cause and entitled to process, the Board should also have been provided the provisions in the Handbook relating to terminations for cause. (Ross Dep. 151:23-155:15.) Dean Lynn also did not send the Board of Directors his email to Dr. Markovitz informing Dr. Markovitz that he planned to characterize Pinder and Sigman's terminations as nonrenewals rather than terminations for cause in order to avoid providing Pinder and Sigman process under the Handbook. (Pl. Ex. 164; Ross Dep. 171:2-173:11.)

58.     Section 405(c)(5) of the Handbook states that non-reappointment of a probationary faculty member is not subject to appeal "except that probationary faculty are entitled to request a review by the Dean" if unlawful discrimination, violation of academic freedom or procedural violations by the RPTC are alleged. Handbook, §405(c)(5).

RESPONSE:        Admitted, but not material.

59.     Plaintiffs never requested a review by the Dean. Ex. D.

RESPONSE:        Admitted that Plaintiffs never requested a review by the Dean because Section 405(c)(5) did not apply to their dismissals for cause, but

rather Plaintiffs attempted to appeal their for cause terminations pursuant to Section 703 of the Handbook.  (Pl. Exs. 1, 99; Ex. "B" (JMLS6080-81.)

60.    Their appeal requests did not allege unlawful discrimination, violations of academic freedom or procedural failures by the RPTC. *Id.*

RESPONSE:      Admitted, but not material.  While the March 7, 2011 appeal requests did not allege unlawful discrimination, violations of academic freedom or procedural failures by the RPTC, Plaintiffs did allege all three in other pieces of correspondence.  (Pl. Exs. 105, 175, 176, 199.)  Additionally, Plaintiffs did not make allegations pursuant to Section 405(c)(5) because that provision of the Handbook did not apply to their dismissals for cause.  (Pl. Ex. 1)  Rather Plaintiffs attempted to appeal their for cause terminations pursuant to Section 703 of the Handbook, which applied to their dismissals for cause.  (Pl. Exs. 1, 153; Burch Dep. 114:9-13, 134:2-10.)

61.    Even though their nonrenewals were not subject to appeal under Section 703, Plaintiffs were effectively allowed to appeal to the Chairman and the entire Board of Directors, who ultimately approved the Dean's decision. Deposition of K. Ross [Doc. 53] [128:21-129:10, 136:23-138:3] (testifying that the Board discussed the Dean's decision and whether it was consistent with the Handbook); Markovitz Dep. [89:19-90:13].

RESPONSE:      Admitted that after being denied the ability to appeal their for cause terminations pursuant to Section 703 of the Handbook, Plaintiffs reached out to the Board of Directors ("the Board") and asked the Board to review Dean Lynn's actions.  (Pl. Ex. 107; Markovitz Dep. 76:4-77:22; Ross Dep. 126:6-128:16.)  Before the Board of Directors' "review" of Plaintiffs' terminations, Dean Lynn sent the Board of Directors the text of the Faculty Handbook regarding only nonrenewals but not terminations for cause for review.  (Ross Dep. 151:23-155:15; Pl. Exs. 165, 219.)  Board of Directors member Kevin Ross felt that in order to review the appropriateness of Pinder and Sigman's terminations, including determining whether they were terminated for cause and entitled to process, the Board should also have been provided the provisions in the Handbook relating to terminations for cause.  (Ross Dep. 151:23-155:15.)  Dean Lynn also did not send the Board of Directors his email to Dr. Markovitz informing Dr. Markovitz that he planned to characterize Pinder and Sigman's terminations as nonrenewals rather than terminations for cause in order to avoid providing Pinder and Sigman process under the Handbook.  (Pl. Ex. 164; Ross Dep. 171:2-173:11.)  Further, admitted that the Board ultimately approved the Dean's decision, they did so without all available information and only after at least one board member, Kevin Ross, "expressed deep concern about the nonrenewals, the appearance of deficiencies,

and fair process that impact on the faculty," because "it felt more to [him] like it was termination for cause because this issue about the business was being cited as the reason," particularly since "the dean was acknowledging that they were excellent classroom teachers and otherwise seemed to be on track for promotion." (Ross Dep. 134:1-24.) Indeed, Kevin Ross "found that it was a termination for cause." (Ross Dep. 135:4-10.)

62.     Plaintiffs had been employed by John Marshall for more than three years and were entitled to written notice of non-reappointment "at least six months prior to the termination date of the faculty member." Pinder Dep., Ex. 2; Sigman Dep., Ex. 27; Handbook, § 405(c)(3)(iii).

RESPONSE:        Denied. Plaintiffs were entitled to one year's notice under their contracts which incorporated the 1940 Statement of Principles on Academic Freedom and Tenure.  (Pl. Exs. 1, 85, 140, 175.)

63.     Both Plaintiffs were given notice on March 3, 2011 that their appointments would not be renewed the following academic year, 2011-2012, and that they would be paid through September 2, 2011, their termination date. Pinder Dep., Ex. 17; Sigman Dep., Ex. 48; Sigman Dep. [234:20-23].

RESPONSE:        Admitted that Dean Lynn characterized Plaintiffs' terminations as nonrenewals in order to avoid affording Plaintiffs the "process for

firing for cause, including an appeal to the Retention, Promotion & Tenure Committee" and Dr. Markovitz.  (Pl. Ex. 164.)  Further, Plaintiffs were terminated for cause, given cause reasons, and were not provided the notice required under Section 405(c)(3)(iii) and were denied appeal rights under that section.  (Pl. Ex. 1, p. 16; Pinder Dep. 261:12-264:24; Sigman Dep. 238:12-239:14; *see* Response to SMFs 55, 57.)  Admitted that Plaintiffs were paid through September 2, 2011, but denied that September 2 was their termination date.  (Pl. Exs. 85, 140.)  Both Plaintiffs' contracts with JMLS terminated on July 31, 2011 and JMLS never contracted to employ Plaintiffs beyond that date, since they had been terminated for cause.  (Pl. Exs. 85, 140; Pinder Dep. 261:12-264:24; Sigman Dep. 238:12-239:14.)

64.    Plaintiffs were not told that their contracts would be terminated immediately.  *Id*.; Sigman Dep. [92:6-7]; Lynn Dep. II [311:3-10].

RESPONSE:        Admitted, but not material.

65.    For probationary faculty who have been with the Law School for one or two years, a specific date to notify the faculty member of nonrenewal is given, or in the alternative, a faculty member in his or her first year of service is given notice "at least three months prior to the expiration of an initial one-year appointment" and a faculty member in his or her second year of service is given "at

33

least six months prior to the expiration of the appointment." Handbook, §405(c)(3)(i),(ii).

RESPONSE:        Denied. The 1940 Statement of Principles on Academic Freedom and Tenure provides, in pertinent part, that:

> Notice should be given at least one year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period.

(Pl. Ex. 175[2], Bates No. P000728.)  The AAUP'S 1970 Interpretive Comments to the 1940 Statement explains that the one year notice period applies after a professor has held a probationary appointment of two or more years.  (Pl. Ex. 175, Bates No. P000731.) Both the 1940 Statement of Principles on Academic Freedom and Tenure are explicitly incorporated by reference into the Faculty Handbook and Plaintiffs' employment contracts. (Pl. Exs. 1, 85, 140.) The 1970 Interpretive Comments do not modify the one-year notice period applicable to Pinder and Sigman, and as such, the 1940 Statement of Principle both on its face and as interpreted entitle Pinder and Sigman to one year notice of the terminations of their contracts. (Pl. Ex. 175.)

---

[2]        Plaintiffs' Exhibit 175 is a letter from the American Association of University Professors to Dean Richardson Lynn dated March 22, 2011, regarding Plaintiffs' terminations.  The author of Exhibit 175 attached sections of multiple documents, each with page numbers at the bottom, but the page numbers are not in order.  Therefore, for the Court's ease of reference, Plaintiffs refer the Court to the Bates numbers stamped on the bottom right corner of Exhibit 175.

66.    For faculty members who have been with John Marshall for three years or more, notice of nonrenewal is to be given "at least six months prior to the termination date." *Id*., §405(c)(3)(iii).

RESPONSE:        Denied. The 1940 Statement of Principles on Academic Freedom and Tenure provides, in pertinent part, that:

> Notice should be given at least one year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period.

(Pl. Ex. 175, Bates No. P000728.)  The AAUP'S 1970 Interpretive Comments to the 1940 Statement explains that the one year notice period applies after a professor has held a probationary appointment of two or more years.  (Pl. Ex. 175, Bates No. P000731.) Both the 1940 Statement of Principles on Academic Freedom and Tenure are incorporated by reference into the Faculty Handbook and Plaintiffs' employment contracts. (Pl. Exs. 1, 85, 140.) The 1970 Interpretive Comments do not modify the one-year notice period applicable to Pinder and Sigman, and as such, the 1940 Statement of Principle both on its face and as interpreted entitle Pinder and Sigman to one year notice of the terminations of their contracts. (Pl. Ex. 175.)

67.    The Handbook provides that failure by the Law School to meet a time requirement does not entitle a faculty member to remain a faculty member.

Handbook, § 904.

RESPONSE:       Denied.  Section 904 of the Handbook provides that:

> Unless otherwise noted in this Handbook, no time limits may be
> waived.  No faculty holding probationary appointment may receive
> promotion or tenure because the relevant committee, Dean, Chairman,
> Board of Directors or their delegate failed to meet a deadline
> prescribed by this Handbook.  No faculty member subject to *dismissal
> for cause* obtains any right to remain a faculty member by any failure
> to meet any time requirement.

(Pl. Ex. 1, p. 39)(emphasis added).

68.     The Preamble to the Handbook states that it "specifically incorporates

the '1940 Statement of Principles on Academic Freedom and Tenure' prepared by

the American Association of University Professors, as modified by the process of

post-tenure review as set forth herein…." Handbook, p. 1 (Preamble).

RESPONSE:       Admitted.

69.     The "1940 Statement of Principles on Academic Freedom and

Tenure" does not include any notice provisions.  Ex. F.

RESPONSE:       Denied.  The 1940 Statement of Principles on Academic

Freedom and Tenure provides, in pertinent part, that:

> Notice should be given at least one year prior to the expiration of the
> probationary period if the teacher is not to be continued in service
> after the expiration of that period.

36

(Pl. Ex. 175, Bates No. P000728.)   The AAUP's 1970 Interpretive Comments to the 1940 Statement explains that the one year notice period applies after a professor has held a probationary appointment of two or more years.  (*Id.* at Bates No. P000731.)   The 1970 Interpretive Comments do not modify the one-year notice period applicable to Pinder and Sigman, and as such, the 1940 Statement of Principle both on its face and as interpreted entitle Pinder and Sigman to one year notice of the terminations of their contracts. (*Id.*)

70.   The AAUP did not address notice of nonrenewal until thirty years later, when it added the 1970 Interpretive Comments. Ex. F, p. 6.

RESPONSE:        Denied.  See Plaintiffs' response to DSF 69.

71.   The 1970 Interpretative Comments are not incorporated into the Handbook and are not referenced in Plaintiffs' renewal letters.

RESPONSE:        Denied.   The 1970 Interpretative Comments are incorporated into the 1940 Statement of Principles on Academic Freedom and Tenure, which itself is incorporated into the Handbook and Plaintiffs' contracts. (Pl. Exs. 1, 85, 140, 175, Bates No. P000729, P000731.)

72.   The Handbook states that "[i]n case of conflicting policies, the provisions of the Handbook shall prevail." Handbook, p. 1 (Preamble); Lynn Dep. I [63:2-5].

RESPONSE:      Admitted, but not material.  The Handbook incorporates the AAUP guidelines which provides for one year of notice of the terminations of Pinder and Sigman's contracts.  (Pl. Exs. 1, 175.)  Moreover, even if there were a conflict between the Handbook and the 1940 Statement of principles, the Handbook provides that Plaintiffs were entitled to at least six months' notice of the terminations of their contracts, but they were provided notice of their for cause terminations on March 3, 2011, less than six months prior to the July 31, 2011 contract termination.   (Pl. Exs. 1, 91, 151; Van Detta Dep. 179:17-180:1; Markovitz Dep. 83:13-84:1.)

Respectfully submitted this 13th day of September, 2013.

BUCKLEY & KLEIN, LLP

By:     */s/ Jaime L. Duguay*
        Jaime L. Duguay
        Georgia Bar No. 829447
        jlduguay@buckleyklein.com
        Edward D. Buckley
        Georgia Bar No. 092750
        edbuckley@buckleyklein.com

Promenade II, Suite 900
1230 Peachtree Street NE
Atlanta, GA  30309
Telephone:  (404) 781-1100
Facsimile:   (404) 781-1101

Counsel for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 13, 2013, I electronically filed **PLAINTIFFS' RESPONSE TO DEFENDANTS JOHN MARSHALL LAW SCHOOL, LLC AND JOHN MARSHALL LAW SCHOOL'S STATEMENT OF UNDISPUTED FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Mary M. Brockington
Jonathan R. Poole

BUCKLEY & KLEIN, LLP

By:   */s/ Jaime L. Duguay*
Jaime L. Duguay
Georgia Bar No. 829447
jlduguay@buckleyklein.com

Counsel for Plaintiffs