IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KAMINA PINDER and SCOTT SIGMAN, | : : : | CIVIL ACTION NO. 1:12-CV-3300-WSD-JSA |
| Plaintiffs, | : : | |
| v. | : : | |
| JOHN MARSHALL LAW SCHOOL, LLC, and JOHN MARSHALL LAW SCHOOL, | : : : : | **ORDER AND NON-FINAL REPORT AND RECOMMENDATION ON A MOTION FOR SUMMARY** |
| Defendants. | : | **JUDGMENT** |

Plaintiffs Kamina Pinder and Scott Sigman are former associate professors at John Marshall Law School. They were terminated in 2011, ostensibly because they engaged in unapproved outside business activities. Plaintiffs allege, however, that these reasons were a pretext, in Plaintiff Pinder's case, for unlawful discrimination on the basis of race and, in Plaintiff Sigman's case, in retaliation for complaining about discrimination. Plaintiffs assert claims for race discrimination and unlawful retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, *et seq*., and 42 U.S.C. § 1981 ("§ 1981"). They also assert claims for breach of contract and bad faith under Georgia law, alleging that the form and timing of their termination violated their contractual rights.

The action is now before the Court on the Defendants' Motion for Summary Judgment [57], the Defendants' Motions for Continued Protection [62][75], the Plaintiffs' Motion for Leave to File Excess Pages [61], and the Plaintiffs' Motion to Exclude Sham Affidavit of Richardson Lynn [68]. For the reasons discussed below, the Defendants' Motions for Continued Protection [62][75] are **GRANTED**, the Plaintiffs' Motion for Leave to File Excess Pages [61] is **GRANTED**, and the Plaintiffs' Motion to Exclude Sham Affidavit of Richardson Lynn [68] is **DENIED**.

The undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [57] be **GRANTED** entirely as to Defendant John Marshall Law School, which the undisputed facts show was not Plaintiffs' employer. As to Plaintiffs' employer, Defendant John Marshall Law School, LLC, the undersigned **RECOMMENDS** that Defendants' Motion [57] be **GRANTED IN PART AND DENIED IN PART**. Specifically, the Court **RECOMMENDS** that summary judgment be **GRANTED** as to Count IV, which alleges unlawful retaliation under Title VII as to Plaintiff Sigman. The undisputed evidence shows that Plaintiff Sigman did not engage in protected activity within the scope of Title VII as required in that Count. But the Court otherwise **RECOMMENDS** that summary judgment be **DENIED** as to all other counts as to Defendant John Marshall Law School, LLC. In particular, Plaintiffs have adduced sufficient facts from which a jury could infer that

2

they were terminated for improper reasons and that the original reasons articulated were pretextual. Plaintiffs have also presented sufficient facts to create a genuine dispute as to whether Defendant complied with the provisions of the Handbook.

## I.    FACTS

Unless otherwise indicated, the Court draws the following facts from Defendants' "Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried" [57-1] ("Def. SMF") and "Plaintiffs' Statement of Material Facts as to Which There Exist Genuine Issues to Be Tried" [66-1] ("Pl. SMF"). The Court also draws some facts from Plaintiffs' Response to Defendants' Statement of Material Facts [67] ("Pl. Resp. SMF") and Defendants' Response to Plaintiffs' Statement of Additional Material Facts [76-1] ("Def. Resp. SMF").

The Court has excluded assertions of fact by either party that are immaterial or presented as arguments or legal conclusions, and has excluded assertions of fact unsupported by a citation to evidence in the record or asserted only in the party's brief and not the statement of facts. *See* LR 56.1B, NDGa ("The court will not consider any fact: (a) not supported by a citation to evidence . . . or (d) set out only in the brief and not in the movant's [or respondent's] statement of undisputed facts."). The Court has also viewed all evidence and factual inferences in the light most favorable to Plaintiffs, as required on a defendant's motion for summary judgment. *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *McCabe v. Sharrett*, 12 F.3d 1558, 1560 (11th Cir. 1994); *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993). Accordingly, the following facts are viewed in the light most favorable to Plaintiffs.

John Marshall Law School, LLC ("JMLS"), and not John Marshall Law School, employed the Plaintiffs.[1] Def. SMF at ¶ 1. Plaintiff Kamina Pinder, an African-American female, began her employment at JMLS as an Associate Professor of Legal Skills on August 1, 2006, under a one-year contract to run through July 31, 2007. Def. SMF at ¶ 2; Pl. SMF at ¶ 1. Plaintiff Scott Sigman,[2] a white male, began his

---

[1] Although Plaintiffs state "Denied" in response to this fact, they have failed to cite to any evidence disputing that fact. *See* Pl. Resp. SMF at ¶ 1. Instead, they state that "Plaintiffs are not aware whether . . . [this] is a fact, but know only that ADP Totalsource I Inc and Adams-Keegan-GA, LLC issued their paychecks at different times during their employment with Defendants." *Id.* Under the Local Rules, this response is insufficient to controvert or dispute the Defendants' proffered fact, so the Court must deem the fact admitted. *See* LR 56.1B(2)(a)(4), NDGa. As required by Local Rule 56.1, the Court has deemed any fact not directly refuted by the opposing party with citations to evidence in the record to be admitted, unless the subject of a proper objection on other grounds. LR 56.1B(2)(a)(2), NDGa. Because it is undisputed that Plaintiffs were employed by John Marshall Law School, LLC, any reference to "Defendant" herein refers to the Plaintiffs' employer, John Marshall Law School, LLC ("JMLS").

[2] In Defendants' Statement of Facts, they refer to Plaintiff as "Scot Sigman," but the Plaintiff identifies himself as "Scott Sigman." *See* Def. SMF at ¶ 3; Pl. Resp. SMF at ¶ 3; Compl. [1] at 1. The Court will use the Plaintiff's spelling.

4

employment at JMLS the following year, on July 1, 2007, when he was hired as an Associate Professor of Legal Skills. Def. SMF at ¶ 3; Pl. SMF at ¶ 35.

In the fall of 2006, Plaintiff Pinder applied for a tenure-track position, but in early 2007, Dean of the Law School Richardson Lynn informed her that her application was denied. Pl. SMF at ¶¶ 3-6. Thereafter, Pinder complained to Dean Lynn that she believed she had been discriminated against based on her race when she was not moved to the tenure track. Pl. SMF at ¶ 7. Pinder also drafted a report to the American Bar Association pointing out what she believed to be patterns of race-based discrimination at JMLS, and forwarded the draft report to Dr. Michael Markovitz,[3] copying Dean Lynn and JMLS Board of Directors member Kevin Ross. Pl. SMF at ¶ 9. Pinder informed Dean Lynn that she contacted the ABA to report what she perceived to be biased treatment at JMLS, and Dean Lynn took this complaint as a complaint of discrimination. Pl. SMF at ¶¶ 10-11. Plaintiffs contend that Pinder's complaint of discrimination was never investigated by JMLS, while Defendant contends that Dr. Markovitz investigated the issues raised in Pinder's letter. Pl. SMF at ¶ 12; Def. Resp. SMF at ¶ 12.

---

[3] Plaintiffs contend that Dr. Markovitz was the "owner" of JMLS, but he testified that the owner of JMLS was "two of my family trusts." Markovitz Dep. at 11. Dr. Markovitz testified on June 24, 2013, that he had been Chairman of the Board of JMLS until a few months prior to his deposition. *Id.* at 23.

Pinder was reappointed to a position as an Associate Professor of Legal Skills for the 2007-2008 academic year. Pl. SMF at ¶ 13; Def. Resp. SMF at ¶ 13. During the 2007-2008 academic year, Pinder reapplied for a tenure-track doctrinal position and received a substantial majority of positive votes. Pl. SMF at ¶ 15. Pinder accepted a tenure-track doctrinal position for the 2008-2009 academic year, but was also assigned to teach a skills class in addition to her doctrinal contracts class. Pl. SMF at ¶ 16. Plaintiff contends that no other doctrinal hire was assigned to teach a skills course along with a doctrinal course. Pl. SMF at ¶ 17; Pinder Dep. at 170. According to Defendant, Dean Lynn asked Pinder to teach legal writing because she had taught it before, and he wanted to "avoid giving her more than one new preparation." Def. Resp. SMF at ¶ 16; Lynn Dep. I at 136-37.

Beginning in January of 2008, Sigman served as the Director of Legal Skills and Professionalism Program. Pl. SMF at ¶ 37. Plaintiffs contend that, on an unspecified date, Sigman made a report to Michelle Harris, Assistant Dean for Administration, that Associate Professor Michelle Butts had told a student that "minorities did not do well in Sigman's class." Pl. SMF at ¶ 40. Harris testified as follows: "The actual sequence of events I got was that Professor Butts told a student who then told another faculty member who then told Scott Sigman what the comment was, that minorities did not do well in the class." Harris Dep. at 114. According to

Harris, she asked Sigman to have the student come to her so she could talk to the student to find out exactly what was said, but the student did not come to her and she did not even know the name of the student. Harris Dep. at 115.

Plaintiffs contend that, on an unspecified date in 2008, Pinder asked Dean Lynn whether privately tutoring current students would be an ethical conflict of interest. Pl. SMF at ¶ 65; Pinder Decl. at ¶ 4. According to Plaintiffs, Dean Lynn responded that it might be odd but that it would not pose a conflict with her job at the law school. Pl. SMF at ¶ 66; Pinder Decl. at ¶ 5. Defendants dispute this contention, and cite to Pinder's deposition testimony:

> Q      [Y]ou asked him about outside tutoring and whether it posed a conflict?
>
> A      Right. I had.
>
> Q      And you were concerned that it could pose a conflict?
>
> A      I wasn't sure. Well, my concern had nothing to do with what I had seen in the handbook per se. My concern is that to tutor the same students I was teaching might pose a conflict.

Pinder Dep. at 254.

During the 2009-2010 academic year, Pinder proposed a change to the JMLS Faculty Handbook ("Handbook") that would make it a policy at JMLS for the full-time faculty to get priority over faculty at other schools for summer and intercession teaching assignments. Pl. SMF at ¶ 29. Although the faculty voted to

adopt the proposed change, before it went before the Board of Directors, Dr. Markovitz asked for an explanation as to why it was good for the institution. Pl. SMF at ¶ 30. Pinder concluded that Dr. Markovitz did not want the change and did not send an explanation on June 4, 2010. Pl. SMF at ¶ 31.

On June 14, 2010, Pinder was extended an offer to teach on the doctrinal track for the 2010-2011 academic year. Pl. SMF at ¶ 32; Pinder Dep., Def. Ex. 9. In the letter from Dean Lynn to Pinder offering her that position, he stated as follows:

> These responsibilities are set forth generally in the Faculty Handbook and include your obligation to engage in teaching, scholarship, and service. Regularly engaging in law practice, having an on-going relationship with a law firm or business, being listed on a law firm letterhead, or having a professional telephone listing is not permitted.

Def. SMF at ¶ 12; Pinder Dep., Def. Ex. 6.

On June 14, 2010, JMLS also renewed Sigman's contract for the 2010-2011 academic year, with a term from August 1, 2010 through July 31, 2011, and his letter of renewal incorporated the Handbook by reference. Pl. SMF at ¶ 41; Sigman Dep., Def. Ex. 31; Pl. Ex. 140. His letter of renewal further stated that: "Regularly engaging in law practice, having an on-going relationship with a law firm or business, being listed on a law firm letterhead, or having a professional telephone listing is not permitted." Sigman Dep., Def. Ex. 31; Pl. Ex. 140.

In November 2010, an evening student complained to Sigman that Butts discriminated on the basis of gender. Pl. SMF at ¶ 42. Subsequently, at least one other student complained to Sigman that Butts discriminated on the basis of gender. Pl. SMF at ¶ 43. On February 8, 2011, the Retention, Promotion, and Tenure Committee ("RPTC") recommended that Sigman's contract be renewed for the 2011-2012 academic year. Pl. SMF at ¶ 44.

In February 2011, after Professor Sigman received multiple complaints from students that Professor Butts was favoring minorities and women, he complained to the RPTC and Dean Lynn about Butts's discriminatory practices. Pl. SMF at ¶ 45. Sigman also complained to Harris that Butts was grading minority students more favorably than non-minority students; Harris turned his complaint over to Academic Dean Michael Mears, who investigated whether Sigman's complaints were accurate. Pl. SMF at ¶ 46. Plaintiffs contend that, on February 28, 2011, Sigman had a phone conversation with the Chair of the RPTC, Professor Jeff Van Detta, in which Sigman stated that he believed that he and JMLS students were being discriminated against.[4] Pl. SMF at ¶ 49; Sigman Decl. at ¶ 5.

---

[4] Plaintiffs do not explain the basis of Sigman's complaint that he had been the victim of "discrimination." *See* Pl. SMF at ¶ 49; Sigman Decl. at ¶ 5. It is not clear whether Sigman was accusing Butts of discriminating him, or how she had allegedly done so.

Plaintiffs contend that, on March 1, 2011, Sigman met with Dean Lynn and complained to him about racial and gender discrimination directed against both Sigman and students. Pl. SMF at ¶ 51; Sigman Dep. at 159-61. Plaintiffs contend that Sigman complained "about gender and racial bias against [him] and students and us[ed] supporting information [about grading biases] that [he] believed supported [his] complaint." Pl. SMF at ¶ 52; Sigman Dep. at 159. According to Plaintiffs, Sigman told Dean Lynn that the "disparate treatment of white male students was consistent with the disparate treatment of me, a white male colleague." Pl. SMF at ¶ 53; Sigman Dep. at 159-60.[5] Plaintiffs contend that Sigman told Dean Lynn that "the pattern of altering grades for minority females was consistent with my treatment by Ms. Butts that I had attempted to get remedied through numerous channels, and I wanted it to stop both on my behalf and the students." Pl. SMF at ¶ 54; Sigman Dep. at 160. Plaintiffs also contend that Sigman complained to Dean Lynn that Butts favored African Americans and women in her grading and other policies, and that her biased behavior against white male students was consistent with her biased behavior against Sigman, a white

_____

[5] Plaintiffs contend that Sigman complained to Dean Lynn that Butts had discriminated against him when she "told students of color to avoid taking his classes." Pl. SMF at ¶ 53. The evidence cited by Plaintiffs, however, does not support the allegation that Sigman made that claim to Lynn. *See* Sigman Dep. at 159-60; Lynn Dep. I at 72-74; 211-12.

male, including previously writing to Sigman, "I'm not your bitch, Scott."[6] Pl. SMF at ¶ 55; Sigman Dep. at 159-61, 169-70, Pl. Ex. D, E.

Although Defendant does not dispute that Sigman complained about Butts's treatment of students, it disputes that Sigman complained to Dean Lynn that Butts had discriminated against him personally. Def. Resp. SMF at ¶¶ 52-55. Defendant contends that Dean Lynn never understood that any of Sigman's comments were complaints that Butts had discriminated against Sigman. Def. SMF at ¶ 32; Def. Resp. SMF at ¶¶ 52-55. Dean Lynn testified as follows about Sigman's complaints about Butts:

> Q      Did Mr. Sigman ever say to you that he felt Ms. Butts was discriminating against him?
>
> A      I don't recall that.
>
> Q      You say you don't recall. Are you saying he didn't say it, or you just don't remember?
>
> A      I don't remember. There was a great deal of friction between them. I talked to him numerous times about it.

---

[6] Plaintiffs also contend that Sigman complained to Dean Lynn that "Professor Butts was putting him in a hostile work environment." Pl. SMF at ¶ 55. The evidence cited by Plaintiffs, however, does not support that allegation. *See* Sigman Dep. at 159-61 ("I was complaining to Dean Lynn about gender and racial bias against me and students" and "a pattern and practice of discriminatory conduct against white males, including me"), 169-70. Instead, Sigman testified that it was Butts who had accused him of creating a hostile work environment for her, and he complained that she had falsely accused him. Sigman Dep. at 175.

> Q    If an employee, a professor, complains to you about discrimination, as a dean or as a member of the administration, do you have any duties once you have received such a complaint?
>
> A    Well, under our employee handbook, there's a duty to investigate such a complaint. In this case, on its face it's just the battle between Professor Butts and Professor Sigman, and nothing I knew indicated it had any racial component.
>
> So if that was one of his series of concerns, it was not one that I thought had any basis in fact and no reason to investigate it further.

Lynn Dep. I at 72-74.

According to Defendant, Sigman complained to Lynn about a "false" complaint of discrimination that arose in an email exchange between Sigman and Butts in October of 2010. Def. SMF at ¶ 33; Sigman Dep., Ex. 32 and 33. JMLS planned to have a photographer on campus to take business headshots of the faculty. Def. SMF at ¶ 34. Butts sent an email saying she would not be available that day, and Sigman responded with a five-paragraph email conveying his disappointment in response. Def. SMF at ¶ 35. The next day, Butts forwarded the email exchange to Dean Lynn and stated, "Scott creates a very hostile work environment for me." Def. SMF at ¶ 36. Dean Lynn then followed up with Butts, who said that she was not using hostile work environment in its legal sense, but merely wanted to express her concerns about Sigman's actions. Def. SMF at ¶ 37. Dean Lynn relayed that information to Sigman, but Sigman was not satisfied with the Dean's response and wanted the Dean to

discipline Butts for making a "false complaint" about him. Def. SMF at ¶¶ 38-39. Sigman admits the comment from Butts that "I'm not your bitch, Scott" came in response to "recent changes that [he] made in the program." Def. SMF at ¶ 40. Sigman characterized the comment as "unpleasant" and said he "believe[d] others–even others on the RPTC–have had similar confrontations with Prof. Butts where a line of professionalism/ collegiality has been crossed." Def. SMF at ¶ 41; Sigman Dep., Ex. 41.

Plaintiffs contend that Dean Lynn concluded that Sigman's complaints regarding Professor Butts giving race and gender-biased grade bumps at JMLS appeared to be true, but the Defendant disputes that. Pl. SMF at ¶ 57; Def. Resp. SMF at ¶ 57; Lynn Dep. I at 211-212. Dean Lynn testified that, with respect to the complaints about "grade-bumping" by Butts, he did not see "any support for that." Lynn Dep. I at 211. He wrote in an email to Dr. Markovitz that he had "looked into it, and there was one class where that appeared to be true but not true in others." Lynn Dep. I at 212, Pl. Ex. 163.

In the summer of 2010, Pinder approached Dean Lynn and suggested a summer preparation program for incoming law students, and Dean Lynn responded that "it was a good concept." Pl. SMF at ¶ 25; Def. Resp. SMF at ¶ 25. Dean Lynn testified as follows about Pinder's suggestion:

Q      Now before this, had Pinder or Sigman or both approached you about teaching a course to new law students to assist them in learning the ropes, so to speak, about law school before they went to give them a little better advantage?

A      I don't believe Professor Sigman did. Within a year or two before this, Professor Pinder had talked to me about starting such a program, some other schools have them frequently, in an effort to get more minority students.

And so we discussed the concept, which I told her was a good concept. I wasn't sure that we had any money for it, and I wasn't sure it was quite as important a program to us as it might be for some other schools.

Q      In other words, you didn't approve her going forward with the program at the school?

A      It was a very preliminary conversation, so neither she nor I did anything at all to move it forward on behalf of the law school.

Lynn Dep. at 222-23.

Pinder contends that she approached Dr. Markovitz with her idea, and Dr. Markovitz gave her permission to start it herself.[7] Pl. SMF at ¶ 26. Defendant disputes that Dr. Markovitz ever gave Pinder "permission" to start a summer program, and contends that Dr. Markovitz denied doing so. Def. Resp. SMF at ¶ 26. Dr. Markovitz testified as follows:

---

[7] Plaintiffs contend that Dr. Markovitz gave Pinder "permission" to start the summer program, and said "why not make the program your own?" Pl. SMF at ¶ 26. In support of that contention, Plaintiffs cite to Pinder's deposition testimony, but the pages cited do not support that contention that Dr. Markovitz said "why not make the program your own?" *See* Pinder Dep. at 240, 258-59, 260, 271.

Q      In fact, Kamina Pinder had approached you about doing such a program in-house at John Marshall Law School, hadn't she?

A      Well, Kamina was always looking for ways to make more money, so she may have, may have mentioned that.

Q      And her thought, as she expressed it to you, was what about doing this course, and she or other faculty could teach the course and make some extra money at John Marshall Law School doing so; right? . . .

A      Yes, she may have.

Q      And you, upon hearing her idea, told her to go out and make it your own; right? . . .

A      No. That's not so.

Q      That's not so?

A      No. No. Because I don't do that. That's not my role at the school I would have told her whatever you want to do to make more money at the school, you've got to talk to the dean about it.

Q      You say you would have told her that?

A      Absolutely, I would have told her that.

Q      Do you have any specific recollection of telling her that?

A      No, I don't.

Q      Did you tell her or suggest to her in any way, shape, or form that she go out and start her own private business?

A      What I would have said to Kamina is that if she is not happy working at the law school, she has a perfect right to leave and go do something else.

Markovitz Dep. at 36-37. Dr. Markovitz further testified: "I'm aware that Pinder claims that I gave her permission to start this business, and that is absolutely not the case." *Id.* at 51.

15

During the spring and summer of 2010, Pinder and Sigman began organizing a for-profit company called Law School Advantage ("LSA"), which was a summer preparation program for incoming law students with plans to launch in July of 2011. Def. SMF at ¶ 5; Pl. SMF at ¶¶ 27, 59-60. Plaintiffs planned for LSA to be a one-week long course during the summer before JMLS students began official classes, designed to help the entering law students learn the basic skills they needed to learn to start law school, including how to read a case and how to write a case brief. Pl. SMF at ¶ 60.

Beginning in 2010, Plaintiffs had created and launched the company website using JMLS computers, opened a post office box, obtained a business telephone number, advertised for students on the website and on Facebook, and prepared and filed a Certificate of Organization, Articles of Organization, and Annual Registration for the company. Def. SMF at ¶ 6. Plaintiffs do not dispute this, but contend that they only used the JMLS computers after observing other Professors doing so for their own separate business enterprises. Pl. Resp. SMF at ¶ 6. Plaintiffs also hired an attorney who prepared an Operating Agreement for the company. Def. SMF at ¶ 7. In addition to using their JMLS credentials and the Law School's name, Plaintiffs also used testimonials from their John Marshall students to promote the business, and LSA's website announced plans "to expand throughout the Southeastern region" and "grow the business nationally." Def. SMF at ¶ 8; Pl. SMF at ¶ 61. Plaintiffs contend that they

16

did not keep the launch of LSA a secret, and that other faculty members were aware of the program and offered suggestions in support of the business. Pl. SMF at ¶ 63.

During the 2010-2011 academic year, both Plaintiffs were employed as full-time faculty members at JMLS, but they held probationary appointments that were subject to renewal on an annual basis. Def. SMF at ¶¶ 4-5, 47. As probationary faculty members, the Plaintiffs' appointments were subject to renewal (also called "re-appointment") or nonrenewal (also called "non-reappointment") each academic year under Section 405(c) of the Handbook. Def. SMF at ¶ 48.

In mid-February of 2011, Dean Lynn learned that Plaintiffs had created and were operating LSA when Michelle Harris informed him of the LSA Facebook page. Def. SMF at ¶ 9; Pl. SMF at ¶ 73. Dean Lynn spoke to Dr. Markovitz about the LSA Facebook page within a day or two. Pl. SMF at ¶ 75. Although the Plaintiffs had been working on the company's business throughout the entire 2010-11 academic year, they had never discussed their business with Lynn, nor had they sought permission to engage in the business. Def. SMF at ¶ 6; Pl. Resp. SMF at ¶ 6.

Defendant contends that, after reviewing the company's marketing materials and business documents, Dean Lynn concluded that it conflicted with the interests of the Law School and Plaintiffs' obligations and responsibilities to the Law School as full-time faculty members. Def. SMF at ¶ 10. Lynn was concerned that the business

created an impression with incoming law students that, if they paid for and took classes from the Plaintiffs before starting school at JMLS, they would have an advantage over other JMLS students, and thereby improve their prospects of success at the Law School. Def. SMF at ¶ 11. Plaintiffs dispute Lynn's conclusion that LSA conflicted with their responsibilities, and contend that Lynn never asked them whether LSA would conflict with their obligations and responsibilities to JMLS as full-time faculty members. Pl. Resp. SMF at ¶¶ 10-11.

According to Defendant, the Handbook required all faculty members to consult with the Dean about any activity that could create a conflict of interest and seek his permission. Def. SMF at ¶ 12. The section of the Handbook cited by Defendant, § 802, provides as follows:

**(b) Outside Employment**

The Law School recognizes that occasional consulting work may be a valuable professional experience for faculty members. However, such work must not interfere with the faculty member's contractual arrangements with the Law School. Faculty members may neither permit their names to be listed on law firm stationery nor have an "of counsel" relationship with any law firm.

Generally, consulting may not consume more than ten hours per week and the subject matter of the consulting must be related to the faculty member's teaching expertise. Prior permission to consult must be received from the Dean. Faculty members may not cancel class in order to arrange for consulting opportunities except with permission of the Dean.

Handbook, Pinder Dep., Ex. 9 at § 802; Pl. SMF at ¶ 84.

It is undisputed that Plaintiffs did not obtain the permission of the Dean before creating LSA. Def. SMF at ¶¶ 13, 30; Pl. Resp. SMF at ¶¶ 13, 30. Plaintiffs contend that the Handbook did not require them to obtain the permission of the Dean; although the Handbook required faculty members to obtain permission from the Dean for "consulting," they were not engaging in "consulting," so the Dean's permission was not needed. Pl. SMF at ¶¶ 72, 84; Pl. Resp. SMF at ¶¶ 12-13. Plaintiffs also contend that Pinder obtained permission to start the business from Dr. Markovitz., which Dr. Markovitz denies, as discussed above. Pl. SMF at ¶ 26; Def. Resp. SMF at ¶ 26; Pl. Resp. SMF at ¶ 44; Markovitz Dep. at 36-37, 51 ("I'm aware that Pinder claims that I gave her permission to start this business, and that is absolutely not the case.").

Plaintiffs further contend that they did not consider their work with LSA to be a violation of JMLS policy or a conflict with their jobs at JMLS. Pl. SMF at ¶ 64. Plaintiffs contend that LSA would not have conflicted with their positions at JMLS because LSA would be taught during the summer when they had no teaching obligations to JMLS, would not conflict with the first-year orientation program, would not obligate them to work on it for more than ten hours a week, there was no such program at JMLS, and their first-year courses are blind-graded and as such, they could

not give preference to JMLS students who took the LSA course. Pl. SMF at ¶ 68; Pinder Decl. at ¶¶ 8-14; Sigman Decl. at ¶¶ 7-11, 13-16.

According to Defendant, Dean Lynn made the decision not to renew the Plaintiffs' contracts. Def. SMF at ¶ 14; Lynn Aff. at ¶¶ 7-13. Defendant contends that Lynn made the decision not to renew the Plaintiffs' contracts in mid-February of 2011. Def. SMF at ¶ 43; Lynn Aff. at ¶¶ 12-14. Plaintiffs dispute this, and contend that Dean Lynn did not make the decision to terminate their employment until March 2, 2011. Pl. Resp. SMF at ¶ 43; Pl. Ex. 164.

On March 2, 2011, Dean Lynn wrote an email to Dr. Markovitz that stated:

Michael, rather than fire Kamina and Scott for cause, I have decided to notify them that their contract will not be renewed, as I am doing with Profs. Marbes and Butts. The faculty handbook has a lot of process for firing for cause, including an appeal to the Retention, Promotion & Tenure Committee, before an appeal to you. Since I assume that they will finish out their courses professionally, other than trashing me, non-renewal will [be] easier and reduces, but does not eliminate, the threat of litigation. It will cost one more month of pay, since they're entitled to six months notice of non-renewal, but I think that's cheap compared to the alternative. I'm planning to talk to them tomorrow. Thanks.

Pl. SMF at ¶ 76; Pl. Ex. 164.

It is undisputed that, also on March 2, 2011, Dean Lynn sent emails to Pinder and Sigman asking each of them to meet with him the following day. Def. SMF at ¶ 15. Upon receiving her email, Pinder knew immediately that the meeting was not

20

going to be positive, and thought it could have something to do with her business. Def. SMF at ¶ 16. Plaintiffs do not dispute this, but contend that Pinder believed that the meeting would not be "positive" because she believed that Dean Lynn "wanted to find a way to get rid of" her and because of his negative "pattern of behavior" with her. Pl. Resp. SMF at ¶ 16. Pinder prepared for the meeting by drafting a document that set forth the text of the section of the Handbook addressing outside employment and outlined talking points explaining why she did not believe the business created a conflict of interest, and emailed that document to Sigman. Def. SMF at ¶¶ 17-18.

On March 3, 2011, Dean Lynn met with each Plaintiff separately and informed them that their annual appointments would not be renewed for the next academic year. Def. SMF at ¶¶ 21-22; Pl. SMF at ¶ 77; Lynn Aff. at ¶ 20. Dean Lynn gave each Plaintiff a "nonrenewal letter" that stated as follows:

> This is to inform you that your contract will not be renewed for the 2011-12 academic year. Because you are entitled to six months notice, you will be paid through September 2, 2011. . . .
>
> This is not a termination for cause, but you are entitled to know the reasons why your contract will not be renewed. They include your establishing and engaging in a business while employed as a full-time faculty member, engaging in a business which creates possible conflicts of interest, using the law school name on your business website without permission, [and] using law school computer facilities for your business. . . .

Def. SMF at ¶¶ 24, 49; Pl. SMF at ¶ 78; Pinder Dep., Ex. 17; Sigman Dep., Ex. 48.

Pinder's nonrenewal letter also included as reasons for her nonrenewal her "failure to cooperate by submitting an explanation to the Board of Directors for the proposed Faculty Handbook change that you supported, and failure to follow law school policies on make-up classes." Def. SMF at ¶ 24; Pl. SMF at ¶ 87; Pinder Dep., Ex. 17. Plaintiffs dispute that Pinder missed a make-up class, and contend that no professor other than Pinder has ever been nonrenewed "for failing to conduct a single make-up class." Pl. SMF at ¶ 89.

In the nonrenewal letters, Plaintiffs were given notice that their appointments would not be renewed the following academic year, 2011-2012, and that they would be paid through September 2, 2011, the date of their termination. Def. SMF at ¶ 63; Pinder Dep., Ex. 17; Sigman Dep. at 234, Ex. 48. Plaintiffs were not told that their contracts would be terminated immediately. Def. SMF at ¶ 64. JMLS paid both Pinder and Sigman through September 2, 2011, which was six months from the date that Dean Lynn informed them that their appointments were not being renewed. Def. SMF at ¶ 26. Both Pinder and Sigman found jobs at other law schools before July 31, 2011. Def. SMF at ¶ 27. Plaintiffs do not dispute that they found jobs at other law schools, but contend that Pinder has secured employment as a visiting professor, and neither Plaintiff is currently on a tenure track as they were at JMLS. Pl. Resp. SMF at ¶ 27.

22

Plaintiffs further contend that neither has been compensated at the same level that they were at JMLS. Pl. Resp. SMF at ¶ 27.

Plaintiffs do not dispute that Dean Lynn informed them that their annual appointments would not be renewed, and that the "nonrenewal letter" each of them received informed them that this was "not a termination for cause." Pl. Resp. SMF at ¶¶ 23-25. They contend, however, that despite Dean Lynn's language in the "nonrenewal letters," their employment was actually terminated "for cause." Pl. Resp. SMF at ¶¶ 23-25; Pl. SMF at ¶ 77. They further contend that Dean Lynn did not ask them how much time they spent per week working on LSA. Pl. SMF at ¶ 79. Plaintiffs also contend that, after Pinder received her nonrenewal letter on March 3, 2011, she told Dean Lynn and Michelle Harris that Dr. Markovitz was aware of the business and "told Pinder to make the business her own." Pl. SMF at ¶ 81; Pinder Dep. at 239-40; Harris Dep. at 99-100. Sigman also told Dean Lynn that he would not participate in LSA if it would cost him his job. Pl. SMF at ¶ 83.

The Handbook states that nonrenewal of a probationary faculty member's appointment is different from termination or dismissal for cause. Def. SMF at ¶ 50. When a faculty member is nonrenewed, the Law School is not required to set forth its reasons in the initial notice of non-reappointment, but the faculty member is entitled to have the reasons for nonrenewal given in writing upon request to the Dean. Def.

SMF at ¶¶ 51-52. Defendant contends that Dean Lynn was thus not required by the Handbook to include the reasons for nonrenewal in the nonrenewal letters, but he did so because he believed it was the right thing to do. Def. SMF at ¶¶ 53-54.

It is undisputed that, under the terms of the Handbook, the Dean had the authority to make the decision to nonrenew Plaintiffs' teaching appointments. Def. SMF at ¶ 45. Although Plaintiffs admit that Dean Lynn had authority over personnel decisions, they contend that the Handbook did not authorize the Dean to characterize a termination for cause as a "nonrenewal." Pl. Resp. SMF at ¶ 45. Plaintiffs contend that Dean Lynn did so in order to avoid giving them the appeal procedures in the Handbook provided for terminations "for cause." Pl. Resp. SMF at ¶¶ 45, 53-54; Pl. Ex. 164.

Section 405 of the Handbook further provides the following with respect to "nonreappontment" or nonrenewal:

> **§ 405 SEPARATION FROM SERVICE** . . .
>
> **(C) Non-Reappointment of Probationary Appointments** . . .
>
> (1)   Non-reappointment is different from termination and dismissal for cause. Reasons for non-reappointment include, but are not limited to, the following: incongruity between the teaching expertise of the faculty member and the educational goals of the Law School; unfavorable peer evaluation of the faculty member's teaching or scholarship which makes promotion or the award of tenure unlikely; or unfavorable evaluation of the faculty member's other responsibilities.

24

Handbook, at ¶ 405(c)(1); Pl. Ex. 1; Pinder Dep., Ex. 9; Pl. SMF at ¶ 173; Def. Resp. SMF at ¶ 173. Plaintiffs contend that none of the reasons set forth in the Handbook was given as a reason for their nonrenewal, but Defendant contends that the reasons for nonrenewal "are not limited" to those set forth in the Handbook. Pl. SMF at ¶¶ 173-75; Def. Resp. SMF at ¶ 173.

The Handbook further provides that reasons for dismissal for cause include ""failure to adhere to a class or examination schedules . . . [and] violating Law School rules and policies." Pl. SMF at ¶ 178; Handbook, at ¶ 405(e)(1), Pinder Dep., Ex. 9, Pl. Ex. 1. Plaintiffs contend that no professor has been "nonrenewed" at JMLS without having nonrenewal or potential nonrenewal recommended by the RPTC except for the Plaintiffs. Pl. SMF at ¶ 179; de Haven Dep. at 56. Defendant disputes that and contends that the evidence relied upon by the Plaintiffs, the deposition testimony of Helen de Haven, indicates that de Haven testified only that she was not aware of that ever happening before. Def. Resp. SMF at ¶ 179; de Haven Dep. at 56.

On March 7, 2011, Plaintiffs attempted to request an appeal of their terminations to the RPTC under Section 703 of the Faculty Handbook. Pl. SMF at ¶ 99. Professor Van Detta, the Chair of the RPTC, forwarded their appeal requests to Dean Lynn and asked for Dean Lynn's "guidance on how RPTC should proceed." Pl. SMF at ¶ 100. Dean Lynn responded by telling Van Detta that Pinder and Sigman

25

were not terminated for cause and that the Faculty Handbook did not allow a hearing for nonrenewals. Pl. SMF at ¶ 99; Pl. Ex. 153. According to Plaintiffs, the RPTC accepted Dean Lynn's characterization of their terminations as nonrenewals, and "did not discuss the question of cause or no cause." Pl. SMF at ¶ 102; Van Detta Dep. at 125. Van Detta did not see the Plaintiffs' nonrenewal letters and the RPTC did not review the letters in determining whether to provide Plaintiffs with a review of their terminations. Pl. SMF at ¶ 103. On March 14, 2011, Van Detta responded to both Plaintiffs that the RPTC did not have jurisdiction over the matter. Pl. SMF at ¶ 104.

Defendant does not dispute that the Plaintiffs sought review of the Dean's nonrenewal decision by the "faculty grievance committee" under Section 703 of the Handbook, which applies to dismissals for cause, and that the Plaintiffs' request for review was denied. Def. SMF at ¶¶ 55-57; Pl. SMF at ¶ 99. Defendant contends that the request for review was denied because Plaintiffs were nonrenewed and not terminated or dismissed for cause. Def. SMF at ¶ 57. Plaintiffs dispute that, and contend that the faculty review committee was not aware that they were terminated for cause. Pl. Resp. SMF at ¶ 57. Plaintiffs also contend that other professors disagreed with their terminations, and cite Helen de Haven's testimony that she "had a very difficult time getting past summarily discharging someone for doing something

26

to which the school objected without first telling them." Pl. SMF at ¶¶ 91-97; de Haven Dep. at 58-59.

Section 405(c)(5) of the Handbook states that the non-reappointment of a probationary faculty member is not subject to appeal "except that probationary faculty are entitled to request a review by the Dean" if unlawful discrimination, violation of academic freedom or procedural violations by the RPTC are alleged. Def. SMF at ¶ 58. Plaintiffs never requested a review by the Dean, and their appeal requests did not allege unlawful discrimination, violations of academic freedom or procedural failures by the RPTC. Def. SMF at ¶¶ 59-60. Even though their nonrenewals were not subject to appeal under Section 703, Plaintiffs were effectively allowed to appeal to the Chairman and the entire Board of Directors, who ultimately approved the decision of Dean Lynn. Def. SMF at ¶ 61.

It is undisputed that, because the Plaintiffs had been employed by John Marshall for more than three years, the Handbook entitled them to written notice of non-reappointment "at least six months prior to the termination date of the faculty member." Def. SMF at ¶¶ 62, 66; Pl. SMF at ¶ 183; Pinder Dep., Ex. 2; Sigman Dep., Ex. 27; Handbook, § 405(c)(3)(iii), Pinder Dep., Ex. 9, Pl. Ex. 1. Plaintiffs contend that they were instead entitled to one year's notice because their contracts incorporated the "1940 Statement of Principles on Academic Freedom and Tenure."

Pl. Resp. SMF at ¶¶ 62-63, 66; Pl. SMF at ¶¶ 181-82; Pl. Ex. 1, 85, 140, 175.

Defendant disputes that Plaintiffs were entitled to one year's notice, because,

Defendant contends, the "1940 Statement of Principles on Academic Freedom and

Tenure" did not include any notice provisions. Def. SMF at ¶¶ 69-71; Def. Resp. SMF

at ¶ 181.

Plaintiffs contend that their last contracts of employment expired on July 31,

2011, at which time they vacated their offices, turned in their keys and parking passes,

and did not return to JMLS after that date. Pl. SMF at ¶ 185. Plaintiffs also contend

that Sigman was offered the opportunity to teach the summer 2011 session at JMLS,

but Lynn notified him during the "nonrenewal" meeting, that he would no longer be

allowed to teach the summer 2011 session that ended before July 31, 2011. Pl. SMF

at ¶¶ 188-89. Defendant does not dispute Plaintiffs' contention, but contends that the

Handbook only required notice "at least six months prior to the termination date of the

faculty member," not prior to the expiration date of the contract. Def. Resp. SMF at

¶ 185; Handbook, § 405(c)(3)(iii), Pinder Dep., Ex. 9, Pl. Ex. 1. Defendant also

contends that Section 904 of the Handbook provides that failure by the Law School

to meet a time requirement does not entitle a faculty member to remain a faculty

member. Def. SMF at ¶ 67; Handbook, Pinder Dep., Ex. 9 at § 904. Section 904 of the

Handbook provides that:

**§904 NON-WAIVER OF TIME LIMITS**

Unless otherwise noted in this Handbook, no time limits may be waived. No faculty holding probationary appointment may receive promotion or tenure because the relevant committee, Dean, Chairman, Board of Directors or their delegate failed to meet a deadline prescribed by this Handbook. No faculty member subject to *dismissal for cause* obtains any right to remain a faculty member by any failure to meet any time requirement.

Pl. Resp. SMF at ¶ 68; Handbook, Pinder Dep., Ex. 9 at § 904; Pl. Ex. 1 at § 904 (emphasis added).

The Preamble to the Handbook states that it "specifically incorporates the '1940 Statement of Principles on Academic Freedom and Tenure' prepared by the American Association of University Professors, as modified by the process of post-tenure review as set forth herein." Def. SMF at ¶ 68; Handbook, Pinder Dep., Ex. 9, at 1 (Preamble). Defendant contends that the "1940 Statement of Principles on Academic Freedom and Tenure" does not include any notice provisions. Def. SMF at ¶ 69; Def. Ex. F [57-8]. Plaintiffs dispute that and contend that the "1940 Statement of Principles on Academic Freedom and Tenure" does include a notice provision.[8] Pl. Resp. SMF at ¶ 69. The

---

[8] Plaintiffs cite to "Pl. Ex. 175, Bates No. P000728" in support of their contention. Pl. Resp. SMF at ¶ 69. Plaintiffs' Exhibit 175 filed with the Court and submitted to the undersigned, however, does not have a document with Bates No. P000728. *See* Pl. Ex. 175 [69-17]; Pl. SMF at ¶ 5 n.1 (explaining that Plaintiffs used continuous exhibit numbers 1-249 during the witness depositions). Instead, Plaintiffs' Exhibit 175 consists of a letter to Dean Lynn on letterhead of the American Association of University Professors ("AAUP") from Gregory Scholtz, Associate

"1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments" provides as follows:

> Notice should be given at least one year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period.

Pl. SMF at ¶ 181; Def. Ex. F [57-8] at 4; Pl. Ex. 175 [69-17], Bates No. JMLS000456.

Defendant contends that the American Association of University Professors ("AAUP") did not address notice of nonrenewal until thirty years later, when it added the 1970 Interpretive Comments, which were not incorporated into the Handbook and were not referenced in the Plaintiffs' renewal letters. Def. SMF at ¶¶ 70-71; Def. Resp. SMF at ¶ 181; Def. Ex. F, at 6. Plaintiffs dispute this, and contend that the 1970 Interpretative Comments are incorporated into the "1940 Statement of Principles on Academic Freedom and Tenure," which is incorporated into the Handbook, and thus, into each professor's contract. Pl. SMF at ¶ 169; Pl. Resp. SMF at ¶ 71. It is undisputed that the due process set forth in the Handbook is a part of the Plaintiffs'

_____

Secretary and Director, Department of Academic Freedom, Tenure, and Governance, dated March 22, 2011, with Bates No. JMLS000451-453; the "1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments," with Bates No. JMLS000330-334 and Bates No. JMLS000455-463; the "Standards for Notice of Nonreappointment" with Bates No. JMLS000335 and Bates No. JMLS000454; and the "Statement on Procedural Standards in the Renewal or Nonrenewal of Faculty Appointments," with Bates No. JMLS000336-338. It appears that Plaintiffs intended to cite to the "1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments," Bates No. JMLS000456.

contracts with JMLS. Pl. SMF at ¶ 170. Defendant further contends that the Handbook states that "[i]n case of conflicting policies, the provisions of the Handbook shall prevail." Def. SMF at ¶ 72.

On or around March 7, 2011, Professor Pinder contacted the AAUP and the Society of American Law Teachers ("SALT") for assistance with appealing their terminations. Pl. SMF at ¶ 107. Also on March 7, Pinder emailed Dr. Markovitz complaining that she had been subjected to discrimination and retaliation, which Dr. Markovitz forwarded to Dean Lynn, who subsequently forwarded it to Michelle Harris, the Associate Dean of Administration with oversight over Human Resources. Pl. SMF at ¶ 108. Plaintiffs contend that Pinder's complaints of discrimination and retaliation were not turned over to Adams Keegan for investigation, in violation of the usual procedure when discrimination is reported at JMLS. Pl. SMF at ¶ 109.

After the Plaintiffs sought assistance from the AAUP, Gregory Scholtz, the Associate Secretary and Directory Department of Academic Freedom, Tenure, and Governance at the AAUP responded to Pinder's complaint regarding Plaintiffs' terminations: "Under our standards, the decision not to reappoint should have been originated with review by an appropriate faculty body…you should have received 12 month's notice…and you should have been afforded the opportunity to file an appeal with a duly constituted faculty body." Pl. SMF at ¶ 107; Pl. Ex. 105.

31

Raquel Aldana, Co-President of SALT, wrote to the JMLS Board of Directors in response to Pinder's complaint regarding her and Sigman's terminations: "we are also concerned that the failure to renew the contracts of these…professors may be part of a pattern of disparate treatment on the basis of race, gender, and/or sexual orientation. In particular, we note that had these unilateral decanal decisions not taken place, Professor Kamina Pinder would have been considered for tenure next year and most likely…would have become the law school's first tenured African American woman faculty member and the first African American faculty member." Pl. SMF at ¶ 107; Pl. Ex. 176.

After investigating Pinder's allegations, the AAUP contacted Dean Lynn and Dr. Markovitz, indicating that "Professors Pinder and Sigman, however, reject your characterizing [their terminations] as no more than nonreappointment. Given the gravity of the charges against them, we believe that their rejection of that characterization is correct and that you have, in fact, moved to dismiss them for cause." Pl. SMF at ¶ 112.

On March 23, 2011, the Board of Directors of JMLS met and discussed Plaintiffs' nonrenewals. Pl. SMF at ¶ 113. Before the meeting Plaintiffs submitted a letter to the Board of Directors challenging the Dean's actions and his contention that their termination was a "nonrenewal" rather than a termination for cause for the

Board's consideration at the meeting. Pl. SMF at ¶ 114. Dean Lynn sent the Board of Directors the portion of the Handbook regarding nonrenewals for review. Pl. SMF at ¶ 115. Board of Directors member Kevin Ross believed that in order to review the appropriateness of Plaintiff's terminations, including determining whether they were terminated for cause and entitled to process, the Board should also have been provided the provisions in the Handbook relating to terminations for cause. Pl. SMF at ¶ 116. Although Defendant does not dispute that Dean Lynn did not send the portion of the Handbook relating to terminations for cause, it contends that the Board of Directors had access the entire Handbook as well. Def. Resp. SMF at ¶ 115; Ross Dep. at 153-54.

According to Plaintiffs, Dean Lynn did not send the Board of Directors his email to Dr. Markovitz informing Dr. Markovitz that he planned to characterize Plaintiff's terminations as nonrenewals rather than terminations for cause in order to avoid providing them with the appeals process under the Handbook. Pl. SMF at ¶ 117. After reviewing the Handbook provisions, Ross believed that the Plaintiffs' terminations were "termination[s] for cause because this issue about the business was being cited as the reason…particularly in the context of discussions being had where the dean was acknowledging that they were excellent classroom teachers and otherwise seemed to be on the track for promotion." Pl. SMF at ¶¶ 118, 122. Ross was

also concerned as to whether there was fair process applied in the terminations. Pl. SMF at ¶¶ 119, 121.

According to Defendant, no other JMLS faculty members, other than Pinder and Sigman, started and operated a for-profit business without permission from the Dean or a former Dean. Def. SMF at ¶ 31; Lynn Aff., ¶ 11. Plaintiffs dispute this, and contend that Kathleen Burch started and operated a for-profit business in late 2012, but did not discuss her business with Lynn until "a few days before February 18, 2013." Pl. Resp. SMF at ¶ 31. Plaintiffs further contend that Professor Robert D'Agostino did not seek permission for his work outside of the law school, and Professor Helen de Haven also did not seek permission for her for-profit advocacy work outside of the law school. Pl. Resp. SMF at ¶ 31.

Plaintiffs contend that JMLS Professor Kathleen Burch, a white woman, began operating a for-profit bar exam tutoring business in December of 2012. Pl. SMF at ¶ 124; Pinder Dep. at 194; Burch Dep. at 13, 36. According to Plaintiffs, Burch obtained the contact information of students who failed the Georgia Bar Examination from Dean Lynn's secretary, and used JMLS resources containing private and confidential information about its former students to send correspondence to prospective clients. Pl. SMF at ¶ 126; Burch Dep. at 71-72; Pl. Ex. 192, 204. Burch also uses the JMLS name on advertisements for her business. Pl. SMF at ¶ 128.

34

Although Burch began soliciting JMLS graduates to be customers of her tutoring business by Facebook as early as December 11, 2012, and by email solicitations as early as January 20, 2013, Plaintiffs contend that she did not discuss her business with Dean Lynn until "a few days before February 18, 2013." Pl. SMF at ¶¶ 129-31; Burch Dep. at 15, 73, Ex. C; Pl. Ex. 192, 204; Lynn Dep. I at 245. Defendant disputes this, and contends that both Burch and Lynn testified that Burch actually spoke to Lynn about her bar preparation course in November of 2011, before Burch set up a Facebook page. Def. Resp. SMF at ¶¶ 130-31; Burch Dep. at 69-70; Lynn Dep. II at 269-70. Burch testified as follows:

> Q    Did you go to Dean Lynn to get approval for this business?
>
> A    Yes, I did.
>
> Q    And he gave it to you?
>
> A    Yes.
>
> Q    Tell me the substance of that conversation. And I want to know about the initial conversation.
>
> A    Initial conversation with Dean Lynn?
>
> Q    Right, about your business.
>
> A    Yes. I talked to Dean Lynn in I think it was November of last year about starting a tutoring bar review business, really focusing on the writing component.

And I told him that I had been approached by Sally Lockwood[9] years ago about doing this and hadn't been interested at the time but was thinking about it now, and would it be okay if I did it. And he said yes.

And I asked him did he have any concerns about me working with John Marshall alum. And he said something along the lines of, anything we can do to help the students pass the bar we should be doing.

Q      So this was a single conversation?

A      After that conversation, that's when I put up the Facebook page.

Burch Dep. at 69-70.

Defendant contends that Lynn also testified that Burch had spoken to him earlier. Def. Resp. SMF at ¶¶ 130-31. Although initially he testified that he believed she first spoke to him "only a few days before February 18th, 2013," he later testified that he had been wrong about that and that she had spoken to him earlier, based on the dates of the emails that she sent to students. Lynn Dep. I at 245-46; Lynn Dep. II at 270.

Plaintiffs further contend that there is no distinction between LSA and Burch's bar exam tutoring other than "the obvious distinction, one is on the front end of law school and one is on the back end of law school." Pl. SMF at ¶ 125; de Haven Dep. at 77. On February 18, 2013, Dean Lynn wrote to Burch:

Kathe, when you spoke to me about the bar prep business, I was focused on doing anything that you wanted to do, but it has been pointed out to

_____

[9] Lockwood is the executive director of the Georgia Board of Bar Examiners. Lynn Dep. I at 254.

> me that I may have acted inconsistently compared to Sigman and Pinder. Now that has been raised, I'm not sure how to distinguish the two situations.

Pl. SMF at ¶ 133; Lynn Dep. I at 240-41; Burch Dep. at 75; Pl. Ex. 191. In that email, Dean Lynn suggested they discuss the conflict, but Dean Lynn and Burch "never really had the conversation." Pl. SMF at ¶ 134; Pl. Ex. 191; Burch Dep. at 75-76.

Defendant disputes the Plaintiffs' contention that there is "no distinction" between Burch's bar preparation course and the Plaintiff's LSA business. Def. SMF at ¶¶ 130-31. Dean Lynn testified that he found several distinctions:

> Q   So to be clear, the distinctions you see between Pinder and Sigman's business and Burch's are what?

> A   First, of course, as far as I knew, she had asked permission or did ask permission. And her initial description, and then as I thought about it later, it really was not a business like Professor Sigman and Pinder were going to be doing together.

> It was closer to the kind of teaching that we frequently treat as appropriate for consulting. It had met a need to help with our graduates who had failed the bar exam. That it was recommended by Ms. Lockwood, who has a lot of influence and even some power over the law school, was relevant.

> It did not appear to have the same goals of expanding and potentially taking more and more time like Scott and Kamina's program. She was not a probationary employee. She was a tenured employee or faculty member. She did not have any kind of corporate form and was just an individual doing this tutoring, and tutoring seems pretty closely related to law professor.

Lynn Dep. I at 251-52.

Plaintiffs further contend that Professor Robert D'Agostino works outside of the law school, including spending "an enormous amount of time" unwinding the caseload of an attorney who passed away. Pl. SMF at ¶ 144; D'Agostino Dep. at 38 ("I spent an enormous amount of time unraveling his caseload and making sure people were taken care of in consultation with the Georgia Bar."). According to Plaintiffs, D'Agostino also does consulting work, and he does not ask permission to do that consulting work. Pl. SMF at ¶ 145; D'Agostino Dep. at 39 ("I would say the bulk of my consulting work is done pro bono, and I don't ask permission to do that because it's service to the school and service to the bar."). Plaintiffs contend that D'Agostino also spent an "enormous amount of time" on a large private property case and "carried on a lobbying campaign with the Georgia Legislature" without the Dean's permission. Pl. SMF at ¶ 146; D'Agostino Dep. at 40-42. Plaintiffs contend that D'Agostino uses law school facilities, such as computer, email, fax machines, and copy machines, and uses library conference room tables when engaging in his outside work. Pl. SMF at ¶¶ 148-49.

Defendant does not dispute that D'Agostino performs occasional outside consulting, but contends that D'Agostino's consulting is performed *pro bono*, not for compensation. Def. Resp. SMF at ¶¶ 144-46; D'Agostino Dep. at 38-42. When D'Agostino spent "an enormous amount of time" unwinding the caseload of an

attorney who passed away, he was doing it at the request of the Georgia bar on a *pro bono* basis. D'Agostino Dep. at 38. When he also spent an "enormous amount of time" on a large private property case, D'Agostino was spending three to four hours a week assisting a JMLS graduate on a *pro bono* basis in an environmental case involving the protection of fresh-water turtles. D'Agostino Dep. at 39-41, 43. Similarly, when D'Agostino "carried on a lobbying campaign with the Georgia Legislature," he was also lobbying for turtle protection laws on a *pro bono* basis. D'Agostino Dep. at 41-42. Furthermore, D'Agostino testified that he informed Dean Lynn about his work on both the deceased attorney's cases and the turtle case because of the time he spent on those cases. D'Agostino Dep. at 42.

Plaintiffs also contend that Helen de Haven engages in union advocacy work in arbitration cases, and has not been terminated for conducting her outside business, although she did not seek permission to engage in her advocacy work. Pl. SMF at ¶¶ 151-52; de Haven Dep. at 82-85. Defendants do not dispute that, but contend that JMLS had paid for de Haven to take the arbitration training; she testified that JMLS wanted her to teach a course on arbitration "as both a substantive law course and a skills-based course," so part of her consulting was "part of the initial start-up." Def. Resp. SMF at ¶ 152; de Haven Dep. at 84-85.

According to Plaintiffs, Andrea Doneff also engages in mediation both independently and through Mediation Works, Inc. and has not been terminated for conducting her outside business. Pl. SMF at ¶ 154; Doneff Dep. at 11, 14. Defendants do not dispute that Doneff conducts mediation, but contends that Doneff obtained permission to conduct mediation, which is required for her certification, before accepting a position at JMLS. Def. Resp. SMF at ¶ 154; Lynn Aff. at ¶ 11.

Plaintiffs contend that Jeffrey Van Detta teaches classes at Concord Law School and lists JMLS on that school's website, but has not been terminated for teaching at another school. Pl. SMF at ¶ 160; Van Detta Dep. at 48, 54, 208-09. Defendant does not dispute that Van Detta teaches classes at Concord Law School. Def. Resp. SMF at ¶ 160; Van Detta Dep. at 48, 54, 209-10. Dean Lynn testified that he does not consider teaching at another law school to be within the "normal means of consulting, but traditionally we let people teach at other schools." Lynn Dep. II at 277-78 ("In the law school world, we frequently allow our professors to teach at other schools.").

Plaintiffs contend that John Rapping created and runs Gideon's Promise, a public defender training program, and has not been terminated for conducting his outside business. Pl. SMF at ¶ 162; de Haven Dep. at 83; Doneff Dep. at 18, 122; Markovitz Dep. at 98-99; Pl. Ex. 11. Plaintiffs further contend that Rapping uses the JMLS name on his website advertising his business. Pl. SMF at ¶ 162; Pl. Ex. 11;

Ross Dep. at 75-76. Defendant does not dispute that Rapping "serves as Executive Director of the Southern Public Defender Training Center," which is "a nonprofit organization of volunteers who help train public defenders." Def. Resp. SMF at ¶ 162; Lynn Aff. at ¶ 11. According to Lynn, Rapping also obtained "advance permission" before doing that work. Lynn Aff. at ¶ 11.

Plaintiffs contend that Rebecca Cummings is of counsel at a law firm in Atlanta in violation of the Handbook's express prohibition of serving as of counsel at a law firm, and has not been terminated for serving as of counsel at a law firm. Pl. SMF at ¶ 165; de Haven Dep. at 83; Ross Dep. at 82-84; Pl. Ex. 1, 10. Defendant disputes that Cummings actually served in an "of counsel" position at a law firm, and contends that Cummings was given permission to "wind up" her cases at that law firm at the time she was hired. Def. Resp. SMF at ¶ 165. Lynn testified that Cummings informed him that the law firm would list her as "of counsel" on its website in order for her to maintain her malpractice coverage, but she was not listed as "of counsel" on the law firm letterhead. Lynn Dep. II at 285-86.

Plaintiffs contend that no faculty member at JMLS has been terminated for having a business or performing work outside of the law school before their employment was terminated. Pl. SMF at ¶ 165. Defendant contends that no full-time faculty member at JMLS has ever established and operated their own for-profit

41

company while serving as a full-time faculty member. Def. Resp. SMF at ¶ 165; Lynn Aff. at ¶ 11. Plaintiffs further contend that, until the fall of 2011, after Pinder's termination or "nonrenewal," there were no African American tenured faculty members and there has never been an African American female tenured faculty member. Pl. SMF at ¶ 18; de Haven Dep. at 35-36; Doneff Dep. at 80-81; Markovitz Dep. at 89-91; Ross Dep. at 94.

In Plaintiffs' Complaint, they allege that they filed timely Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and that they received notice of their right to sue from the EEOC and complied with all other conditions precedent to the institution of this lawsuit. Compl. [1] at ¶¶ 10-12. It appears to be undisputed that Plaintiffs properly exhausted the administrative remedies required under Title VII before bringing this action.

## II.    DISCUSSION

### A.    DEFENDANTS' MOTIONS FOR CONTINUED PROTECTION

In connection with their Motion for Summary Judgment, Defendants have filed two Motions for Continued Protection [62][75] pursuant to Judge Duffey's Standing Order Regarding Civil Litigation ("Standing Order"), which states in relevant part:

> If information entitled to protection under this Order is submitted to the Court in support of a pleading, such information shall maintain its privileged status for ten (10) days. During this ten-day period the party

who designated the information as protected may move the Court to continue the protected status of the information by submitting to the Court a motion for continued protection. The opposing party shall not be permitted to file a response to the motion. The copy of the motion must be delivered to chambers and accompanied by an unredacted copy of the designated material(s).

Standing Order at 5, ¶ 11.

In their first Motion for Continued Protection [62], Defendants state that, in support of their Motion for Summary Judgment, they have filed three deposition transcripts containing confidential information under the parties' Protective Order [32] entered on March 19, 2013. Defendants contend that the transcript of the first deposition of Richardson Lynn ("Lynn Dep. I") contains confidential information about the salary of Dean Lynn, and transcript of the second deposition of Richardson Lynn ("Lynn Dep. II") contains confidential information about the salary of Dean Lynn, and also includes an Exhibit 3 which contains a list of all faculty salaries at JMLS from 2006-2011. Defendants further contend that the transcript of the deposition of Dr. Michael Markovitz contains confidential information related to Dr. Markovitz's family trust, and also privileged information related to a document containing attorney-client communications. According to Defendants, the Plaintiffs have not objected to the designation of the above-referenced information as confidential. *See* Def. Motion, Ex. B.

In their second Motion for Continued Protection [75], Defendants state that, in support of the Plaintiffs' response to Defendants' Motion for Summary Judgment, the Plaintiffs have filed three deposition transcripts containing confidential information under the parties' Protective Order [32] entered on March 19, 2013. Defendants contend that Exhibit 204 to the transcript of the deposition of Kathleen Burch contains confidential information in emails sent to and from JMLS student accounts related to tutoring sessions for students who did not pass the bar exam. Defendants contend that Exhibits 3 and 4 to the transcript of the deposition of Kathleen Burch contain confidential information involving lists of all faculty salaries from 2006-2013. Finally, Defendants contend that portions of the transcript of the deposition of Jeffrey Van Detta contain confidential information related to Van Detta's salary at Concord Law School. According to Defendants, the Plaintiffs have not objected to the designation of the above-referenced information as confidential. *See* Def. Motion, Ex. B.

The undersigned finds that the redacted information is confidential information subject to the terms of the Protective Order. Moreover, the redacted information is only a very small portion of the evidence submitted by the parties, and includes limited information that is not material to the issues presented in the Defendants' Motion for Summary Judgment. Accordingly, for good cause shown, the Defendants' Motions for Continued Protection [62][75] are **GRANTED**.

B.     PLAINTIFFS' MOTION FOR LEAVE TO FILE EXCESS PAGES

Plaintiffs have filed a Motion for Leave to File Excess Pages [61] in which they request leave of Court to exceed the page limits provided in the Local Rules. Plaintiffs request permission to file a brief in response to the Defendants' Motion for Summary Judgment that is ten pages longer than the 25-page limit set forth in Local Rule 7.1D. *See* LR 7.1D, NDGa. Plaintiffs argue that they require these additional pages because they must "separately respond to Defendants' Motion for Summary Judgment," and "the facts and evidence in this case are sufficiently complex and voluminous as to require a longer Response." Pl. Mot. at 2.

Defendants have opposed the Plaintiffs' request, arguing that they failed to obtain "prior permission," as required by Local Rule 7.1D, that it was the Plaintiffs' decision to bring this case jointly, and further, that the issues in this case are not "complex and voluminous." Def. Br. [74] at 2.

Defendants are correct that, under Local Rules 7.1D, a party must obtain "prior permission" in order to file a brief that exceeds the page limits of that rule. *See* LR 7.1D, NDGa. Plaintiffs failed to comply with that rule in this case. Nevertheless, the undersigned concludes that the Court should exercise its discretion to consider the Plaintiffs' motion, and that the Plaintiffs' request to file a brief that is ten pages over the page limit is not unreasonable under the circumstances of this case. Accordingly,

45

for good cause shown, the Plaintiffs' Motion for Leave to File Excess Pages [61] is

**GRANTED**.

      C.     PLAINTIFFS' MOTION TO EXCLUDE AFFIDAVIT

In connection with their response to the Defendants' Motion for Summary

Judgment, Plaintiffs have filed a "Motion to Exclude Sham Affidavit of Richardson

Lynn" [68] ("Motion to Exclude"). Plaintiffs argue that the Affidavit of Richardson

Lynn that Defendants submitted in support of their Motion for Summary Judgment

must be excluded as a "sham affidavit" because it contains information that directly

contradicts Lynn's earlier deposition testimony. *See* Lynn Aff. [57-3]. Plaintiffs object

to the following portion of Lynn's Affidavit:

> I spoke with Dr. Michael Markovitz, the Chairman of the Law School's
> Board of Directors, a day or two after I learned about Ms. Pinder's and
> Mr. Sigman's new business. Based on everything that had happened, he
> agreed that it was totally inappropriate for Ms. Pinder and Mr. Sigman
> to try to run a business while they continued as full-time professors at
> John Marshall. I met with Dr. Markovitz for dinner in Atlanta on
> February 23, 2011 and discussed my decision to separate Ms. Pinder and
> Mr. Sigman from their employment at John Marshall. Dr. Markovitz
> agreed with that decision.

Lynn Aff. at ¶ 13.[10]

---

[10] Plaintiffs actually cite to paragraph 23 of Lynn's Affidavit, but Lynn's
Affidavit does not contain any paragraph 23. *See* Lynn Aff. It appears that the
paragraph containing the objectionable testimony is paragraph 13.

According to Plaintiffs, Lynn's testimony in his Affidavit regarding a dinner with Dr. Markovitz on February 23, 2011 directly contradicts Lynn's previous deposition testimony regarding when he discussed the Plaintiffs' LSA business with Dr. Markovitz. In Lynn's deposition, he testified as follows:

> Q    When did you first learn about the one-week summer program that Pinder and Sigman intended to offer in the summer of 2011? . . .
>
> A    The middle of February 2011, probably the 14th or 15th. . . .
>
> Q    You saw the website. Was the website a website, or was it a Facebook site?
>
> A    I thought it was a website, but I'm not sure.
>
> Q    And did you discuss this with anybody?
>
> A    Initially, I discussed it with Michelle Harris. And within just a day or two, I discussed it with Dr. Markovitz.

Lynn Dep. I at 221-22.

In creating an issue of fact, a party may not rely on an affidavit from an individual that directly contradicts his or her own deposition testimony. An affidavit may be considered a "sham" affidavit "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . [and that party attempts] thereafter [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986); *see also Dotson v. Delta Consol. Indus., Inc.*, 251 F.3d 780, 781 (8th Cir. 2001) ("a party may not create

47

a question of material fact, and thus forestall summary judgment, by submitting an affidavit contradicting his own sworn statements in a deposition"). A court presented with such an inconsistency in a party's testimony may disregard the later "sham affidavit" in favor of the earlier deposition testimony. *Tippens*, 805 F.2d at 949; *see also Van T. Junkins & Assoc. v. U.S. Indus., Inc.*, 736 F.2d 656, 658 (11th Cir. 1984); *Anderson v. Radisson Hotel Corp.*, 834 F. Supp. 1364, 1373 (S.D. Ga. 1993).

This "sham affidavit" rule, however, as set forth in this Circuit and elsewhere, operates to nullify only *unexplained* variations in testimony. *See Van T. Junkins & Assoc.*, 736 F.2d at 656 ("a district court may find an affidavit which contradicts testimony on deposition a sham when the party merely contradicts its prior testimony *without giving any valid explanation*.") (emphasis added); *accord S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495-96 (5th Cir. 1996); *Colantuoni v. Alfred Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994). When the witness furnishes a credible explanation for his reversal, courts are properly unwilling to discard the revised testimony as a sham. *See, e.g.*, *Pries v. Honda Motor Co.*, 31 F.3d 543 (7th Cir. 1994) (declining to discard affidavit as sham because plaintiff credibly explained variation in testimony based on later understanding of events); *Waitek v. Dalkon Shield Claimants Trust*, 908 F. Supp. 672 (N.D. Iowa 1995) (finding no sham because

medical expert witness gave reasonable explanation for revised opinion presented in affidavit).

Furthermore, the Eleventh Circuit has cautioned courts that, in reviewing affidavits submitted in connection with a motion for summary judgment, an affidavit may not be simply disregarded as a "sham" because it contains information contradictory to other evidence in the record.

> [E]very discrepancy contained in an affidavit does not justify a district court's refusal to give credence to such evidence. In light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an early deposition.

*Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980) (*quoted in Tippens*, 805 F.2d at 954).[11]

In light of these considerations, the Court concludes that Lynn's Affidavit is not a "sham affidavit" that must be disregarded by the Court. The Court does not find such a clear and direct contradiction between the Affidavit and the earlier testimony so as to support the extraordinary remedy of exclusion. The Plaintiffs have not cited to any portion of Lynn's deposition in which he was directly asked when, and how many times, he met with Dr. Markovitz to discuss the Plaintiffs and their LSA

---

[11] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

business. Instead, Lynn was asked only if he had discussed the Plaintiffs' LSA website with anyone, and he responded "Initially, I discussed it with Michelle Harris. And within just a day or two, I discussed it with Dr. Markovitz." Lynn Dep. I at 222. Lynn was not asked to elaborate on his conversation with Dr. Markovitz, nor was he asked how many times thereafter he discussed the Plaintiffs' LSA business with Dr. Markovitz. Lynn also was not asked to describe the details of the meeting with Markovitz.

In their Motion to Exclude, Plaintiffs argue that any mention of a dinner with Dr. Markovitz on February 23, 2011 is "strikingly absent from Lynn's deposition testimony, where he was asked about any conversation regarding termination of Pinder and Sigman and yet did not mention this alleged February 23 dinner." Pl. Mot. at 3. Plaintiffs, however, have not cited to any portion of Lynn's deposition in which he was asked about "any conversation regarding termination of Pinder and Sigman." Instead, the portion of Lynn's deposition testimony cited by Plaintiffs indicates only that Lynn was asked only if he had discussed the Plaintiffs' LSA website with anybody, and he responded that he discussed it with Harris and Dr. Markovitz. Lynn Dep. I at 222.

Furthermore, the Defendants argue in response to the Plaintiffs' Motion to Exclude that Dean Lynn testified that he discussed the Plaintiffs' LSA business with

50

Dr. Markovitz "several times" before he made the decision not to renew their contract.

Def. Br. [77] at 2-3. In Dean Lynn's second deposition, he testified as follows:

> Q      How much discussion did you have with Dr. Markovitz other than this e-mail [on March 2, 2011] before you terminated Pinder and Sigman?
>
> A      I talked to him several times before this. . . .
>
> Q      Now, in your conversations concerning terminating them with Dr. Markovitz up to and prior to the date of March 3rd, 2011, did you discuss terminating them for cause? Separate and apart from this e-mail, I mean. . . .
>
> A      Oh, yes.
>
> Q      You did?
>
> A      Yes.
>
> Q      Tell me the substance of that communication.
>
> A      We had one or two phone conversations, at least one conversation in person where I talked about all of our options under the handbook, the consequences for them when they tried to get another job, consequences to the law school for the various alternatives.

Lynn Dep. II at 301-03.

Defendants argue that Lynn's testimony in his deposition that he had "at least one conversation in person" with Dr. Markovitz before sending him the email on March 2, 2011, is entirely consistent with Lynn's statement in his Affidavit that he had dinner with Dr. Markovitz on February 23, 2011. The undersigned agrees that a factfinder could so find. Plaintiffs have not cited to any portion of Lynn's deposition testimony that is in direct conflict with his statement in his Affidavit that he had

dinner with Dr. Markovitz on February 23, 2011. All of the deposition testimony cited by the parties indicates that Lynn's testimony is at least arguably consistent with his statement in his Affidavit.

Plaintiffs argue further that Dr. Markovitz's deposition testimony further casts doubt on Lynn's statement in his Affidavit that he had dinner with Dr. Markovitz on February 23, 2011. Plaintiffs point to the deposition testimony of Dr. Markovitz in which he recalled having an "in person" conversation with Dean Lynn that only lasted "a few minutes." Pl. Reply Br. [78] at 2-3. But as discussed above, an affidavit may not be simply disregarded as a "sham" because it is inconsistent with other testimony or evidence in the record. *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) (*quoting Kennett-Murray Corp.,* 622 F.2d at 894).

Even assuming that Plaintiffs are correct that Dean Lynn failed to testify during his deposition that he discussed the Plaintiffs and their LSA business in a February 23, 2011 dinner with Dr. Markovitz, that absence of testimony would also not provide a basis for disregarding Lynn's Affidavit. As discussed above, the only basis for disregarding an affidavit as a "sham" is when it directly contradicts prior deposition testimony. Plaintiffs have not pointed to any statement from Lynn's deposition that directly contradicts his statement in his Affidavit that he had dinner with Dr. Markovitz on February 23, 2011, and discussed the Plaintiffs at that time. Moreover,

52

the remainder of the Plaintiffs' argument involves issues of credibility, impeachment, and the weight that the testimony should be given, all of which are the province of the factfinder and not the Court. "Issues concerning the credibility of witnesses and weight of the evidence are questions of fact which require resolution by the trier of fact." *Tippens*, 805 F.2d at 954.[12]

Accordingly, because the Plaintiffs have failed to establish that Lynn's Affidavit is a "sham," the Plaintiffs' Motion to Exclude Sham Affidavit of Richardson Lynn [68] is **DENIED**.

### D.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

#### 1.   *Summary Judgment Standard*

Summary judgment is authorized when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 175 (1970); *Bingham, Ltd. v. United States*, 724

---

[12] Nothing about this ruling should be construed as finding or suggesting that the differences between the later affidavit and the earlier deposition testimony may or may not be proper grounds for cross-examination and attempted impeachment. All that is before the Court on Plaintiff's objection is the extraordinary request to exclude the affidavit altogether as a "sham," which the Court rejects.

F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court must view the evidence and all factual inferences in the light most favorable to the nonmoving party.

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See Anderson*, 477 U.S. at 249; *Ryder Int'l Corp. v. First American Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991). Rather, the court only determines whether there are genuine issues of material fact to be tried. Applicable substantive law identifies those facts that are material and those

54

that are irrelevant. *Anderson*, 477 U.S. at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *Id.*

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *Id.* An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 250. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 242. Moreover, for factual issues to be genuine, they must have a real basis in the record. *Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259.

2.    *Defendant John Marshall Law School*

Defendants contend that John Marshall Law School, LLC and not John Marshall Law School, employed the Plaintiffs. Def. SMF at ¶ 1; Lynn Aff. at ¶ 4. Although Plaintiffs responded to that fact by stating "Denied," they failed to cite to any evidence disputing that fact. *See* Pl. Resp. SMF at ¶ 1. Instead, they state that "Plaintiffs are not aware whether . . . [this] is a fact, but know only that ADP Totalsource I Inc and Adams-Keegan-GA, LLC issued their paychecks at different times during their employment with Defendants." *Id.* Under Local Rule 56.1B, this response is insufficient to controvert or dispute the Defendants' proffered fact, so the Court must deem the fact admitted. *See* LR 56.1B(2)(a)(4), NDGa.

In support of their allegation that John Marshall Law School, LLC employed the Plaintiffs, Defendants have cited Lynn's Affidavit, which provides as follows: "John Marshall Law School is owned and operated by John Marshall Law School, LLC. It is neither owned nor operated by the entity called 'John Marshall Law School.' I was employed by John Marshall Law School, LLC, as were all John Marshall faculty, staff and employees." Lynn Aff. at ¶ 4. Because Defendants have established that John Marshall Law School, LLC and not John Marshall Law School, employed the Plaintiffs, Defendants argue that "John Marshall Law School" is an improper party to this action. Def. Reply Br. [76] at 1 n.1. The undersigned agrees.

56

Accordingly, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [57] be **GRANTED** as to all claims asserted against John Marshall Law School.

The Court will discuss the Plaintiffs' claims asserted in the Complaint only as they are asserted against Defendant John Marshall Law School, LLC. The Court will first discuss Plaintiff Pinder's claims of race discrimination under Title VII and § 1981, and then Plaintiff Sigman's claims of unlawful retaliation under Title VII and § 1981. Finally, the Court will discuss the Plaintiffs' state-law claims of breach of contract and bad faith.

3. *Pinder's Claim of Race Discrimination under Title VII*

In Count III of the Complaint, Plaintiff Pinder asserts a claim for race discrimination under Title VII. *See* Compl. at ¶¶ 74-79. She alleges that she is African American, and Defendants discriminated against her on the basis of her race.

a.  Standards of Proof under Title VII

Title VII of the Civil Rights Act of 1964 provides that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a Title VII claim, a plaintiff must prove that the defendant acted with discriminatory

intent. *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980-981 (11th Cir. 1989); *Clark v. Huntsville City Bd. of Educ.*, 717 F.2d 525, 529 (11th Cir. 1983). Such discriminatory intent may be established either by direct evidence or by circumstantial evidence meeting the four-pronged test set out for Title VII cases in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984). Additionally, statistical proof may also be used as circumstantial evidence to establish intent. *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989).

Direct evidence is defined as evidence "that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." BLACK'S LAW DICTIONARY 596 (8th ed. 2004); *see also Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993); *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 n.6 (11th Cir. 1987). Only the most blatant remarks the intent of which could only be to discriminate constitute direct evidence. *Clark*, 990 F.2d at 1226; *Carter*, 870 F.2d at 581. Evidence that only suggests discrimination, *see Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990), or that is subject to more than one interpretation, *see Harris v. Shelby County Bd. of Educ.*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), does not constitute direct evidence. "[D]irect evidence relates to actions or statements of

an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee." *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990); *see also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641-42 (11th Cir. 1998).

Evidence that merely "suggests discrimination, leaving the trier of fact to infer discrimination based on the evidence" is, by definition, circumstantial. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir. 1990). Because direct evidence of discrimination is seldom available, a plaintiff must typically rely on circumstantial evidence to prove discriminatory intent, using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527-1528 (11th Cir. 1997). Under this framework, a plaintiff is first required to create an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *see also Jones v. Bessemer Carraway Medical Ctr.*, 137 F.3d 1306, 1310, *reh'g denied and opinion superseded in part*, 151 F.3d 1321 (11th Cir. 1998); *Combs*, 106 F.3d at 1527.

Demonstrating a *prima facie* case is not onerous; it requires only that the plaintiff establish facts adequate to permit an inference of discrimination. *Jones*, 137 F.3d at 1310-1311; *Holifield*, 115 F.3d at 1562; *see Burdine*, 450 U.S. at 253-54. Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802; *Jones*, 137 F.3d at 1310. If the defendant is able to carry this burden and explain its rationale, the plaintiff, in order to prevail, must then show that the proffered reason is merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253-54; *Perryman v. Johnson Products Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983).

A plaintiff is entitled to survive a defendant's motion for summary judgment if there is sufficient evidence to demonstrate the existence of a genuine issue of material fact regarding the truth of the employer's proffered reasons for its actions. *Combs*, 106 F.3d at 1529. A *prima facie* case along with sufficient evidence to reject the employer's explanation is all that is needed to permit a finding of intentional discrimination. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Combs*, 106 F.3d at 1529.

This *McDonnell Douglas-Burdine* proof structure "was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate

the evidence in light of common experience as it bears on the critical question of discrimination." *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); *see also Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987). The Eleventh Circuit has held that this framework of shifting burdens of proof is a valuable tool for analyzing evidence in cases involving alleged disparate treatment, but the framework is only a tool. *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1184 (11th Cir. 1984). The "ultimate question" is not whether a plaintiff has established a *prima facie* case or demonstrated pretext, but "whether the defendant intentionally discriminated against the plaintiff." *Id.*, 738 F.2d at 1184 (quoting *Aikens*, 460 U.S. at 713-14); *see also Jones*, 137 F.3d at 1313. The plaintiff retains the ultimate burden of proving that the defendant is guilty of intentional discrimination. *Burdine*, 450 U.S. at 253.

b.   Plaintiff's *Prima Facie* Case

Plaintiff Pinder does not contend that she has produced any direct evidence of any discriminatory intent; thus her claim of race discrimination rests purely on circumstantial evidence and must be analyzed under the *McDonnell Douglas-Burdine* framework. Under this framework, a plaintiff can generally establish a *prima facie* case of unlawful discrimination under Title VII by showing that: 1) she is a member

of a protected class;[13] 2) she was subjected to an adverse employment action by her employer; 3) she was qualified to do the job in question, and 4) her employer treated similarly situated employees outside her protected classification (*i.e.*, those of a different sex, race, or religion) more favorably than it treated her. *See McDonnell Douglas*, 411 U.S. at 802; *see also Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

It is undisputed that Pinder is African-American and a member of a protected class, and that she was qualified for her job at JMLS. It is also undisputed that Pinder was subjected to an adverse employment action when JMLS terminated her employment on March 3, 2011.[14] Defendant JMLS argues, however, that Pinder

---

[13] Although courts continue to include the requirement that a plaintiff establish as part of a *prima facie* case that he or she is a member of a "protected class," it is clear that individuals of any sex, race, or religion may pursue claims of employment discrimination under Title VII. *See Wright v. Southland Corp.*, 187 F.3d 1287, 1290 n.3 (11th Cir. 1999) (*citing McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-80 (1976)). Thus, the key element of the *prima facie* case is establishing that persons outside of the plaintiff's protected classification (*i.e.*, those of a different sex, race, or religion) were treated more favorably by the employer. *See Wright*, 187 F.3d at 1290 n.3.

[14] The parties dispute whether Plaintiffs' employment was terminated "for cause" or whether their contract was "nonrenewed." The undersigned finds that, for the purpose of the Plaintiffs' claims under Title VII and § 1981, the distinction is immaterial. It is undisputed that Dean Lynn made the decision that Plaintiffs' employment would not continue at JMLS and informed the Plaintiffs on March 3, 2011. Thus, the Court will refer both to the "termination" of Plaintiffs' employment and their "nonrenewal" interchangeably. Regardless of the language that Dean Lynn

cannot establish a *prima facie* case of race discrimination because, it argues, she has failed to present sufficient evidence that a similarly situated comparator outside her protected class was treated more favorably.

A plaintiff alleging discriminatory discharge under Title VII may establish a *prima facie* case by presenting evidence that her employer treated a similarly situated person outside her class more favorably than it treated her under similar circumstances. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997); *see also Knight v. Baptist Hospital of Miami*, 330 F.3d 1313, 1316 (11th Cir. 2003); *Silvera v. Orange County School Bd.*, 244 F.3d 1253, 1259 (11th Cir. 2001); *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1185 (11th Cir. 1984). When a plaintiff attempts to establish a *prima facie* case by pointing to a comparator, a plaintiff first must identify an employee outside of her protected class to which she is "similarly situated in all relevant respects." *Holifield*, 115 F.3d at 1562; *see also Knight*, 330 F.3d at 1316; *Silvera*, 244 F.3d at 1259.

In addition, the plaintiff must point to evidence that the identified comparator committed the same or similar infractions as the plaintiff, but did not receive similar disciplinary treatment from the employer. Indeed, the plaintiff must show that the

---

used to notify them of their termination, there is no dispute that Plaintiffs were subject to an adverse employment action.

comparator's misconduct was "nearly identical" to the alleged misconduct of the plaintiff in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler v. Orange County, Florida*, 447 F.3d 1319, 1323 (11th Cir. 2006) (*quoting Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999)); *see also Silvera*, 244 F.3d at 1259; *Nix*, 738 F.2d at 1185. If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate if no other evidence of discrimination is present. *Holifield*, 115 F.3d at 1562.

In this case, Pinder has identified Professor Kathleen Burch, who Pinder contends is a white woman, as an allegedly similarly situated comparator outside her protected classification. Pl. SMF at ¶ 124; Pinder Dep. at 194. Defendant does not appear to dispute that Burch is white. Def. Resp. SMF at ¶ 124. According to Plaintiffs, Burch began operating a for-profit bar exam tutoring business in December of 2012. Pl. SMF at ¶ 124; Burch Dep. at 13, 36. Plaintiffs contend that Burch obtained the contact information of students who failed the Georgia Bar Examination from Dean Lynn's secretary, and used JMLS resources containing private and confidential information about its former students to send correspondence to prospective clients. Pl. SMF at ¶ 126; Burch Dep. at 71-72; Pl. Ex. 192, 204. Burch also used the JMLS name on advertisements for her business. Pl. SMF at ¶ 128.

On the key issue whether Burch obtained permission from Dean Lynn prior to beginning to operate her for-profit bar exam tutoring business, there is a factual dispute. Lynn testified that Burch did not notify him about her business until "only a few days before February 18th, 2013," which was months after Burch began operating it. Lynn Dep. I at 245-46. If true, this would appear to violate the same rule that Plaintiffs supposedly violated and Defendants do not appear to argue otherwise.

However, Lynn later changed his testimony. The testimony cited above occurred during the first installment of his deposition, on June 11, 2013. Lynn Dep. I [54] at 245-246. His deposition was not completed that day, and was later completed in a second installment two weeks later, on June 24, 2013. Lynn Dep. II [55]. At the start of the second deposition, Lynn began by announcing that he needed to "correct" some statements from his first deposition. *Id.* at 268. One of those corrections related to when he believed he gave permission to Burch for the for-profit bar review course. In his second deposition, he stated that "driving home after the [first] deposition," he realized that he "must be wrong" in stating that he only learned of Burch's operation in February 2013. *Id.* at 268-269. Lynn stated that this realization was based, not on any newly refreshed memory, but on a deduction. Based on emails he was shown in the deposition, he realized that Burch was actively gathering student contact information from Lynn's secretary in 2012, and Lynn deduced that he must

have spoken with Burch before then. *Id.* at 269-270. When questioned whether it was possible whether Burch could have obtained the information about the students by going to his assistant without his knowledge, however, Lynn responded that it was possible. Lynn Dep. II at 271 ("So you don't know whether [your assistant] was asked and simply gave her the information, do you?" "I don't know that."). Lynn also made clear that his new testimony was not based on any "specific recollection" of the events but, rather, only on his deduction from the email traffic he was shown. In other words, his testimony as a whole remains that he has no recollection of discussing the issue with Burch at all until he spoke to her in February 2013.

As for Burch, she testified that she first went to Dean Lynn in November of 2011 to ask him about starting a "tutoring bar review business," before any operations, and he "said something along the lines of, anything we can do to help the students pass the bar we should be doing." Burch Dep. at 69-70.

The Court concludes, based on the evidence presented by the parties, that there exists sufficient evidence to create a genuine issue of fact as to whether Burch is a "similarly situated" comparator who committed similar "misconduct" to that which Pinder was accused of committing. If one were to rely on Lynn's specific recollection that Burch only informed him of her business in February 2013, one could find that Burch violated the rule requiring permission. If one were to rely on Lynn's later

66

change in testimony, and/or Burch's testimony, one would find there was no such violation. The Court in assessing this motion is obliged to look at the facts in the light most favorable to the Plaintiff. And where a dispute arises between witnesses, or between two versions of a story presented by the same witness, the Court is obliged to consider the version most favorable to the Plaintiff. A jury could credit Lynn's June 11 testimony and find, on that basis, that Burch had violated the same rule that Plaintiffs has supposedly violated.

Otherwise, at face value, Plaintiffs' LSA course appears highly similar to Burch's bar review course. Defendant, however, points to various distinctions between the two operations in an effort to justify any differential treatment. Defendant states that Burch gave no indication that she planned to grow her business "nationally," while the Plaintiffs advertised that was their intention. Lynn also considered Burch's bar preparation course to be "closer to the kind of teaching that we frequently treat as appropriate for consulting. It had met a need to help with our graduates who had failed the bar exam. That it was recommended by Ms. Lockwood, who has a lot of influence and even some power over the law school, was relevant." Lynn Dep. I at 251-52. Burch was also a tenured professor while Pinder was non-tenured.

However, while Defendant now makes legal arguments that these distinctions are material, Plaintiffs have adduced evidence from which a jury could find that Lynn,

the decision-maker, did not perceive any material distinctions at the time. As he stated in a February 18, 2013 email to Burch:

> Kathe, when you spoke to me about the bar prep business, I was focused on doing anything that you wanted to do, but it has been pointed out to me that I may have acted inconsistently compared to Sigman and Pinder. Now that has been raised, I'm not sure how to distinguish the two situations.

Pl. SMF at ¶ 133; Lynn Dep. I at 240-41; Burch Dep. at 75; Pl. Ex. 191. Lynn distanced himself from this statement in his deposition, stating that it reflected only his initial reaction, and that he later perceived differences between Burch's bar preparation course and the Plaintiffs' LSA course. Lynn Dep. I at 251-52. But while Lynn may have been able to come up with reasons for the differential treatment months later, in the context of this litigation, the fact that he had such trouble distinguishing the circumstances at the time could be seen by a jury as evidence of substantial similarity in the eyes of the decision maker himself. This creates a triable issue of fact on this question.[15]

--------------------------------

[15] Defendant also does not demonstrate how the distinctions cited would have made a material difference. For example, although it is undisputed that Burch was a tenured professor while Pinder was in a non-tenured probationary position, the Defendant has not shown that tenured professors were subject to different rules under the Handbook for the participation in outside businesses. Presumably, as a tenured professor, Burch was more difficult to terminate. But Defendant does not make that argument or explain any such facts. Indeed, Defendant does not argue that this rules violation would not have been grounds for termination for cause of even a tenured professor. Moreover, even short of termination, Burch was not apparently disciplined

Thus, Plaintiffs have shown that a jury could find the two for-profit tutoring operations to be substantially similar, and that Burch similarly began soliciting students and otherwise operating the company before receiving the required permission. Yet Burch was not fired or non-renewed, as Plaintiffs were, or even disciplined. Burch is therefore a relevant comparator for the purpose of Pinder's claim of race discrimination.

Defendant argues that a *prima facie* cannot be established because each Plaintiff is the other's best comparator. By definition, they engaged in the exact same misconduct and were both terminated, yet one is African-American and one is Caucasian. According to Defendant, this defeats any inference of discrimination. The jury may certainly consider this point, and agree with Defendant's argument. But Defendant cannot obtain summary judgment by just pointing to each Plaintiff as evidence that no violation was committed against the other. Indeed, the existence of a comparator who was treated similarly to Plaintiff does not defeat a *prima facie* case. *See, e.g., Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642 (6th Cir. 2012). More importantly, in this case, Plaintiffs argue that neither of them was terminated because of the LSA course. They both contend that this reason was pretext for actual race-

_____

and faced no other negative consequences at all. If the jury found that she committed a similar violation, this disparate treatment would be relevant to Pinder's claim.

based reasons. In Sigman's case, the termination was allegedly not on account of his own race, but rather because of views he expressed about racial injustice at the school. In other words, Plaintiffs allege that they are not similarly-situated, because despite the same pretextual basis for termination, the actual reasons that motivated Lynn to fire each of them were different. For Defendant to argue otherwise is circular, as it assumes the truth of the allegedly pretextual reasons that were given for termination.

Plaintiffs point to several comparators other than just Burch. The Court will discuss this evidence in the interests of completeness, although it is ultimately unnecessary since Burch alone presents an issue of fact as to disparate treatment.

The other comparators relied on by Plaintiffs are more distinguishable. Indeed, Plaintiffs failed to allege in their Statement of Facts that any of these other potential comparators is outside Pinder's protected class. They do not allege that these individuals were white, nor do they cite to any evidence in the record regarding the race or ethnic background of any alleged comparator. *See* Pl. SMF at ¶¶ 144-65.

Even assuming that Plaintiffs could point to evidence in the record establishing that all of these comparators were outside Pinder's protected class,[16] however, the

---

[16] Plaintiffs argue in their brief that all of these alleged comparators are white. Pl. Br. [66] at 25. In support of that allegation, they cite to Pinder's Declaration at ¶ 20, in which she states "Professors Kathleen Burch, Helen de Haven, Robert D'Agostino, Andrea Doneff, John Rapping, Rebecca Cumming and Jeffrey Van Detta are all white." Pinder Decl. [66-2] at ¶ 20. Plaintiffs failed to include this assertion of

undersigned concludes that none of the alleged comparators was operating a for-profit business that was comparable to LSA without obtaining permission from the Dean to do so.

With respect to D'Agostino, the undisputed evidence indicates that he occasionally assisted the Georgia Bar or consulted on cases for JMLS alumni, but on a *pro bono* basis, without compensation. D'Agostino Dep. at 39-43. Plaintiffs have not cited to any evidence in the record establishing that he ever operated a for-profit business remotely similar to LSA. Furthermore, it is also undisputed that D'Agostino informed Dean Lynn about his work on *pro bono* cases when he spent a considerable amount of time on them. D'Agostino Dep. at 42.

With respect to de Haven, the evidence indicates that JMLS had paid for her to take arbitration training for the purpose of teaching an arbitration course for the Law School. She testified that JMLS wanted her to teach a course on arbitration "as both a substantive law course and a skills-based course," so she engaged in union advocacy work in arbitration as "part of the initial start-up." de Haven Dep. at 84-85. Plaintiffs

---

fact in their Statement of Material Facts, however, and the Local Rules prohibit the Court from considering it. *See* LR 56.1B, NDGa ("[t]he court will not consider any fact: . . . set out only in the brief"). Nevertheless, the Court concludes that, even if the Plaintiffs had properly asserted this fact in their Statement of Facts, none of the alleged comparators was similarly situated to Pinder because none operated a for-profit business similar to LSA without permission from the Dean.

have not cited to any evidence in the record that de Haven ever operated a for-profit business that was comparable to LSA.

Plaintiffs also contend that Doneff was an alleged comparator to Pinder, because Doneff engages in mediation both independently and through Mediation Works, Inc. and has not been terminated from her position at JMLS for conducting her outside business. Doneff Dep. at 11, 14. Although it is undisputed that Doneff conducts mediation, it is also undisputed that she obtained permission to do so from Dean Lynn before she accepted a position at JMLS. Def. Resp. SMF at ¶ 154; Doneff Dep. at 20-21; Lynn Aff. at ¶ 11.

Plaintiffs further argue that Van Detta was allowed to teach classes at Concord Law School without being terminated from his position at JMLS. It is undisputed that Van Detta teaches classes at Concord Law School. Def. Resp. SMF at ¶ 160; Van Detta Dep. at 48, 54, 209-10. It is further undisputed, however, that Dean Lynn does not consider teaching at another law school to be similar to operating a for-profit business such as LSA. Lynn testified that "traditionally we let people teach at other schools." Lynn Dep. II at 277-78 ("In the law school world, we frequently allow our professors to teach at other schools."). Plaintiffs have not pointed to any evidence in the record that Van Detta ever attempted to operate a for-profit business similar to LSA while he was a full-time faculty member at JMLS.

72

Plaintiffs also argue that John Rapping was not terminated for conducting an outside for-profit business. Rapping created and runs Gideon's Promise, a public defender training program, and has not been terminated for conducting his outside business. Pl. SMF at ¶ 162; de Haven Dep. at 83; Doneff Dep. at 18, 122; Markovitz Dep. at 98-99; Pl. Ex. 11. Defendant does not dispute that Rapping "serves as Executive Director of the Southern Public Defender Training Center," which is "a nonprofit organization of volunteers who help train public defenders." Def. Resp. SMF at ¶ 162; Lynn Aff. at ¶ 11. It is undisputed, however, that Rapping also obtained "advance permission" before doing that work. Lynn Aff. at ¶ 11. Plaintiffs have not presented any evidence that Rapping operated a for-profit business similar to LSA without seeking permission from the Dean.

Finally, Plaintiffs argue that Rebecca Cummings is a JMLS professor who participated in an outside business without having her employment terminated for violating JMLS policy. According to Plaintiffs, Cummings is "of counsel" at a law firm in Atlanta in violation of the Handbook's express prohibition of serving as of counsel at a law firm. Pl. SMF at ¶ 165; de Haven Dep. at 83; Ross Dep. at 82-84. Defendant disputes that Cummings actually served in an "of counsel" position at a law firm, and contends that Cummings was given permission to "wind up" her cases at that law firm at the time she was hired. Def. Resp. SMF at ¶ 165. According to Dean

73

Lynn's testimony, Cummings informed him that the law firm would list her as "of counsel" on its website in order for her to maintain her malpractice coverage, but she was not listed as "of counsel" on the law firm letterhead. Lynn Dep. II at 285-86.

The undersigned concludes that, even if Cummings was listed as "of counsel" on the website of a law firm, that does not establish that she was a similarly situated comparator. Plaintiffs have presented no evidence that Cummings actually participated in the business of the law firm on an ongoing basis without informing Dean Lynn. Instead, the undisputed evidence reflects that she obtained permission from Dean Lynn to "wind up" her cases at the law firm at the time she was hired at JMLS. Plaintiffs have not presented any evidence to contradict Lynn's testimony that the law firm listed Cummings as "of counsel" on its website for the purpose of maintaining malpractice coverage during that transitional period. Thus, Plaintiffs have not presented any evidence that Cummings operated a for-profit business similar to LSA without seeking permission from the Dean.

In sum, the undersigned concludes that, other than Burch, Plaintiffs have failed to present evidence that a similarly situated comparator outside Pinder's protected classification operated a for-profit business similar to LSA without obtaining permission from Dean Lynn to do so. While Plaintiffs argue that various JMLS professors performed outside work, Defendant has established that, except for Burch's

74

bar preparation course, none of these outside ventures was a for-profit business that was similar to LSA, and most of these professors obtained permission for their outside ventures.

The evidence as to Burch, however, is sufficient to establish a *prima facie* case of race discrimination under Title VII. Thus, under the *McDonnell Douglas* framework, the burden shifts to Defendant to produce evidence of a legitimate, non-discriminatory reason for its decision to terminate Pinder's employment.

c.      Defendant's Legitimate Non-Discriminatory Reason

The undersigned finds that, based on the evidence in the record as set forth in detail above in the facts, Defendant has presented sufficient evidence that it had a legitimate reason for its decision not to renew Pinder's contract with JMLS. Defendant has presented evidence that Dean Lynn made the decision not to renew Pinder's contract after he discovered that Pinder, along with Sigman, had created a for-profit business called Law School Advantage ("LSA"), without informing the Dean or seeking his permission.

It is undisputed that, during the spring and summer of 2010, Pinder and Sigman began organizing LSA, which was a summer preparation program for incoming law students with plans to launch in July of 2011. Def. SMF at ¶ 5; Pl. SMF at ¶¶ 27, 59-60. Plaintiffs planned for LSA to be a one-week long course during the summer before

75

JMLS students began official classes, designed to help the entering law students learn the basic skills they needed to learn to start law school, including how to read a case and how to write a case brief. Pl. SMF at ¶ 60. At some time in 2010, Plaintiffs created and launched the company website using JMLS computers, opened a post office box, obtained a business telephone number, advertised for students on the website and on Facebook, and prepared and filed a Certificate of Organization, Articles of Organization, and Annual Registration for the company. Def. SMF at ¶ 6. Plaintiffs also hired an attorney who prepared an Operating Agreement for the company. Def. SMF at ¶ 7. In addition to using their JMLS credentials and the Law School's name, Plaintiffs also used testimonials from their John Marshall students to promote the business, and LSA's website announced plans "to expand throughout the Southeastern region" and "grow the business nationally." Def. SMF at ¶ 8; Pl. SMF at ¶ 61.

In mid-February of 2011, Dean Lynn learned that Plaintiffs had created and were operating LSA when Michelle Harris informed him of the LSA Facebook page. Def. SMF at ¶ 9; Pl. SMF at ¶ 73. Although the Plaintiffs had been working on the company's business throughout the entire 2010-11 academic year, they had never discussed their business with Dean Lynn, nor had they sought permission to engage in the business. Def. SMF at ¶¶ 6, 13, 30. After reviewing the company's marketing

materials and business documents, Dean Lynn concluded that it conflicted with the interests of the Law School and Plaintiffs' obligations and responsibilities to the Law School as full-time faculty members. Def. SMF at ¶ 10. Lynn was concerned that the business created an impression with incoming law students that, if they paid for and took classes from the Plaintiffs before starting school at JMLS, they would have an advantage over other JMLS students, and thereby improve their prospects of success at the Law School. Def. SMF at ¶ 11.

Dean Lynn also believed that the Plaintiffs' failure to seek his permission violated the Law School policies as set forth in the Handbook. The section of the Handbook cited by Defendant, § 802, provides as follows:

> **(b) Outside Employment**
>
> The Law School recognizes that occasional consulting work may be a valuable professional experience for faculty members. However, such work must not interfere with the faculty member's contractual arrangements with the Law School. Faculty members may neither permit their names to be listed on law firm stationery nor have an "of counsel" relationship with any law firm.
>
> Generally, consulting may not consume more than ten hours per week and the subject matter of the consulting must be related to the faculty member's teaching expertise. Prior permission to consult must be received from the Dean. Faculty members may not cancel class in order to arrange for consulting opportunities except with permission of the Dean.

Handbook, Pinder Dep., Ex. 9 at § 802; Pl. SMF at ¶ 84.

77

According to Defendant, Dean Lynn made the decision in mid-February of 2011 not to renew the Plaintiffs' contracts. Def. SMF at ¶¶ 14, 43; Lynn Aff. at ¶¶ 7-14. He then met with Pinder and Sigman separately on March 3, 2011, and informed them that their annual appointments would not be renewed for the next academic year. Def. SMF at ¶¶ 21-22; Pl. SMF at ¶ 77; Lynn Aff. at ¶ 20. Dean Lynn gave Pinder a "nonrenewal letter" stating as follows:

> This is to inform you that your contract will not be renewed for the 2011-12 academic year. Because you are entitled to six months notice, you will be paid through September 2, 2011. . . .

> This is not a termination for cause, but you are entitled to know the reasons why your contract will not be renewed. They include your establishing and engaging in a business while employed as a full-time faculty member, engaging in a business which creates possible conflicts of interest, using the law school name on your business website without permission, [and] using law school computer facilities for your business. . . .

Def. SMF at ¶¶ 24, 49; Pl. SMF at ¶ 78; Pinder Dep., Ex. 17.

Accordingly, Defendant has presented evidence of a legitimate reason for the nonrenewal of Pinder's contract. Under the *McDonnell Douglas* framework, the burden thus shifts to Plaintiffs to present evidence that the proffered reason was a mere pretext for unlawful discrimination.

       d.      Pretext

A plaintiff may carry the burden of showing that the employer's proffered reasons are pretextual by showing that they have no basis in fact, that they were not the true factors motivating the decision, or that the stated reasons were insufficient to motivate the decision. A plaintiff can either directly persuade the court that a discriminatory reason more likely motivated the employer or show indirectly that the employer's ultimate justification is not believable. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1522 (11th Cir. 1991). In other words, the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. *Burdine*, 450 U.S. at 256; *McDonnell Douglas*, 411 U.S. at 804.

When a plaintiff is able to present some evidence suggesting that the employer's explanation lacks credibility or that discrimination is the more likely motive, a case is made for pretext. *Burdine*, 450 U.S. at 256. Once the plaintiff produces evidence sufficient to permit the factfinder to disbelieve the defendant's explanation for its actions, summary judgment is not appropriate because "[i]ssues of fact and sufficiency of evidence are properly reserved for the jury." *Hairston v.*

*Gainesville Sun Publishing Co.*, 9 F.3d 913, 921 (11th Cir. 1993); *see also Combs v. Plantation Patterns*, 106 F.3d 1519, 1530 (11th Cir. 1997). "[T]he grant of summary judgment, though appropriate when evidence of discriminatory intent is totally lacking, is generally unsuitable in Title VII cases in which the plaintiff has established a *prima facie* case because of the 'elusive factual question' of intentional discrimination." *Hairston*, 9 F.3d at 921 (*quoting Burdine*, 450 U.S. at 256).

In this case, Pinder argues that she has presented evidence that Defendant's proffered reason is pretextual by establishing that Kathleen Burch, a white professor at JMLS, started a bar exam preparation course in 2012, and although Lynn did not find out about Burch's bar preparation course until well after it began, he did not terminate Burch's employment or even discipline her as a result. The evidence regarding Burch's bar exam tutoring business is discussed at length above in connection with Pinder's *prima facie* case. In sum, the evidence in the record indicates that there is a genuine issue of material fact as to whether Burch sought permission from Dean Lynn before starting her business.

Although Burch testified that she sought, and obtained, permission from Dean Lynn before she began operating her bar preparation course in 2012 and contacting prospective students, Lynn at least initially stated otherwise, that is, that he did not discuss the matter with her until February 2013. Although he later "corrected" that

testimony by stating it "must be wrong," he also stated that he had no specific recollection of meeting with Burch at any earlier time. Thus, there is a genuine issue of material fact as to whether Burch sought or obtained prior permission from Dean Lynn to operate her bar preparation course.

Defendant argues that Dean Lynn also concluded that Burch's bar preparation course was different from the Plaintiffs' LSA business in other ways. In response, Plaintiffs argue that "Defendants' argument boggles the mind given the fact that Lynn allowed Kathleen Burch to start a bar exam tutoring business, which clearly created a conflict with the school's contract with the Kaplan bar review program." Pl. Br. [66] at 22-23. The Court need not conclude that Burch's bar preparation course created a conflict with the school's contract with Kaplan. Instead, it need only determine whether the Plaintiffs have presented sufficient evidence to cast doubt on Defendant's proffered reason for allowing Burch to operate her bar preparation course without any negative consequences, while it had previously terminated Pinder's employment for operating a substantially similar type of business. The undersigned concludes that they have done so. Indeed, as discussed above, despite articulating distinctions now, Dean Lynn when first learning about Burch's business was "not sure how to distinguish the two situations." For these reasons, the undersigned concludes that Pinder has

81

presented sufficient evidence that Defendant's proffered reason for the differential treatment was pretextual.

Plaintiffs argue further that they have presented evidence that the other reasons given for the nonrenewal of Pinder's contract were pretextual. Pinder's nonrenewal letter also included as reasons for her nonrenewal her "failure to cooperate by submitting an explanation to the Board of Directors for the proposed Faculty Handbook change that you supported, and failure to follow law school policies on make-up classes." Def. SMF at ¶ 24; Pl. SMF at ¶ 87; Pinder Dep., Ex. 17. While these reasons given in the nonrenewal letter were undoubtedly secondary to the main reason, Pinder's operation of the LSA business, Plaintiffs have cited to evidence in the record that casts doubt on these additional proffered reasons as well.

Plaintiffs argue that "Defendants' additional allegation that Pinder was terminated because she did not explain her proposal to the Faculty Handbook is patently pretextual." Pl. Br. at 26. As set forth in the facts, during the 2009-2010 academic year, Pinder proposed a change to the Handbook that would make it a policy at JMLS for the full-time faculty to get priority over faculty at other schools for summer and intercession teaching assignments. Pl. SMF at ¶ 29. Although the faculty voted to adopt the proposed change, before it went before the Board of Directors, Dr. Markovitz asked for an explanation as to why it was good for the institution. Pl. SMF

at ¶ 30. Pinder concluded that Dr. Markovitz did not want the change and did not send an explanation on June 4, 2010. Pl. SMF at ¶ 31.

Plaintiffs have presented evidence that Defendant never previously took issue with her lack of explanation. Pl. SMF at ¶ 31; Pinder Dep. at 214-16; Markovitz Dep. at 58-59. Furthermore, Plaintiffs point out that Pinder's contract was renewed on June 14, 2010, which was after her proposed amendment to the Handbook and shortly after she failed to send an explanation to Dr. Markovitz. Additionally, Pinder informed Dean Lynn that she was not going to provide explanations and Lynn, by reply, indicated that was not a problem. *See* Pl. Ex. 84. It was not until eight months later and the renewal of Pinder's contract that Dean Lynn suddenly raised the issue for the first time in her "nonrenewal letter." Defendant has provided no explanation as to why Dean Lynn made the decision to renew Pinder's contract on June 14, 2010, but then decided almost a year later in March of 2011 that her "failure to cooperate by submitting an explanation to the Board of Directors for the proposed Faculty Handbook change that you supported" was a cause to nonrenew her contract. Plaintiffs argue that this evidence that neither Dr. Markovitz nor Dean Lynn seemed to have a problem with her lack of explanation, and particularly, the evidence that Dean Lynn made the decision to renew her contract afterward, establishes that this purported reason for her nonrenewal was pretextual. The Court agrees that a jury could so find.

Pinder's nonrenewal letter also included as another reason for her nonrenewal her "failure to follow law school policies on make-up classes." Pinder Dep., Ex. 17. Defendant has not cited to evidence in the record establishing that Pinder failed to follow law school policies on make-up classes or otherwise supporting this purported reason for Pinder's nonrenewal. Plaintiffs argue, however, that Pinder did not miss a make-up class, and in fact, students actually complained that Pinder held a mandatory make-up class. Pl. SMF at ¶ 88; Pinder Dep. at 212; Harris Dep. at 149-50. Plaintiffs further argue that no professor other than Pinder has ever been nonrenewed "for failing to conduct a single make-up class." Pl. SMF at ¶ 89.

In their Reply, Defendants do not address the Plaintiffs' arguments that these additional reasons given in Pinder's nonrenewal letter were blatantly pretextual. In any event, taken with the other evidence discussed above, the undersigned concludes that Plaintiffs have presented sufficient evidence to create a genuine issue of fact as to whether the Defendant's purported reasons for nonrenewing Pinder's contract were a pretext for race discrimination. Accordingly, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [57] be **DENIED** with respect to Count III, Pinder's claim of race discrimination under Title VII, as asserted against Defendant John Marshall Law School, LLC.

84

4.   *Pinder's Claim of Race Discrimination under § 1981*

In Count I of the Complaint, Plaintiff Pinder has asserted a claim under § 1981

for race discrimination. *See* Compl. at ¶¶ 61-66.

The statute provides as follows:

**(a) Statement of equal rights**

 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

**(b) "Make and enforce contracts" defined**

 For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

**(c) Protection against impairment**

 The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

It is well-settled law that § 1981 prohibits race discrimination in both the public

and private employment context. *See Little v. United Techs., Carrier Transicold Div.*,

103 F.3d 956, 961 (11th Cir. 1997) ("It is well-established that § 1981 is concerned

with racial discrimination in the making and enforcement of contracts."); *Brown v.*

*American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991) ("The aim of the statute is to remove the impediment of discrimination from a minority citizen's ability to participate fully and equally in the marketplace."); *see also St. Francis College v. Al-Khazraji*, 481 U.S. 604, 609 (1987) ("Although § 1981 does not itself use the word 'race,' the Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts."). To establish a claim of race discrimination under Section 1981, a plaintiff must establish that: (1) the plaintiff was a member of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute. *See White v. Fla. Highway Patrol, Div. of Fla. Dep't of Highway Safety & Motor Vehicles*, 928 F. Supp. 1153, 1157 (M.D. Fla. 1996) (citing *Milan v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2nd Cir. 1993)).

Furthermore, in cases in which a plaintiff has asserted a claim under § 1981 as a remedy for employment discrimination, the elements required to establish a claim under Section 1981 mirror those required for a Title VII claim. *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (the same analysis applies to a Title VII race discrimination claim and a § 1981 race discrimination claim because both statutes "have the same requirements of proof and use the same analytical framework"); *see also Howard v. B.P. Oil Co.*, 32 F.3d 520, 524 n.2 (11th

Cir. 1994) (*citing Patterson v. McClean Credit Union*, 491 U.S. 164 (1989)); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991). In this case, the parties agree that Pinder's claim of race discrimination under § 1981 should be analyzed under the same analytical framework as her claim of race discrimination under Title VII. Def. Br. [57] at 17-18; Pl. Br. [66] at 8. Thus, for the same reasons discussed above in connection with Pinder's claim of race discrimination under Title VII, the undersigned finds that Pinder established a *prima facie* case of race discrimination under § 1981, and she has also presented sufficient evidence that Defendant's proffered reason was pretextual.

Accordingly, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [57] be **DENIED** as to Count I, Pinder's claim of race discrimination under § 1981, as asserted against Defendant John Marshall Law School, LLC.

### 5.  *Sigman's Claim of Retaliation under Title VII*

In Count IV of the Complaint, Plaintiff Sigman has asserted a claim for retaliation under Title VII. *See* Compl. at ¶¶ 80-84. Title VII acts to shield employees from retaliation for certain protected practices. Specifically, the statute provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee or applicant] has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

Proof of retaliation is governed by the framework of shifting evidentiary burdens established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600 (11th Cir. 1986); *see also Goldsmith v. City of Atmore*, 996 F.2d 1155, 1162-63 (11th Cir. 1993). In order to prevail, a plaintiff must first establish a *prima facie* case of retaliation. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601; *see also Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985). Once a *prima facie* case has been established, the employer must come forward with a legitimate non-discriminatory reason for its action. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601; *see also Weaver*, 922 F.2d at 1525-1526. If the employer carries its burden of production to show a legitimate reason for its action, the plaintiff then bears the burden of proving by a preponderance of the evidence that the reason offered by the defendant is merely

88

a pretext for discrimination. *Goldsmith*, 996 F.2d at 1162-63; *Donnellon*, 794 F.2d at 600-601.

a.    *Prima Facie* Case

To establish a *prima facie* case of illegal retaliation under 42 U.S.C. § 2000e-3(a), Plaintiff Sigman must show that: (1) he engaged in a protected activity or expression; (2) he received an adverse employment action, and (3) there was a causal link between the protected expression and the adverse action. *See, e.g., Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454 (11th Cir. 1998); *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1524 (11th Cir. 1991); *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985). Defendant does not dispute that Sigman received an adverse employment action when JMLS chose not to renew his contract. Defendant argues, however, that Sigman has failed to establish a *prima facie* case of retaliation because he has failed to present evidence that he engaged in a protected activity under Title VII or, even if he did so, that there was any causal link between the alleged protected activity and the termination of his employment.

(1)    Protected Activity

A plaintiff alleging unlawful retaliation can show that he engaged in a protected act under Title VII through evidence of either "participation" or "opposition." An act of participation ordinarily requires the existence of a Title VII proceeding or

89

investigation. *See EEOC v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000); *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999). Sigman does not contend that he "participated" in any formal proceeding or investigation. Instead, he claims that he engaged in a protected act under Title VII by making complaints to Dean Lynn that Michelle Butts, an Associate Professor at JMLS, had discriminated against both Sigman and students on the basis of race. Pl. SMF at ¶ 51; Sigman Dep. at 159-61.

Making informal complaints to superiors about suspected illegal discrimination may qualify as protected expression under the opposition clause of Title VII. *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997); *see also Rollins v. Fla. Dep't. Of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989) ("[W]e recognize that the protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those, like [the plaintiff], who informally voice complaints to their superiors."). Nevertheless, not every informal complaint made by an employee automatically qualifies as a protected expression that shields the employee from subsequent retaliation.

In order for an employee engaging in opposition activity to be protected under the anti-retaliation provision of Title VII, he or she must be opposing conduct that is made an "unlawful employment practice" by Title VII. Title VII defines an "unlawful

employment practice" as, *inter alia*, discrimination against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). In other words, it is not enough for a plaintiff to show that he opposed garden-variety unfairness or harsh treatment in the workplace; he is only protected from retaliation if the practice he opposed or complained about is specifically prohibited by Title VII.

To recover under a theory of retaliation, a plaintiff need not *prove* the underlying claim of discrimination that led to the complaint, so long as he had a "good faith, reasonable belief" that the conduct or practice he was opposing constituted unlawful discrimination. *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999); *Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999); *Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989). The reasonableness of the plaintiff's belief is measured against the law as it existed at the time of the protected activity; thus, the plaintiff is charged with knowledge of the parameters of what Title VII does and does not prohibit. *Clover*, 176 F.3d at 1351; *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 n.2 (11th Cir. 1998); *Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997).

In addition, the Eleventh Circuit has held that, in order to establish that a complaint was a protected activity for the purpose of a retaliation claim, the employee

must "'at the very least, communicate her belief that discrimination is occurring to the employer,' and cannot rely on the employer to 'infer that discrimination has occurred.'" *Demers v. Adams Homes of Northwest Fla., Inc.*, 21 Fed.Appx. 847, 852, 2009 WL 724033 at *4 (11th Cir. March 20, 2009) (*per curiam*) (unpublished) (quoting *Webb v. R & B Holding Co., Inc.*, 992 F. Supp. 1382, 1390 (S.D. Fla. 1998)).

In this case, the Court finds that Plaintiff Sigman has failed to present sufficient evidence that he held a "good-faith" or subjective belief that Butts discriminated against him on the basis of his race. Nor has he presented any evidence to establish that his belief was objectively reasonable. As discussed, the Plaintiff's belief must be measured against existing law at the time the complaints were made. In other words, it is not enough for Sigman to allege merely that he complained to Lynn that he believed Butts had "discriminated" against him. The use of a particular Title VII "buzzword" does not turn his complaints into protected activities under Title VII. Instead, Sigman must point to some evidence in the record indicating that, at the time he made the alleged complaints, Butts had taken some action against him that a reasonable person would consider to be an act of unlawful discrimination on the basis of race.

After a careful review of the evidence presented by the parties, the undersigned concludes that Sigman has failed to point to any evidence that Butts took any action

against him that could reasonably be considered an act of racial discrimination under Title VII. He contends that he complained "about gender and racial bias against [him] and students and us[ed] supporting information [about grading biases] that [he] believed supported [his] complaint." Pl. SMF at ¶ 52; Sigman Dep. at 159. He claims that he told Dean Lynn that the "disparate treatment of white male students was consistent with the disparate treatment of me, a white male colleague." Pl. SMF at ¶ 53; Sigman Dep. at 159-60. He claims that he complained that "the pattern of altering grades for minority females was consistent with my treatment by Ms. Butts that I had attempted to get remedied through numerous channels, and I wanted it to stop both on my behalf and the students." Pl. SMF at ¶ 54; Sigman Dep. at 160. But Sigman does not explain what "treatment by Ms. Butts" was an act of discrimination against him on the basis of his race. He makes only conclusory allegations that he complained about "discrimination" against him, without identifying a single act taken against him by Butts that he claims was an act of race discrimination.

Sigman further claims that he complained that Butts favored African Americans and women in her grading and other policies, and that her biased behavior against white male students was consistent with her biased behavior against Sigman, a white male, including previously writing to Sigman, "I'm not your bitch, Scott." Pl. SMF at ¶ 55; Sigman Dep. at 159-61, 169-70, Pl. Ex. D, E. Sigman does not explain,

however, how Butts's use of the word "bitch" in an email to him could be construed as an act of racial discrimination against him. *Cf. Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 810 (11th Cir. 2010) (the term "bitch" when used to apply to a female employee is "gender-derogatory"). The undersigned finds that, under the circumstances of this case, Butts's use of the term "bitch" could not be considered an act of racial discrimination against Sigman. *See, e.g.*, *Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997) ("no rational jury" could find that an employee had an "objectively reasonable" belief that he was opposing an unlawful employment practice on the basis of his complaint about one racist remark by a co-worker).

Furthermore, Sigman also claims that he complained to Dean Lynn that "Professor Butts was putting him in a hostile work environment." Pl. SMF at ¶ 55. Plaintiffs have not cited to any evidence in the record supporting that allegation, however. *See* Sigman Dep. at 159-61 ("I was complaining to Dean Lynn about gender and racial bias against me and students" and "a pattern and practice of discriminatory conduct against white males, including me"). Instead, the evidence reflects that Sigman actually complained that it was Butts who had accused him of creating a hostile work environment for her, and he complained to Dean Lynn that she had falsely accused him. Sigman Dep. at 175. Sigman does not claim, however, that Butts discriminated against him on the basis of his race when she "falsely accused" him of

94

creating a hostile work environment, and the undersigned finds that Butts's allegation against Sigman cannot reasonably be considered an act of race discrimination.

In addition to claiming that Butts had discriminated against him personally on the basis of his race, Sigman also claims that he complained that she had discriminated against students. Sigman claims that he had received multiple complaints from students that Butts was favoring minorities and women in her grading practices, and Sigman then complained to Dean Lynn that Butts favored African Americans and women in her grading and other policies. Regardless of whether Sigman's complaints about Butts were true, her alleged discriminatory grading policies against white male students could not be construed as a discriminatory *employment* practice that is prohibited by Title VII. *See Holt v. Lewis*, 955 F.Supp. 1385 (N.D.Ala. 1995), *aff'd*, 109 F.3d 771 (11th Cir. 1997) (because a complaint by a teacher that a student was being treated unfairly did not relate to any prohibited employment practice, "any retaliation by defendants for plaintiff's advocacy of a student's rights is simply not prohibited by Title VII").

In sum, although Sigman made complaints to Dean Lynn about Butts's alleged "discrimination" against him, he has failed to allege that she took any action against him that could reasonably be considered an act of race discrimination. In fact, he has not alleged that she took any specific action against him at all, other than sending him

95

an email in which she wrote "I'm not your bitch, Scott." Plaintiff has failed to cite to evidence in the record supporting his claim that he had a good-faith and objectively reasonable belief that he was being subjected to discrimination on the basis of his race. Furthermore, he has failed to present evidence showing that he had a good-faith and reasonable belief that his complaints about the way that Butts graded students could be considered a complaint about unlawful *employment* practices under Title VII.

Accordingly, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [57] be **GRANTED** as to Count IV, Sigman's claim of retaliation under Title VII, as asserted against Defendant John Marshall Law School, LLC.

6.      *Sigman's Claim of Retaliation under § 1981*

In Count II of the Complaint, Plaintiff Sigman has asserted a claim of retaliation under § 1981. *See* Compl. at ¶¶ 67-73.

a.      *Prima Facie* Case

The Supreme Court has held that § 1981 encompasses claims of race-based retaliation as well as claims of race discrimination. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 445 (2008); *see also Bryant v. Jones*, 575 F.3d 1281, 1301 (11th Cir. 2009). As discussed above, when a plaintiff has asserted a claim under § 1981 as a remedy for employment discrimination, the elements required to establish a claim under Section 1981 are ordinarily the same as those required for a Title VII claim. *See*

96

*Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) (the same analysis applies to a Title VII race discrimination claim and a § 1981 race discrimination claim because both statutes "have the same requirements of proof and use the same analytical framework"); *see also Howard v. B.P. Oil Co.*, 32 F.3d 520, 524 n.2 (11th Cir. 1994) (*citing Patterson v. McClean Credit Union*, 491 U.S. 164 (1989)); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 949 (11th Cir. 1991).

With respect to a claim grounded in retaliation, however, there is nothing in the language of § 1981 that limits claims to contracts involving employment, as Title VII is so limited. Instead, § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Furthermore, the statute defines the term "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

The Supreme Court has further held that a person may assert a claim of retaliation under § 1981 when he has complained about a race-based violation of another person's "contract-related right," and was retaliated against as a result of that

complaint. *CBOCS West, Inc.*, 553 U.S. at 445 ("The basic question before us is whether [§ 1981] encompasses a complaint of retaliation against a person who has complained about a violation of another person's contract-related 'right.' We conclude that it does."). Thus, a plaintiff may state a claim under § 1981 for race-based retaliation if he alleges that he complained about a violation of another person's "contract-related right" on the basis of race, and was retaliated against as a result in a way that interfered with his own right to "make and enforce contracts."[17]

   In this case, Plaintiffs argue that Sigman's complaints about the discriminatory manner in which Butts graded minority students more favorably than white students implicated a concern about the students' contractual rights, because, Plaintiffs argue, private universities in Georgia may form contracts with students through the student

---

[17] To the extent that the Eleventh Circuit's decision in *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956 (11th Cir. 1997), can be read to suggest that white persons cannot bring any claim for retaliation under § 1981 for claiming that they were retaliated against for opposing racial discrimination against others, the Supreme Court's decision in *CBOCS West, Inc.*, casts doubt on that holding. *See Little*, 103 F.3d at 961 ("Here, there is no evidence in the record–and Little does not suggest or allege–that the discrimination or retaliation allegedly levelled against him was due to his race; that is, Little does not contend that Carrier discriminated against him because he was white."); *see also Milton v. Milligan*, No. 4:12cv384-RH/CAS, 2013 WL 828591, at *3 (N.D. Fla. March 5, 2013) ("The Supreme Court has held that Congress intended § 1981 to include an antiretaliation principle, so that those who oppose racial discrimination in contracting are protected from retaliation in contracting. The principle must surely protect whites who oppose discrimination as well as African Americans who do so.").

handbook. *See, e.g.*, *Barnes v. Zaccari*, 757 F. Supp. 2d 1313, 1335 (N.D. Ga. 2010) (affirmed in part, reversed in part and remanded on other grounds); *see also Kuritzky v. Emory University*, 294 Ga. App. 370 (2008)*; Morehouse College, Inc. v. McGaha*, 277 Ga. App. 529 (2005).

Defendant argues that Sigman has not produced any particular contract. For example, Plaintiff has not introduced the student handbook or any other document in the record that sets out contractual rights. Defendant, however, does not cite authority for the notion that Plaintiffs must produce a specific contract. Section 1981 broadly protects equal rights with regard to the "the enjoyment of all benefits, privileges, terms, and conditions" of any "contractual relationship." This has been interpreted to cover non-express, implicit, contractual relationships, such as that between a retail merchant and customer. *See, e.g., Gregory v. Dillards, Inc.*, 565 F.3d 464 (8th Cir. 2009). It is well established that the student-university relationship is essentially contractual in nature. *See Mangla v. Brown University*, 135 F.3d 80, 83 (1st Cir. 1998). Indeed, courts have specifically found that § 1981 protects student rights in this contractual relationship. *See, e.g., Sanford v. Howard University*, 415 F.Supp. 23, 29 (D.D.C. 1976) ("Whenever a student is found qualified and admitted to the University, a term of the student contract must be implied to guarantee that student that grades, assignments and educational progress will not be tainted by any invidious

discrimination based on race."). Thus, the Court finds that Sigman's complaints about Butts's discriminatory treatment of white students in grading could be construed as a protected activity under § 1981.

Based on the comments Sigman alleges that students made to him about the "grade-bumping" by Butts, Sigman has also presented evidence that he had a "reasonable" belief that Butts was discriminating against students on the basis of their race in her distribution of grades.

Furthermore, the undersigned also finds that Sigman has presented evidence suggesting a causal link between his complaints about Butts's discriminatory grading practices and the termination of his employment. As set forth above in detail in the facts, Sigman met with Dean Lynn on March 1, 2011, to discuss his complaints about Butts, and two days later, on March 3, 2011, Lynn informed Sigman that his contract was not being renewed. The undersigned finds that such close temporal proximity suggests an inference of a causal link. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *Bass v. Board of County Comm., Orange County, Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001); *Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 798-99 (11th Cir. 2000); *see also Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as

sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be very close.") (internal quotes omitted).

In sum, the undersigned finds that Sigman has presented sufficient evidence to establish a *prima facie* case of retaliation under § 1981. Sigman has presented evidence that he complained to Dean Lynn on March 1, 2011, that Butts had discriminated in favor of minority students and against white students in the distribution of grades. He has also presented evidence that two days later, on March 3, 2011, Lynn informed him that his contract would not be renewed. Thus, under the *McDonnell Douglas* framework, the burden shifts to Defendant to produce evidence of a legitimate, non-discriminatory reason for its decision to terminate Sigman's employment.

b.      Defendant's Legitimate Reason and Pretext

The undersigned finds that, based on the evidence in the record as set forth in detail above in the facts, Defendant has presented sufficient evidence that it had a legitimate reason for its decision not to renew Sigman's contract with JMLS that was unrelated to Sigman's complaints about Butts and her alleged discriminatory grading practices. As with Plaintiff Pinder, the question then becomes whether Plaintiff Sigman can point to evidence that these reasons were pretextual.

The Court finds that the answer to this question is yes, for the same principal reason discussed above as to Plaintiff Pinder. Specifically, Plaintiff Sigman points to evidence that Professor Burch was allowed to start a bar exam preparation course in 2012, without receiving the necessary permission, and was not terminated or apparently disciplined at all. Plaintiffs have produced evidence, in the form of a contemporaneous email from Dean Lynn, that Dean Lynn himself could not identify any material distinctions between Burch's operation and Plaintiffs' operation. As discussed above, a jury could see this as inconsistent, more favorable, treatment of another professor who did not engage in protected activity, in circumstances Lynn admitted were indistinguishable. This is probative on the question of pretext, because it helps show that other reasons other than the alleged rules violation motivated the dismissals.

In addition, Sigman points out that he was not renewed on March 3, 2011, just two days after he engaged in his protected activity. While timing alone is ordinarily insufficient to demonstrate pretext, "'the combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment.'" *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999). The Court must also consider the strength of the timing-related evidence, which here shows an

102

extraordinarily short period of time between Sigman's protected activity and the adverse employment action.

Defendant, of course, disputes the timing. Defendant contends that Lynn actually made the non-renewal decision in "mid-February," before the protected activity, and informed Dr. Markovitz of the decision on February 23, 2011. Lynn Aff. at ¶ 13. As discussed above in connection with Plaintiffs' objection to Lynn's affidavit, this detail was not included in Lynn's deposition when he described the decision and his discussions with Dr. Markovitz. And while the statement is not directly contradicted by Dr. Markovitz, it is also not corroborated by Dr. Markovitz's much more vague testimony. All Dr. Markovitz recalled was a conversation with Lynn about Plaintiffs that lasted only "a few minutes" and that occurred at some point "before the fact." Markovitz Dep. at 34-35, 42.

Both sides draw support from an email from Lynn to Markovitz on March 2, 2011, which stated as follows:

> Michael, rather than fire Kamina and Scott for cause, I have decided to notify them that their contract will not be renewed, as I am doing with Profs. Marbes and Butts. The faculty handbook has a lot of process for firing for cause, including an appeal to the Retention, Promotion & Tenure Committee, before an appeal to you. Since I assume that they will finish out their courses professionally, other than trashing me, non-renewal will [be] easier and reduces, but does not eliminate, the threat of litigation. It will cost one more month of pay, since they're entitled to six months notice of non-renewal, but I think that's cheap

compared to the alternative. I'm planning to talk to them tomorrow. Thanks.

Pl. SMF at ¶ 76; Pl. Ex. 164.

On the one hand, this email shows Lynn actively initiating the termination just one day after Sigman reported the allegedly discriminatory conduct. On the other hand, the email itself appears consistent with the claim that a decision had already been made and discussed, because the entire purpose of this email appears to discuss the form of termination; the fact of the terminations themselves appears to be a given. In the end, the Court perceives this to be an issue for a jury to resolve. A jury could credit Lynn's testimony that he had already decided to fire Sigman weeks before Sigman's protected activity. But the jury could also wonder why no action occurred for weeks to effectuate dismissals supposedly decided upon in "mid-February," only for the terminations to suddenly occur immediately on the heels of protected activity. That Dr. Markovitz's vague testimony does not corroborate Lynn on the timing could also be considered by the jury in this regard.

Thus, there is at least a basis to find an extraordinary close temporal link between the protected activity and the adverse action. In combination with the other evidence discussed above, this is sufficient to show pretext. Accordingly, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [57]

be **DENIED** as to Count II, Sigman's claim of retaliation under § 1981, as asserted against Defendant John Marshall Law School, LLC.

7.   *Plaintiffs' Claim of Breach of Contract*

In Count V of the Complaint, Plaintiffs assert a claim against Defendants for breach of contract under Georgia law. Plaintiffs allege that they had contracts with JMLS that incorporated the provisions of the Faculty Handbook and that JMLS breached its contract with them by failing to provide them with the protections and procedures contained in that Handbook. Plaintiffs also argue that, even assuming that they were "nonrenewed" rather than terminated for cause, JMLS failed to provide them with the proper notice required under the Handbook.

Under Georgia law, the essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom. *See Budget Rent-A-Car of Atlanta, Inc. v. Webb*, 220 Ga. App. 278 (1996)*; Turner v. Connor*, 192 Ga. App. 348, 349 (1989); *Cartin v. Boles*, 155 Ga. App. 248, 252 (1980); *see also TDS Healthcare Sys. Corp. v. Humana Hosp. Illinois, Inc.*, 880 F.Supp. 1572, 1583 (N.D.Ga. 1995) (Evans, J.). Furthermore, "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1.

In this case, it appears to be undisputed that the Plaintiffs had a valid contract with JMLS. Defendant argues, however, that Plaintiffs have failed to establish that it breach the material terms of the Handbook, because Dean Lynn had the authority to nonrenew their contracts, rather than terminate their employment for cause. Defendant argues that the Plaintiffs were also provided with the proper notice required by the Handbook for nonrenewals.

The evidence in the record establishes that, on June 14, 2010, both Plaintiffs were offered positions for the 2010-2011 academic year, 2011, and their letters of renewal incorporated the Handbook by reference. Pl. SMF at ¶¶ 32, 41; Def. SMF at ¶ 12; Pinder Dep., Def. Ex. 6, 9; Sigman Dep., Def. Ex. 31; Pl. Ex. 140. During the 2010-2011 academic year, both Plaintiffs were employed as full-time faculty members at JMLS; they held probationary appointments that were subject to renewal on an annual basis. Def. SMF at ¶¶ 4-5, 47. As probationary faculty members, the Plaintiffs' appointments were subject to renewal or re-appointment, or nonrenewal or non-reappointment each academic year under Section 405(c) of the Handbook. Def. SMF at ¶ 48.

On March 3, 2011, Dean Lynn met with each Plaintiff separately and informed them that their annual appointments would not be renewed for the next academic year.

Def. SMF at ¶¶ 21-22; Pl. SMF at ¶ 77; Lynn Aff. at ¶ 20. Dean Lynn gave each

Plaintiff a "nonrenewal letter" that stated as follows:

> This is to inform you that your contract will not be renewed for the 2011-12 academic year. Because you are entitled to six months notice, you will be paid through September 2, 2011. . . .

> This is not a termination for cause, but you are entitled to know the reasons why your contract will not be renewed. They include your establishing and engaging in a business while employed as a full-time faculty member, engaging in a business which creates possible conflicts of interest, using the law school name on your business website without permission, [and] using law school computer facilities for your business. . . .

Def. SMF at ¶¶ 24, 49; Pl. SMF at ¶ 78; Pinder Dep., Ex. 17; Sigman Dep., Ex. 48.

The Handbook states that nonrenewal of a probationary faculty member's

appointment is different from termination or dismissal for cause. Def. SMF at ¶ 50.

When a faculty member is nonrenewed, the Law School is not required to set forth its

reasons in the initial notice of non-reappointment, but the faculty member is entitled

to have the reasons for nonrenewal given in writing upon request to the Dean. Def.

SMF at ¶¶ 51-52.

Section 405 of the Handbook provides the following with respect to nonrenewal

or nonreappointment:

### § 405 SEPARATION FROM SERVICE . . .

### (C) Non-Reappointment of Probationary Appointments . . .

(1)   Non-reappointment is different from termination and dismissal for cause. Reasons for non-reappointment include, but are not limited to, the following: incongruity between the teaching expertise of the faculty member and the educational goals of the Law School; unfavorable peer evaluation of the faculty member's teaching or scholarship which makes promotion or the award of tenure unlikely; or unfavorable evaluation of the faculty member's other responsibilities.

Handbook, at ¶ 405(c)(1); Pl. Ex. 1; Pinder Dep., Ex. 9; Pl. SMF at ¶ 173; Def. Resp. SMF at ¶ 173. The Handbook further provides that reasons for dismissal for cause include ""failure to adhere to a class or examination schedules . . . [and] violating Law School rules and policies." Pl. SMF at ¶ 178; Handbook, at ¶ 405(e)(1), Pinder Dep., Ex. 9, Pl. Ex. 1.

Section 405(c)(5) of the Handbook states that the non-reappointment of a probationary faculty member is not subject to appeal "except that probationary faculty are entitled to request a review by the Dean" if unlawful discrimination, violation of academic freedom or procedural violations by the RPTC are alleged. Def. SMF at ¶ 58. It is undisputed that Plaintiffs never requested a review by the Dean, and their appeal requests did not allege unlawful discrimination, violations of academic freedom or procedural failures by the RPTC. Def. SMF at ¶¶ 59-60.

Plaintiffs do not dispute that Dean Lynn informed them that their annual appointments would not be renewed, and that the "nonrenewal letter" each of them received informed them that this was "not a termination for cause." Pl. Resp. SMF at ¶¶ 23-25. Plaintiffs argue, however, that despite Dean Lynn's language in the "nonrenewal letters," their employment was actually terminated "for cause." According to the Plaintiffs, because the failure to adhere to the Law School policies was listed in the Handbook as a reason for a termination for cause, but not for nonrenewal, that means that their termination was actually "for cause" despite the Dean's attempt to characterize it as a "nonrenewal." Plaintiffs argue that "[y]ou can call a duck a chicken, but it is still going to quack." Pl. Br. at 30.

The Court finds that, regardless of whether the chicken in this case quacked or not, the Handbook provided that the Dean had the authority to make the decision to nonrenew a probationary faculty member's contract. Plaintiffs do not dispute that, under the terms of the Handbook, the Dean had the authority to make personnel decisions, which would include the decision to nonrenew Plaintiffs' teaching appointments. Plaintiffs have not cited to any provision in the Handbook that required the Dean to label a nonrenewal a termination "for cause" if the nonrenewal was based on one of the factors enumerated in the Handbook under the section discussing terminations for cause. Moreover, the section of the Handbook dealing with

nonrenewals specifically stated that the reasons for nonrenewal "include, *but are not limited to*, the following." Handbook, at ¶ 405(c)(1); Pinder Dep., Ex. 9 (emphasis added).

Thus, the undersigned finds that Plaintiffs have failed to present evidence establishing that Dean Lynn violated the terms of the Handbook when he made the decision to nonrenew their contracts rather than terminate them "for cause." Regardless of the reason given for the decision, the Handbook does not require the Dean to label a termination "for cause" if the termination is based on a specific ground, such as the violation of a Law School policy. The Handbook specifically authorizes the Dean to make a decision to nonrenew a faculty member's contract, and the reasons for that renewal may include the reasons listed in the Handbook as examples, but "are not limited" to those listed examples of reasons.

Plaintiffs also argue that, even if their termination was considered a nonrenewal rather than a termination for cause, JMLS violated the provisions of the Handbook dealing with notice. In the nonrenewal letters, Plaintiffs were given notice that their appointments would not be renewed the following academic year, 2011-2012, and that they would be paid through September 2, 2011, which Defendant argues was the date of their termination. Def. SMF at ¶ 63; Pinder Dep., Ex. 17; Sigman Dep. at 234, Ex. 48. JMLS paid both Pinder and Sigman through September 2, 2011, which was six

months from the date that Dean Lynn informed them that their appointments were not being renewed. Def. SMF at ¶ 26.

It is undisputed that, because the Plaintiffs had been employed by John Marshall for more than three years, the Handbook entitled them to written notice of non-reappointment "at least six months prior to the termination date of the faculty member." Def. SMF at ¶¶ 62, 66; Pl. SMF at ¶ 183; Pinder Dep., Ex. 2; Sigman Dep., Ex. 27; Handbook, § 405(c)(3)(iii), Pinder Dep., Ex. 9, Pl. Ex. 1. Plaintiffs argue that they were instead entitled to one year's notice because their contracts incorporated the "1940 Statement of Principles on Academic Freedom and Tenure." Pl. Resp. SMF at ¶¶ 62-63, 66; Pl. SMF at ¶¶ 181-82; Pl. Ex. 1, 85, 140, 175. The Preamble to the Handbook states that it "specifically incorporates the '1940 Statement of Principles on Academic Freedom and Tenure' prepared by the American Association of University Professors, as modified by the process of post-tenure review as set forth herein." Def. SMF at ¶ 68; Handbook, Pinder Dep., Ex. 9, at 1 (Preamble). The "1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments" provides as follows:

> Notice should be given at least one year prior to the expiration of the probationary period if the teacher is not to be continued in service after the expiration of that period.

Pl. SMF at ¶ 181; Def. Ex. F [57-8] at 4; Pl. Ex. 175 [69-17], Bates No. JMLS000456.

The Court finds that Plaintiffs have failed to establish that they were entitled to one year's notice, because the evidence reflects that the Handbook provided a different notice requirement, and further provided that the Handbook's notice requirements prevailed in the event of any conflict. The Handbook states that "[i]n case of conflicting policies, the provisions of the Handbook shall prevail." Def. SMF at ¶ 72; Handbook at 1. Although Plaintiffs argue that the notice provisions were not in conflict, they do not dispute that the Handbook provided that they were entitled to "at least six months" of notice in the event of nonrenewal, rather than one year's notice.

Nevertheless, the undersigned further finds that the Plaintiffs have presented sufficient evidence to create a genuine dispute of material fact as to whether they were provided six months' notice from the date of their "termination." Defendant argues that, because the Plaintiffs were paid through September 2, 2011, that should be considered the date of the "termination" of their employment, and thus, JMLS complied with the notice provision because the Plaintiffs were given notice six months prior to that date. The Handbook provided that they were entitled to written notice of their non-reappointment "at least six months prior to the termination date of the faculty member." Handbook, § 405(c)(3)(iii), Pinder Dep., Ex. 9, Pl. Ex. 1.

Plaintiffs argue, however, that the "termination" of their employment actually occurred on July 31, 2011, which was the last date of their employment contract. On July 31, 2011, Plaintiffs were required to vacate their offices, return their keys and parking passes, and were not allowed to return to JMLS after that date. Moreover, Plaintiffs have also presented evidence that Sigman was offered the opportunity to teach the summer 2011 session at JMLS, but Lynn notified him during the "nonrenewal" meeting, that he would no longer be allowed to teach the summer 2011 session that ended before July 31, 2011. Pl. SMF at ¶¶ 188-89.

In response to the Plaintiffs' argument, Defendant argues that Section 904 of the Handbook provides that failure by the Law School to meet a time requirement does not entitle a faculty member to remain a faculty member. Def. SMF at ¶ 67; Handbook, Pinder Dep., Ex. 9 at § 904. Section 904 of the Handbook provides that:

> **§904 NON-WAIVER OF TIME LIMITS**
>
> Unless otherwise noted in this Handbook, no time limits may be waived. No faculty holding probationary appointment may receive promotion or tenure because the relevant committee, Dean, Chairman, Board of Directors or their delegate failed to meet a deadline prescribed by this Handbook. No faculty member subject to *dismissal for cause* obtains any right to remain a faculty member by any failure to meet any time requirement.

Pl. Resp. SMF at ¶ 68; Handbook, Pinder Dep., Ex. 9 at § 904; Pl. Ex. 1 at § 904 (emphasis added).

113

Plaintiffs argue that, because that section of the Handbook applies only to faculty members dismissed "for cause," that it does not apply to them, because Dean Lynn claimed that they had not been terminated "for cause." The undersigned agrees. Defendant cannot have it both ways. It cannot argue that the Plaintiffs were not entitled to any appeals allowed for those faculty members terminated "for cause," but then argue that other provisions of the Handbook apply to those faculty members terminated "for cause."

In any event, the undersigned concludes that the Plaintiffs have presented sufficient evidence to create a genuine dispute of fact as to whether the termination of their employment occurred on July 31, 2011, which they contend, or September 2, 2011, which Defendant contends. If the jury finds that the date of their termination was July 31, 2011, then the Plaintiffs did not receive the full six months' notice that was required under the Handbook.

As discussed above, under Georgia law, in order to establish the essential elements of a breach of contract claim, a plaintiff must prove the existence of a valid contract, a material breach, and damages. Although Defendant argues that the Plaintiffs have failed to present evidence of a material breach, it has not argued that Plaintiffs have failed to present evidence of damages. The undersigned finds that Plaintiffs have presented some evidence that they were damaged by the alleged breach

114

of contract. Although it is undisputed that both Plaintiffs found jobs at other law schools before July 31, 2011, they contend that Pinder has found a position only as a visiting professor, and neither Plaintiff is currently on a tenure track as they were at JMLS. Pl. Resp. SMF at ¶ 27. Plaintiffs further contend that neither has been compensated at the same level that they were at JMLS. Pl. Resp. SMF at ¶ 27. Thus, construing all evidence in the light most favorable to Plaintiffs, the undersigned finds that the alleged lack of sufficient notice damaged Plaintiffs in that they were not given more time to secure employment for the upcoming academic year that was comparable to their positions at JMLS.

Accordingly, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [57] be **DENIED** as to Count V, Plaintiffs' claim of breach of contract, as asserted against Defendant John Marshall Law School, LLC.

8.   *Plaintiffs' Claim of Bad Faith*

Finally, in Count VI of the Complaint, Plaintiffs assert a claim for bad faith under Georgia law, O.C.G.A § 13-6-11, which provides as follows:

**§ 13-6-11. Expenses of litigation**

The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

O.C.G.A. § 13-6-11.

This claim of bad faith in Count VI is a non-substantive claim for attorney's fees. Because the undersigned is recommending that the Defendants' Motion for Summary Judgment [57] be denied as to the Plaintiffs' claim of breach of contract, the undersigned also **RECOMMENDS** that Defendants' Motion for Summary Judgment [57] be **DENIED** as to Count VI, Plaintiffs' claim of bad faith and request for attorney's fees under Georgia law, as asserted against Defendant John Marshall Law School, LLC.

## III.   CONCLUSION AND RECOMMENDATION

For the above reasons, **IT IS ORDERED THAT** the Defendants' Motions for Continued Protection [62][75] be **GRANTED**, that Plaintiffs' Motion for Leave to File Excess Pages [61] be **GRANTED**, and that Plaintiffs' Motion to Exclude Sham Affidavit of Richardson Lynn [68] be **DENIED**.

**IT IS RECOMMENDED** that Defendants' Motion for Summary Judgment [57] be **GRANTED IN PART, DENIED IN PART**.

**IT IS RECOMMENDED** that the Motion for Summary Judgment [57] be **GRANTED** as to all counts brought against Defendant John Marshall Law School and that judgment be entered in favor of that Defendant.

116

**IT IS FURTHER RECOMMENDED** that the Motion for Summary Judgment [57] be **GRANTED** as to Plaintiff Sigman's claim of retaliation under Title VII asserted in Count IV against Defendant John Marshall Law School, LLC, and that judgment be entered in favor of John Marshall Law School, LLC, on that Count. **IT IS FURTHER RECOMMENDED** that the Motion for Summary Judgment [57] be **DENIED** as to Counts I, II, III, V, and VI of the Complaint as asserted against Defendant John Marshall Law School, LLC.

**IT IS SO ORDERED and RECOMMENDED** this 31st day of January, 2014.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE