IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KAMINA PINDER and SCOTT
SIGMAN,

               Plaintiffs,

    v.                                          1:12-cv-3300-WSD

JOHN MARSHALL LAW
SCHOOL, LLC, and JOHN
MARSHALL LAW SCHOOL,

               Defendants.

## OPINION AND ORDER

This matter is before the Court on Magistrate Judge Justin S. Anand's Non-final Report and Recommendation ("R&R") [79] on Defendant John Marshall Law School, LLC's Motion for Summary Judgment [57].

## I. BACKGROUND

### A. Facts[1]

Plaintiffs Kamina Pinder ("Pinder") and Scott Sigman ("Sigman," and together "Plaintiffs") are ex-employees of Defendant John Marshall Law School,

---

[1] The facts are taken from the R&R and the record. The Court finds no plain error in the facts. To the extent that the parties have not objected to any specific facts determined in the R&R, the Court adopts them. See Garvey v. Vaughn, 993 F.2d 776, 779 n.9 (11th Cir. 1993).

LLC ("Defendant" or "JMLS").  On August 1, 2006, Pinder, an African-American female, began working for JMLS as an Associate Professor of Legal Skills.  On July 1, 2007, Sigman, a white male, began working for JMLS as an Associate Professor of Legal Skills.

In the fall of 2006, Pinder applied for a tenure-track position.  In early 2007, Dean of JMLS Richardson Lynn ("Dean Lynn") told her that her application was denied.  Pinder complained to Dean Lynn that she believed she had been discriminated against based on her race when she was not moved to the tenure track.  Pinder drafted a report to the American Bar Association pointing out what she believed to be patterns of race-based discrimination at JMLS, and she forwarded the draft to Dean Lynn, JMLS Board of Directors member Kevin Ross, and Dr. Michael Markovitz, who was then the chairman of the Board of JMLS. During the 2007-08 academic year, Pinder reapplied for a tenure-track position to teach doctrinal legal courses, and she received substantial support for her application.  She was offered, and she accepted, a tenure-track position for the 2008-09 academic year.  She was assigned to teach doctrinal courses, and a legal skills class.

On June 14, 2010, Pinder was extended an offer to continue teaching on the doctrinal tenure track.  In the offer letter from Dean Lynn, Dean Lynn stated:

"These responsibilities are set forth generally in the Faculty Handbook and include your obligation to engage in teaching, scholarship, and service.  Regularly engaging in law practice, having an on-going relationship with a law firm or business, being listed on a law firm letterhead, or having a professional telephone listing is not permitted."

On June 14, 2010, JMLS renewed Sigman's contract for the 2010-11 academic year.  Sigman's offer letter incorporated the Faculty Handbook ("the Handbook") by reference and also stated that "[r]egularly engaging in law practice, having an on-going relationship with a law firm or business, being listed on a law firm letterhead, or having a professional telephone listing is not permitted."

During the 2010-11 academic year, Plaintiffs held probationary, full-time appointments with JMLS.  Their appointments were subject to renewal or non-renewal each academic year, pursuant to Section 405(c) of the Handbook.

        1.    *Plaintiffs' Discrimination Claims*

During the spring and summer of 2010, Pinder and Sigman began organizing a for-profit company called Law School Advantage ("LSA"), a summer preparation program for incoming law students.  Plaintiffs planned for LSA to be a one-week summer program in which students would learn basic law school skills, including how to read a case and how to write a case brief.  Plaintiffs intended to

launch the company in July, 2011.  In the summer of 2010, Pinder spoke to Dean

Lynn about starting a summer preparation course for incoming law students, and

Dean Lynn said it was a "good concept."  Dean Lynn understood Pinder's inquiry

to be a "very preliminary conversation."

Pinder alleges that she presented her idea to Dr. Markovitz, and Dr.

Markovitz gave her permission to start the program.  Dr. Markovitz has no specific

recollection of this conversation and strongly denies giving Pinder permission to

start a business around this concept.  Dr. Markovitz testified at his deposition that

he "would have told [Pinder] whatever she want[s] to do to make more money at

the school, [she has] got to talk to the dean about it."

Plaintiffs created and launched LSA and its website using JMLS computers.

They opened a post office box and obtained a telephone number for the business.

Plaintiffs also advertised to students on LSA's website and on Facebook, and filed

a Certificate of Organization, Articles of Organization, and Annual Registration for

the company.  Plaintiffs do not dispute that they used JMLS property to launch

LSA, but they contend that they only did so after observing other professors using

JMLS computers for their own business ventures.

Plaintiffs used their JMLS credentials and JMLS student testimonials to

promote their business.  LSA's website announced plans "to expand throughout the

Southeastern region" and "grow the business nationally."

Plaintiffs worked on LSA the entire 2010-11 academic year.  In February, 2011, Dean Lynn became aware of Plaintiffs' LSA venture.  Defendant contends that Lynn reviewed LSA's marketing materials and documents and decided that LSA conflicted with Plaintiffs' responsibilities at JMLS.  Defendant also alleges that Dean Lynn was concerned about the impression of unfairness that might be inferred by the fact that JMLS professors offered, albeit for a fee, a preparation course to those fee-paying JMLS students prior to their enrollment.

Defendant argues that the Handbook required Plaintiffs to ask Dean Lynn's permission before starting LSA.  Plaintiffs do not dispute that they did not obtain Dean Lynn's permission before launching LSA.  They argue, however, that Section 405(c) of the Handbook only requires faculty to obtain permission for "consulting," and not for the type of business Plaintiffs started.

In February 2011, Sigman complained to the Retention, Promotion, and Tenure Committee at JMLS (the "RPTC") and to Dean Lynn that associate professor Michelle Butts was engaging in discriminatory practices.  Sigman had received multiple complaints from students that professor Butts discriminated against them by showing favoritism toward female and minority students.  Sigman

complained that Butts graded minority students more favorably than non-minority students.

On February 28, 2011, Sigman contends that he spoke with Jeff Van Detta, Chair of the RPTC, and told him that he believed he and JMLS students were being discriminated against on the basis of race. On March 1, 2011, Sigman claims he met with Dean Lynn and complained about racial and gender discrimination directed against him and certain students. Sigman argued that Butts had a grading policy that favored minority and female students, and that this policy was consistent with Butts's bias against Sigman. Sigman argued Butts's bias was exemplified in a comment Butts wrote to Sigman, in which she told him, "I'm not your bitch, Scott." Defendant contends that Sigman never complained to Dean Lynn that Butts had discriminated against Sigman personally.

On March 2, 2011, Plaintiffs contend that Dean Lynn made his non-renewal decision, as evidenced by an email Dean Lynn wrote to Dr. Markovitz on March 2, 2011, in which he stated:

> Michael, rather than fire Kamina and Scott for cause, I have decided to notify them that their contract will not be renewed, as I am doing with Profs. Marbes and Butts. The faculty handbook has a lot of process for firing for cause, including an appeal to the Retention, Promotion & Tenure Committee, before an appeal to you. Since I assume that they will finish out their courses professionally, other than trashing me, non-renewal will [be] easier and reduces, but does not eliminate, the threat of litigation. It will cost one more month of

6

pay, since they're entitled to six months notices of non-renewal, but I think that's cheap compared to the alternative. I'm planning to talk to them tomorrow. Thanks.

(R&R at 20.)

The next day, March 3, 2011, Dean Lynn met with Pinder and Sigman separately and informed them that their contracts would not be renewed. Dean Lynn gave Plaintiffs a "non-renewal" letter, which stated that Plaintiffs were not being terminated for cause, but that they were entitled to know why their contracts were not being renewed. The letter stated that Plaintiffs' contracts were not being renewed because they established and engaged in a business, which creates possible conflicts of interest, while employed as full-time members of the JMLS faculty. Pinder's non-renewal letter also stated additional reasons for her termination, including her alleged "failure to cooperate by submitting an explanation to the Board of Directors for the proposed Faculty Handbook change that you supported, and failure to follow law school policies on make-up classes."[2] Defendant contends that no other JMLS faculty members have ever started and operated a for-profit business without permission from the Dean or a former Dean.

_____

[2] During the 2009-10 academic year, Pinder proposed a change to the Handbook that would make it JMLS policy for JMLS professors to get priority over faculty from other schools for intercession teaching assignments. The faculty at JMLS voted in favor of the amendment. Before the proposal went before the Board, Dr. Markovitz asked why the proposed change would be good for the institution. Pinder did not send an explanation to Dr. Markovitz.

Plaintiffs argue that JMLS's reasons for terminating them were a pretext for unlawful discrimination because professor Kathleen Burch started and operated a for-profit business in 2012, and did not discuss her business with Dean Lynn until "a few days before February 18, 2013." Burch, a white woman, began operating a for-profit bar exam tutoring business in December, 2012. According to Plaintiffs, Burch obtained from Dean Lynn's secretary the contact information of JMLS students who failed the Georgia Bar Examination, and used JMLS resources to send correspondence to those students. Burch also used the JMLS name on advertisements for her business. Burch began soliciting students for her tutoring business as early as December 11, 2012. Plaintiffs contend that she did not ask Dean Lynn for permission to start her business until February 18, 2013. On June 11, 2013, Dean Lynn testified at his deposition that Burch first spoke to him about a bar preparation business "only a few days before February 18, 2013." On June 24, 2013, Dean Lynn's deposition was concluded. At the reconvened deposition, Dean Lynn testified that he and Burch must have spoken earlier based on the dates of the emails she sent to students. Burch testified that she spoke to Lynn about her course in November, 2012, before Burch started soliciting students.

Plaintiffs contend that LSA and Burch's business are substantially similar. Defendant argues that there are material differences between Burch's business and

8

LSA.  Plaintiffs rely on a February 18, 2013, email exchange between Dean Lynn
and Burch to support that Dean Lynn believed the businesses were similar.  In the
February 18, 2013, email, Dean Lynn stated:

> Kathe [Burch], when you spoke to me about the bar prep business, I
> was focused on doing anything that you wanted to do, but it has been
> pointed out to me that I may have acted inconsistently compared to
> Sigman and Pinder.  Now that has been raised, I'm not sure how to
> distinguish the two situations.

(R&R at 36-7.)

On June 11, 2013, Dean Lynn testified differently during his deposition,
stating that there were several differences between the two businesses, including
that Burch had asked permission, that Burch's program was "closer to the kind of
teaching we frequently treat as appropriate for consulting[,]" and that Burch had no
intentions to grow her business.  As further differences, Defendant notes that
Burch was a tenured professor, while Plaintiffs' appointments at the time of their
termination were probationary.[3]

## 2.  *Plaintiffs' Breach of Contract Claims*

Plaintiffs' non-renewal letters informed them that they would be paid

---

[3] In addition to Burch, Plaintiffs point to other professors they claim started for-
profit businesses similar to LSA. The Magistrate Judge found that these other
professors and their outside endeavors were not comparable to Plaintiffs and LSA.
Plaintiffs did not object to the Magistrate Judge's findings.  The Court finds no
plain error in the Magistrate Judge's findings regarding these other professors and
adopts them.

through September 2, 2011, six months from the date that Dean Lynn advised them that their appointments were not being renewed.  Under the Handbook, Plaintiffs were entitled to six months' notice of non-renewal.  In the summer of 2011, Plaintiffs found jobs at other law schools.  Plaintiffs are not on tenure-track at their new positions, and they contend that their new jobs do not compensate them at the same level as their JMLS jobs.

Plaintiffs contend that their employment was terminated on July 31, 2011, the day they were forced to vacate their offices and turn in their keys.  Plaintiffs did not return to JMLS after that date.  Sigman contends further that he was offered to teach the summer 2011 session at JMLS.  He claims that Dean Lynn told him during their March 3, 2011, meeting that he would no longer be allowed to teach the summer session that ended before July 31, 2011.  Defendant does not dispute these claims, but contends that the Handbook only required notice "at least six months prior to the termination date of the faculty member," not prior to the expiration date of the contract.

B.    Procedural History

On September 20, 2012, Plaintiffs filed this action against Defendants John Marshall Law School and JMLS, asserting claims of race-based discrimination against Pinder under 42 U.S.C. § 1981 ("§ 1981") (Count one); retaliation against

10

Sigman under 42 U.S.C. § 1981 (Count two); race discrimination against Pinder under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. (Count three); retaliation against Sigman under Title VII (Count four); breach of contract (Count five); and bad faith under O.C.G.A. § 13-6-11 (Count six).

On July 29, 2013, JMLS moved for summary judgment.  On September 13, 2013, Plaintiffs filed their Response in Opposition to the Defendant's Motion for Summary Judgment.

On January 31, 2014, Magistrate Judge Anand issued his R&R, recommending that the Defendant's Motion be (i) granted entirely as to the entity John Marshall Law School, because the facts show that this party was not Plaintiffs' employer, and (ii) granted as to Sigman's Title VII claim, because the facts show that Sigman did not engage in the protected activity required to state a valid Title VII claim.  The Magistrate Judge further recommended that Defendant's Motion be denied as to Pinder's Title VII claim, Pinder's § 1981 claim, Sigman's § 1981 claim, Plaintiffs' claims for breach of contract, and Plaintiffs' claims of bad faith, because Plaintiffs presented sufficient facts from which a reasonable jury would find that the Defendant's reasons for termination were pretextual, and because there is a material issue of fact regarding whether the Defendant breached the termination provisions of the Handbook.

On February 18, 2014, Defendant filed its Objections [82] to the R&R, arguing that summary judgment should be granted on all of the Plaintiffs' claims. Defendant argued that the reasons it declined to renew Plaintiffs' contracts cannot be construed as pretextual, and that the facts prove that it complied with the terms of the Handbook.  On March 7, 2014, Plaintiffs filed their Response to Defendant's Objections.  Plaintiffs did not object to the R&R.

C.    Defendant's Objections

Defendant first objects to the Magistrate Judge's recommendation that Defendant's Motion for Summary Judgment be denied as to Pinder's Title VII claim, because Defendant contends that Pinder has not met her burden to demonstrate a *prima facie* case of discrimination, and she has not shown evidence that Defendant's stated reasons for not renewing her contract were pretextual. Defendant next objects to the Magistrate Judge's recommendation that Defendant's Motion for Summary Judgment be denied as to Pinder's § 1981 claim, for the same reasons it objected to the Magistrate Judge's recommendation on Pinder's Title VII claim.  Defendant also objects to the Magistrate Judge's recommendation that Defendant's Motion for Summary Judgment be denied as to Sigman's § 1981 claim, because it contends that Dean Lynn made the decision not to renew Sigman's contract well before Sigman reported the protected activity, Sigman has

not established a *prima facie* case of retaliation, and Sigman has not met his burden to show that Defendant's stated motives in not renewing his contract were pretextual.  Defendant finally objects to the Magistrate Judge's recommendation that summary judgment not be granted on Plaintiffs' state law breach of contract and bad faith claims.

## II.    DISCUSSION

###    A.    Legal Standards

####    1.    *R&R Standard of Review*

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  28 U.S.C. § 636(b)(1) (Supp. V 2011); Williams v. Wainwright, 681 F.2d 732, 732 (11th Cir. 1982) (per curiam).  A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  If no party has objected to the report and recommendation, a court conducts only a plain error review of the record.  United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

2.      *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact.  Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999).  Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial.  Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999).  The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings."  Id.

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  Where the record tells two different stories, one blatantly contradicted by the evidence, the Court is not required to adopt that version of the facts when ruling on summary judgment.  Id. "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ."  Graham, 193 F.3d at

1282.  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  <u>Herzog</u>, 193 F.3d at 1246.  The party opposing summary judgment "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  <u>Scott</u>, 550 U.S. at 380 (quoting <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986)).  A party is entitled to summary judgment if "the facts and inferences point overwhelmingly in favor of the moving party, such that reasonable people could not arrive at a contrary verdict."  <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269, 1275 (11th Cir. 2002) (internal quotations omitted).

      B.    <u>Analysis</u>

          1.    *Claims against Defendant John Marshall Law School*

The Magistrate Judge found that JMLS was Plaintiffs' employer, and there is no dispute that Defendant John Marshall Law School was not Plaintiffs' employer.  The Magistrate Judge recommended that Defendant's Motion for Summary Judgment be granted as to Defendant John Marshall Law School.  The parties did not object to this recommendation, and the Court finds no plain error in this recommendation.

### 2. *Sigman's Title VII Claim*

The Magistrate Judge found that professor Butts's comment to Sigman ("I'm not your bitch, Scott") was not racial in nature, and it was not objectively reasonable to perceive the comment as a racial insult. The Magistrate Judge concluded that Sigman did not engage in the kind of protected activity required to state a viable Title VII claim when he complained about Butts to the administration. The Magistrate Judge also concluded that Butts's alleged discriminatory grading policies could not be construed as a discriminatory employment practice prohibited under Title VII. The Magistrate Judge thus recommended that Defendant's Motion for Summary Judgment be granted as to Sigman's Title VII claim. The parties did not object to this recommendation, and the Court finds no plain error in this recommendation.

### 3. *Pinder's Title VII Claim*

Defendant objects to the Magistrate Judge's recommendation that its Motion for Summary Judgment be denied as to Pinder's Title VII claim. Defendant argues that Pinder did not meet her burden to demonstrate a *prima facie* case of discrimination, and she has not shown that Defendant's stated reasons for not renewing her contract were a pretext for unlawful discrimination.

16

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a)(1).  The plaintiff bears the burden of showing discrimination.  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1088 (11th Cir. 2004).  Where the plaintiff cannot present direct evidence of discrimination, the plaintiff can still prevail by showing circumstantial evidence of discrimination sufficient to pass the burden-shifting test established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Under the McDonnell Douglas framework, a plaintiff must first present sufficient circumstantial evidence to establish a *prima facie* case of discrimination.  Id. at 802.

To demonstrate a *prima facie* case of discrimination, a plaintiff must "establish facts adequate to permit an inference of discrimination."  Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).  To meet this burden, a plaintiff must show "(1) he belongs to a racial minority; (2) he was subjected to adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job."  Id. (citing McDonnell Douglas, 411 U.S. at 802).

17

"Demonstrating a *prima facie* case is not onerous."  Holifield, 115 F.3d at 1562.  To establish a *prima facie* case, a plaintiff must identify a comparator employee outside her protected class to which she is "similarly situated in all relevant respects."  Id.  The plaintiff must show evidence that the similarly situated comparator committed the same or similar infractions as the plaintiff, but did not receive similar disciplinary treatment from the employer.  The comparator's misconduct must be "nearly identical" to the alleged misconduct of the plaintiff, "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."  Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999)).

Once the plaintiff establishes a *prima facie* case, the defendant must "articulate some legitimate, nondiscriminatory reason" for the adverse job action. McDonnell Douglas, 411 U.S. at 802.  This intermediate burden is "exceedingly light."  Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994).

If the defendant is able to carry its burden to explain its rationale for the adverse job action, the plaintiff must show that the proffered reason is merely a pretext for discrimination.  McDonnell, 411 U.S. at 804.  "The plaintiff retains the burden of persuasion.  She now must have the opportunity to demonstrate that the

proffered reason was not the true reason for the employment decision.  This burden now merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).

In deciding a motion for summary judgment at this stage of the analysis, "[t]he court must, considering all the evidence, ascertain whether the plaintiff has cast doubt on the defendant's proffered nondiscriminatory reasons sufficient to allow a reasonable factfinder to determine that the defendant's proffered legitimate reasons were not what actually motivated its conduct." Silvera v. Orange County School Bd., 244 F.3d 1253, 1258 (11th Cir. 2001) (citing Cooper-Houston v. Southern Ry. Co., 37 F.3d 603, 605 (11th Cir. 1994))

The parties agree that there is no direct evidence of discrimination in this case.  Pinder argues that there is sufficient circumstantial evidence to establish a *prima facie* case of discrimination and to support a finding that JMLS's stated reasons for not renewing her contract were pretextual.  Plaintiffs identify professor Burch as their comparator to carry their burden to make out a *prima facie* case of discrimination.

The Magistrate Judge found that professor Burch is a valid comparator to Pinder.  Defendant argues that Burch is not a valid comparator, and that Sigman is

19

Pinder's comparator.  Defendant contends that Pinder, and Sigman, were terminated for a legitimate, non-discriminatory reason, and therefore a *prima facie* case of discrimination cannot be made by Pinder.

The Court finds that Burch is a viable comparator – albeit barely.  That Defendant argues Sigman also is a comparator and, Defendant impliedly argues, a better one, creates an issue of fact, and it is up to the fact finder to decide how to weigh the evidence of such competing comparators.  See Ondricko v. MGM Grand Detroit, LLC, 689 F.3d 642, 652 (6th Cir. 2012) ("[The employer] cannot defeat the inference of a discriminatory motive with one comparator who was treated similarly.").  Defendant proposes that there can be no unlawful discrimination here given individuals from different racial backgrounds were terminated at the same time for the same purported reasons.  A reasonable jury, however, could conclude that Pinder was fired because of her race, while Sigman was fired in retaliation for complaining about racial discrimination exhibited by other individuals in the workplace.  On the other hand, reasonable jurors presented only with evidence from which inferences can be drawn, could also conclude that the simultaneous termination of individuals from different racial backgrounds weighs against any inference of intentional discrimination on the basis of race.  These examples

illustrate the fact-intensive nature of this dispute, and demonstrate that Defendant

cannot discredit Pinder's *prima facie* case by simply pointing to Sigman.

The Magistrate Judge determined that Pinder established a *prima facie* case

because Burch, a white professor, was not punished for operating a for-profit

business, and using JMLS property and resources for her for-profit business even

though Dean Lynn admitted that there was no distinction between Burch's

activities and the business activities of the Plaintiffs.  There is a factual dispute

concerning if, and when, Burch asked Dean Lynn for permission to start her

tutoring business.  Pinder contends that Burch did not ask for permission before

she started her business.  Defendant argues that Burch asked for permission before

she started her business.  The Court views this factual dispute in the light most

favorable to Pinder.  A jury could find that Burch's testimony and Dean Lynn's

recantation at his deposition are not credible, and conclude that Burch did not ask

for Dean Lynn's permission before she started her bar preparation venture.[4]

Defendant points out numerous distinctions between Burch and Pinder.

Defendant notes that Pinder was a probationary faculty member, while Burch was

---

[4] Defendant relies on <u>Summers v. City of Dothan, Ala.</u>, 757 F. Supp. 2d 1184
(M.D. Ala. 2010), for the proposition that Burch is not a valid comparator, because
her actions occurred after Plaintiffs' actions and punishment.  The Court concludes
that the Defendant's reliance on <u>Summers</u> is misplaced because the <u>Summers</u> court
did not consider whether a comparator committed an infraction before or after the
plaintiff's employment was terminated.

a tenured professor.  This difference is not material to whether Burch is a comparator as long as Burch and Pinder were both subject to the same rules and standards for conduct.  See Lathem v. Dep't of Children and Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999) ("The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies.").  Pinder and Burch were subject to the rules of conduct codified in the Handbook, and the prohibition on operating a for-profit business equally applies to all professors.  Burch's more senior employment level is not material to whether she is a valid comparator.

Defendant contends that the scope of LSA was much broader than that of Burch's bar preparation business.  Defendant asserts that Pinder and Sigman intended to expand LSA nationally, whereas Burch's tutoring was limited to JMLS students who had failed the bar.  Dean Lynn testified at his deposition that he understood Burch's work to be "more in line" with the type of outside consulting work JMLS professors typically do.  These distinctions do not sufficiently discredit the basic similarity between these professors.  Burch and Pinder set up businesses to teach and profit from law students.  Dean Lynn admitted in an email that there was no difference between Burch's business activity and the business activities of Pinder and Sigman.  There simply are genuine issues of fact that need to be

22

resolved at trial to determine whether Pinder and Burch were treated equally and, if not, whether the treatment of Pinder was discriminatory.  Plaintiffs have done enough to make their *prima facie* case using Burch as a comparator.  <u>See</u> <u>Holifield</u>, 115 F.3d at 1562.

The Magistrate Judge also found that Defendant articulated legitimate, non-discriminatory reasons for not renewing Pinder's contract.  There is no objection to this finding, and the Court finds no plain error in the Magistrate Judge's findings on this issue.

The Magistrate Judge next concluded that Pinder met her burden to present sufficient evidence that Defendant's proffered reasons for nonrenewal were pretextual to avoid summary judgment.  Defendant contends that the Magistrate Judge's finding regarding pretext "relied on exactly the same arguments" as the finding of a *prima facie* case.  (Def. Obj. at 19.)

Defendant is not entitled to summary judgment when Pinder proffered evidence sufficient to permit that the Defendant's legitimate, non-discriminatory reasons for terminating Pinder could be found not to be credible.  At this stage, Pinder effectively rebutted the legitimate reasons offered by the Defendant as pretextual.  The Defendant stated that Pinder was terminated for starting a for-profit business, but Burch also started a for-profit business and no adverse action

23

was taken against her.  The Defendant stated that Pinder was terminated for

missing make-up classes, but the Defendant presented no evidence establishing

that Pinder missed make-up classes, or that this offense is cause for non-renewal

even if she did.  Defendant stated that Pinder was terminated for not following up

on a request from Dr. Markovitz to explain her proposed Handbook amendment.

At the time of this request, however, there is evidence that Dean Lynn and Dr.

Markovitz were not concerned that Pinder did not respond to Dr. Markovitz's

request.  Her contract was renewed after she failed to respond to Dr. Markovitz's

request, and she remained employed for more than a year after the alleged

infraction.  That Defendant raised this issue after a decision was made to terminate

Pinder could support an inference of pretext.  The Court thus finds that Pinder,

albeit barely, met her burden to show pretext.  See  Standard v. A.B.E.L. Servs.,

Inc., 161 F.3d 1318, 1333 (11th Cir. 1998) (quoting Combs v. Plantation Patterns,

106 F.3d 1519, 1538 (11th Cir. 1997)) (noting that, to rebut an employer's

legitimate, non-discriminatory reasons for its action, a plaintiff must demonstrate

"such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a

reasonable fact finder could find all of those reasons unworthy of credence").

Based on the record, Plaintiffs met their burdens to show a *prima facie* case of discrimination and to show evidence of pretext.  Upon *de novo* review of the objection to the Magistrate Judge's recommendation, the Court adopts the Magistrate Judge's conclusion that summary judgment as to Pinder's Title VII claim be denied.  Defendant's objection is overruled.

4.   *Pinder's § 1981 Claim*

Defendant next objects to the Magistrate Judge's recommendation that Defendant's Motion for Summary Judgment be denied as to Pinder's § 1981 discrimination claim, because the same analysis applies in § 1981 claims as in Title VII claims, and Defendant contends that Pinder did not carry her burden under Title VII.  The Court has found that Pinder provided sufficient facts to avoid summary judgment on Pinder's Title VII claim.

The elements required to establish a claim under § 1981 mirror those required for a Title VII claim.  See A.B.E.L. Servs., Inc., 161 F.3d at 1330 (noting that Title VII race discrimination claims and § 1981 race discrimination claims "have the same requirements of proof and use the same analytical framework").  The parties agree that Pinder's § 1981 claim should be analyzed in the same way as her Title VII claim.

For the same reasons Pinder has stated a valid Title VII claim, the Court

finds that Pinder has stated a valid § 1981 claim.  Upon *de novo* review of the

objection to the Magistrate Judge's recommendation, the Court adopts the

Magistrate Judge's conclusion that summary judgment as to Pinder's § 1981 claim

be denied.  Defendant's objection is overruled.

     5.    *Sigman's § 1981 Claim*

Defendant next objects to the Magistrate Judge's recommendation that

Defendant's Motion for Summary Judgment be denied as to Sigman's § 1981

claim, because (i) Dean Lynn made the decision to terminate Sigman before

Sigman allegedly engaged in any protected activity, (ii) there is no evidence in the

record to show any retaliation occurred because of Sigman's race, and (iii) Sigman

has not met his burden to show the reasons given for his termination were

pretextual.

"To establish a claim of retaliation under § 1981, a plaintiff must prove that

he engaged in statutorily protected activity, he suffered a materially adverse action,

and there was some causal relation between the two events." Goldsmith v. Bagby

Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008) (citing Burlington N. &

Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)).  Once the plaintiff has made out

the elements of his § 1981 claim, the burden shifts to the employer to offer a

legitimate, non-retaliatory reason for the adverse action.  Goldsmith, 513 F.3d at

1277.  If the employer is able to proffer a legitimate, non-retaliatory reason for the adverse employment action, "the plaintiff bears the ultimate burden of proving retaliation by a preponderance of the evidence and that the reason provided by the employer is a pretext for prohibited retaliatory conduct." Id.

Section 1981 encompasses claims of race-based retaliation.  See CBOCS West, Inc. v. Humphries, 553 U.S. 442, 446 (2008) ("The question before us is whether § 1981 encompasses retaliation claims.  We conclude that it does."); see also Bryant v. Jones, 575 F.3d 1281, 1301 (11th Cir. 2009) (recognizing a private right of action for retaliation under § 1981).  Section 1981 protects the rights of "[a]ll persons" to "make and enforce contracts, to sue, be parties, give evidence, and [enjoy] the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  42 U.S.C. § 1981(a).  A person may, therefore, bring an action under § 1981 if he complains about a race-based violation of another person's "contract-related right" and is retaliated against as a result of that complaint in a way that compromises his rights to make and enforce contracts.  CBOCS West, Inc., 553 U.S. at 446.

The student-university relationship is generally understood to be contractual by nature.  See Mangla v. Brown Univ., 135 F.3d 80, 80 (1st Cir. 1998); Morehouse Coll., Inc. v. McGaha, 627 S.E. 2d 39 (Ga. Ct. App. 2005) (affirming

judgment in favor of student against his university, on a breach of contract theory).

Competent and non-discriminatory grading has been found to be part of the

implied contract between student and school in § 1981 cases.  See Sanford v.

Howard University, 415 F. Supp. 23, 29 (D.D.C. 1976) ("Whenever a student is

found qualified and admitted to the University, a term of the student contract must

be implied to guarantee that student that grades, assignments, and educational

progress will not be tainted by any invidious discrimination based on race.").

To show the causal link element of a § 1981 claim, "a plaintiff merely has to

prove that the protected activity and the . . . [adverse] action are not completely

unrelated."  Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998).

Close temporal proximity between a protected activity and an adverse employment

action suggests a causal link between the two events.  See Higdon v. Jackson, 393

F.3d 1211, 1220 (11th Cir. 2004) ("A close temporal proximity between the

protected expression and an adverse action is sufficient circumstantial evidence of

a causal connection for purposes of a prima facie case.") (quotations omitted); see

also Brungart v. BellSouth Telecomm., Inc., 231 F.3d 791, 799 (11th Cir. 2000)

("The general rule is that close temporal proximity between the employee's

protected conduct and the adverse employment action is sufficient circumstantial

evidence to create a genuine issue of material fact of a causal connection.").

28

If an employer articulates legitimate, non-discriminatory reasons for the adverse employment action, the burden rests on the plaintiff to proffer "evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000). To survive a motion for summary judgment, the plaintiff must proffer evidence sufficient to create a genuine issue of material fact regarding whether the employer's articulated reason is pretextual. Id. at 1024-25. While suspicious timing is ordinarily not enough to demonstrate pretext, it, in "combination [with] other significant evidence of pretext, can be sufficient to survive summary judgment." Shackelford v. Deloitte & Touche, LLP, 190 F.3d 298, 409 (5th Cir. 1999).

Sigman's reporting of alleged discriminatory activity in the grading of white students' assignments could be construed as protected activity under § 1981, because Sigman was reporting on race-based discrimination related to white students' contractual rights with JMLS. Sigman claims he had a reasonable belief that the students were being discriminated against, based on his contention that multiple students complained to him that professor Butts inflated the grades of female and minority students.

29

The parties do not dispute that Sigman was subject to an adverse employment action, but there is a factual dispute whether this employment action could be causally related to the protected activity.  Sigman alleges that, on March 1, 2011, he reported his concerns about race-based discrimination with respect to white students' grades.  On March 2, 2011, Dean Lynn sent an email to Dr. Markovitz, communicating his intention not to renew Pinder and Sigman's contracts.  Plaintiffs contend that this close temporal proximity between the protected activity and the adverse employment decision is sufficient circumstantial evidence of a causal connection for purposes of a *prima facie* case.  Defendant argues that the decision to terminate Sigman was made in mid-February, weeks before the alleged protected activity occurred.  Dean Lynn testified that he had informed Dr. Markovitz of his final decision to terminate Plaintiffs no later than February 23, 2011.  The Magistrate Judge noted that Dean Lynn's March 2, 2011, email to Dr. Markovitz does appear to assume the fact of Pinder and Sigman's terminations.  A jury, however, could decide not to find Dean Lynn's testimony credible, and determine that Dean Lynn made the decision not to renew Sigman the day before the email—the day on which the protected activity occurred. Construing the evidence in the light most favorable to Plaintiffs, the Court finds that Sigman has proffered circumstantial evidence sufficient to support a causal

connection between the protected activity and the adverse employment action.

Defendant contends that, even if Sigman has made out a *prima facie* case, there is no evidence of pretext, because Sigman uses professor Burch as his comparator to show that JMLS's stated reason for his termination may not have been the true reason, and "the finding of pretext based upon the circumstances surrounding [professor] Burch is erroneous."  (Def.'s Obj. at 22.)

Burch is a valid comparator to Sigman for the same reasons she is a valid comparator to Pinder.  There is evidence in the record sufficient to find that Burch started her outside business venture without permission, and she incurred no adverse consequences for doing so.  Sigman's disparate treatment and the suspicious timing of his termination are sufficient to establish pretext.  See Shackelford, 190 F.3d at 409.

On the record here, Sigman, albeit thinly, met his burden to show a *prima facie* case of retaliation and to show evidence of pretext.  Upon *de novo* review of the objection to the Magistrate Judge's recommendation, the Court adopts the Magistrate Judge's conclusion that summary judgment as to Sigman's § 1981 claim be denied.  Defendant's objection is overruled.

6.    *Plaintiffs' Breach of Contract Claim*

Defendant next objects to the Magistrate Judge's recommendation that

summary judgment be denied as to Plaintiffs' breach of contract claims under Georgia law, because it contends that JMLS gave Plaintiffs adequate notice of their non-renewal.

Under Georgia law, a valid contract must include "parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate."  O.C.G.A. § 13-3-1.  Under Georgia law, the elements of a breach of contract claim are (i) a valid contract; (ii) material breach of its terms; and (iii) damages arising from the material breach.  See Budget Rent-A-Car of Atlanta, Inc. v. Webb, 469 S.E. 2d 712 (Ga. Ct. App. 1996).

The Magistrate Judge found that Plaintiffs did not present evidence to establish that Dean Lynn violated the terms of Plaintiffs' contract, as represented in the Handbook, when he made the decision not to renew their contracts rather than to terminate them for cause.  The Magistrate Judge further found that Plaintiffs did not adduce evidence to establish they were entitled to one year's notice as they contend, and not the six months' notice according to the Handbook's requirements. The parties did not object to these findings, and the Court finds no plain error in them.

The Magistrate Judge found that there is a genuine factual dispute as to

when Plaintiffs were actually terminated.  Plaintiffs were paid through September 2, 2011, which is six months from the date they were notified of their non-renewal. Plaintiffs contend, however, that their termination date was July 31, 2011, the last date of their employment contracts.  On July 31, 2011, Plaintiffs were required to vacate their offices, return their keys and JMLS credentials, and were not permitted to return to JMLS after that date.  Plaintiffs also presented evidence that Sigman had been offered the opportunity to teach JMLS's summer 2011 session, and that Dean Lynn informed him on March 3, 2011, that he would no longer be allowed to teach the summer session.  The summer session would have ended before July 31, 2011.

The parties agree that Plaintiffs were JMLS faculty for three years or more. According to the Handbook, for faculty members who have been with JMLS for three years or longer, notice of non-renewal is to be given "at least six months prior to the termination date."  (Pl.'s Ex. 1, § 405(c)(3)(iii).)

Defendant argues that the Handbook differentiates between the "expiration of the appointment" and the "termination date" of an employee.  (Def.'s Obj. at 24.)  At the time the non-renewal decision was made, Plaintiffs did not immediately stop teaching.  In fact, Dean Lynn recognized that Plaintiffs would "finish out their courses professionally[.]"  (Pl. Ex. 164)  A jury could find

evidence sufficient to support a finding that July 31, 2011, was the date that their contracts were terminated.  On that date, Plaintiffs returned their keys and credentials, and they permanently left JMLS.  If July 31, 2011, is found to be the Plaintiffs' termination date, then Defendant breached the terms of the Handbook. Plaintiffs have proffered evidence of their alleged damage, including that their new jobs do not pay them at the same level JMLS did, and they are not on tenure track at these new jobs.

The Defendant has not proffered evidence to show that September 2, 2011, was the Plaintiffs' actual termination date.  Defendant argues, without explanation, that the Handbook distinguishes between "termination" and "expiration," but it does not explain how this distinction affects the interpretation of the "termination date" with respect to Plaintiffs' employment contracts.  The Defendant simply presents this semantic difference and argues, without explanation or justification, that the proper termination date for the Plaintiffs is the date on which they were last paid.  The Defendant's argument is not sufficient to resolve the factual dispute related to the Plaintiffs' contracts.

Upon *de novo* review of the objection to the Magistrate Judge's recommendation, the Court adopts the Magistrate Judge's conclusion that summary judgment as to Plaintiffs' breach of contract claim be denied.

Defendant's objection is overruled.

       7.   *Plaintiffs' Bad Faith Claim*

Defendant finally objects to the Magistrate Judge's recommendation that summary judgment be denied as to Plaintiffs' bad faith claim, because the Magistrate Judge erroneously recommended that Defendant's Motion for Summary Judgment be denied regarding the breach of contract claim.

Under Georgia law, claims for bad faith are permitted as follows:

> The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense, the jury may allow them.

O.C.G.A. § 13-6-11.  Based on the reasons in this Order, Defendant's Motion for Summary Judgment is required to be denied as to several of Plaintiffs' claims. Defendant's Motion thus also is denied, therefore, as to Plaintiffs' claim of bad faith.[5]

In reaching its decision to deny summary judgment on the claims discussed, the Court advises it was a difficult and close decision to allow these claims to proceed.  The claims and the factual content supporting them are just sufficient to

---

[5] Defendant argues summary judgment should be entered on the bad faith claim because summary judgment should be entered on Plaintiffs' other claims. Defendant does not offer an individual basis for summary judgment on the bad faith claim, electing instead to rely on a boot-strap argument.

survive.  They were allowed largely because of the conflicting and inconsistent testimony, and other evidence offered by the Defendant.  In the end, while the claims are nominally viable, they ultimately will have to be evaluated by a jury.

## III.   CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Magistrate Judge Justin S. Anand's Non-Final Report and Recommendation [79] is **ADOPTED**, and Defendant John Marshall Law School, LLC's Objections [82] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [57] is **GRANTED IN PART** and **DENIED IN PART**.  Defendant's Motion is **GRANTED** on all claims against Defendant John Marshall Law School.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [57] is **GRANTED** on Plaintiff Sigman's Title VII retaliation claim.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [57] is **DENIED** on the Plaintiffs' remaining claims.

**IT IS FURTHER ORDERED** that the Plaintiffs' Motion to File a Substitute Response, and a Substitute Statement of Material Facts [81] is **DENIED AS MOOT**.

**SO ORDERED** this 31st day of March, 2014.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE